FILED

OCT 16 2000

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| SOUTH DAKOTA FARM BUREAU, INC.; SOUTH DAKOTA SHEEP GROWERS ASSOCIATION, INC.; HAVERHALS FEEDLOT, INC.; SJOVALL FEEDYARD, INC.; FRANK D. BROST; DONALD TESCH; WILLIAM A. AESCHLIMANN; SPEAR H. RANCH, INC.; MARSTON HOLBEN; MARSTON AND MARIAN HOLBEN FAMILY TRUST; MONTANA-DAKOTA UTILITIES CO.; NORTHWESTERN PUBLIC SERVICE; and OTTER TAIL POWER COMPANY, Plaintiffs, v. JOYCE HAZELTINE, in her official capacity as Secretary of State of South Dakota, and MARK W. BARNETT, in his official capacity as Attorney General of South Dakota, Defendants, and DAKOTA RURAL ACTION and SOUTH DAKOTA RESOURCES COALITION, Defendant-Intervenors. | Civ. No. 99-3018 CBK<br><br><br><br>BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT |

In support of Defendants Hazeltine and Barnett's Motion for Partial Summary Judgment (hereinafter referred to as "Defendants"), Defendants submit the following arguments and authorities. Consistent with the First Amended Complaint (Doc. 96) (hereinafter "Amended Complaint") in this action, Defendants will refer to the provisions of the South Dakota

Constitution Article XVII, Sections 21 through 24 inclusive, as "Amendment E."

A. <u>Standard of Review</u>.

   1. <u>Summary Judgment Standard</u>.

Under Rule 56(c) of the Federal Rules of Civil Procedure, a moving party is entitled to summary judgment if the party can show that there is no material fact at issue and that the party is entitled to judgment as a matter of law. In determining whether summary judgment should issue, the facts and inferences from those facts are viewed in a light most favorable to the nonmoving party. The burden is on the moving party. F.R.C.P. 56(c). Summary judgement is not a "disfavored procedural shortcut"; rather, it is "an integral part of the Federal Rules . . . designed to 'secure just, speedy, and inexpensive determination of every action.'" <u>Schlimgen v. Rapid City</u>, 83 F. Supp. 2d 1061, 1065-66 (D.S.D. 2000) (citation omitted).

   2. <u>The Intent Underlying a Constitutional Amendment Must Be Examined</u>.

Federal courts look to the rules of statutory construction of the involved state when faced with the construction of legislation. <u>K-S Pharmacies, Inc. v. American Homes Products Corp.</u>, 962 F.2d 728, 730 (7th Cir. 1992); <u>Causeway Medical Suite v. Ieyoub</u>, 109 F.3d 1096, 1107 (5th Cir. 1997). The same deference is undoubtedly applicable here where construction of state constitutional provisions are involved.

In construing state constitutional provisions, the South Dakota Supreme Court is "compelled to look to the history of that

2

constitutional provision to ascertain [its] true intent and meaning." State ex rel. McGee v. Gardner, 54 N.W. 606 (S.D. 1893); City of Sioux Falls v. Sioux Falls Firefighters, 234 N.W.2d 35, 37 (S.D. 1975). Further, courts are to "look to the history of the times and examine the state of things existing when the constitution was framed and adopted, in order to ascertain the prior law, the mischief, and the remedy." City of Sioux Falls, 234 N.W.2d at 37.

This analysis applies to "new" constitutional provisions as well as those provisions originally adopted in the South Dakota Constitution. In Poppen v. Walker, 520 N.W.2d 238 (S.D. 1994), the state supreme court considered the meaning of state constitutional provisions concerning video lottery, adopted in the 1980s. The court explained that "the object of construing a constitution is to give effect to the intent of the framers of the organic law and of the people adopting it." Poppen, 520 N.W.2d at 242. After holding that the term "lottery" was ambiguous, the court examined the history of lottery regulation, policy statements in previous legislation, previous proposed constitutional amendments, the circumstances under which the provision was formed, the sprit of the times, and the prevailing sentiment of the people. Id.

B. The Claims Brought by the Utility Plaintiffs Based Upon Deregulation of the Electric Industry Are Not Ripe for Judicial Review.

The Utility Plaintiffs assert, in the First Amended Complaint (Doc. 96), that "If Congress or the South Dakota legislature mandates industry restructuring, Amendment E will

3

significantly impair the process of restructuring and raise costs." Amended Complaint ¶ 110. The Utility Plaintiffs assert that they will be adversely affected by Amendment E because, in a "mandated restructuring environment," a sale of the Big Stone Plant will require the new owners to sell or hold idle the land currently owned and held by Big Stone Plant for future development (Amended Complaint ¶ 110(i)), and a sale or spin-off of transmission assets will require the new owners to covert all existing transmission easements to fee ownership and close all transmission corridors to farming. Amended Complaint ¶ 110(ii).

Without conceding that deregulation will in any way be impacted by Amendment E, Defendants respectfully submit that this deregulation issue is not yet ripe for judicial determination.

The ripeness doctrine is designed to prevent the courts, by avoiding premature adjudications, from entangling themselves in abstract disagreements. <u>Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission</u>, 461 U.S. 190, 200 (1983). Even if the court should have jurisdiction to decide the constitutionality of the law, it should decline to handle issues that are "so premature that the court would have to speculate as to the presence of a real injury." <u>The Meadows of West Memphis v. City of West Memphis</u>, 800 F.2d 212, 214 (8th Cir. 1986). In addition, the doctrine of ripeness includes "certain self-imposed judicial policies which caution against exercising the full power of the courts when it is not necessary to do so." <u>Id.</u>

The question of ripeness turns upon the fitness of the issue for judicial determination and the hardship placed upon the parties by the courts withholding consideration. Pacific Gas & Electric Co., 461 U.S. at 200.

> In order to establish that their case is ripe for judicial review, plaintiffs must meet two requirements. First, they must show a sufficiently concrete "case or controversy" as that phrase is used in Article III of the Constitution. Second, assuming that Article III is satisfied, they must also show that prudential considerations justify the present exercise of judicial power.

Bob's Home Service, Inc. v. Warren County, 755 F.2d 625, 627 (8th Cir. 1985). In order to meet the live case or controversy requirement, the court in Bob's Home Service required that the plaintiff show that it was suffering an immediate injury because of the referendum involved in that case. Id.

The constitutionality of a statute should not be decided until the actual factual setting exists which makes such a decision necessary. Hodel v. Virginia Surface Mining & Reclamation Association, 452 U.S. 264, 294-95 (1981). The ripeness doctrine ensures that only actual deprivations of federal rights can be the basis of a 1983 relief. Wilson v. Robinson, 668 F.2d 380, 384 (8th Cir. 1981).

Clearly, the issue raised in the Amended Complaint ¶ 110, fails the ripeness tests of both Pacific Gas & Electric Co. and Bob's Home Service, Inc. This claim should not be heard because the electric industry has not been deregulated. Based on the Amended Complaint itself, it is apparent that the deregulation issue is speculative. As stated by the Big Stone Partners, Congress "continues to consider" federal legislation in this

area. Amended Complaint ¶ 110. Further, the Amended Complaint asserts that "if" the legislature enacts deregulation legislation, the utilities will be forced to react. Amended Complaint ¶ 111. Clearly, the Amended Complaint addresses only a possibility or potential of deregulation. The actual factual setting of deregulation, how it will work, and what it will require the Utility Plaintiffs to do, are not established.

The Utility Plaintiffs, at deposition, admitted the deregulation method which will be followed is unknown. Defendants' Statement of Material Facts ¶¶ 1-9 (hereinafter "SMF"). Congress has been considering deregulation issues for several years and is unlikely to act this session. SMF ¶ 1. Likewise, South Dakota has not acted. SMF ¶ 2.

Yet, Plaintiff Utility's Amended Complaint not only assumes that deregulation will occur, it further assumes that a specific type of deregulation will occur. The Amended Complaint asserts that the utilities will be required to divest portions of their company operations. They claim that deregulation may require them to sell or "spin off" either their generation or transmission assets, thereby positioning them solely as distribution companies. Amended Complaint ¶ 111.

However, deregulation of the electric industry could occur in different ways. SMF ¶¶ 4-5. One method of change would be for each company to separate utility operations by function (generation, transmission, and distribution) and establish separate divisions within the existing companies. SMF ¶ 4. Another method would be to completely separate these major

6

components (generation, transmission, and distribution) by requiring that companies divest assets. SMF ¶ 5.

Neither the state nor the federal government has required electric utilities to divest or "spin off" any assets. SMF ¶ 6.

The Federal Energy Regulatory Commission (FERC) has taken some limited action. It issued an order requiring that utilities file wholesale transmission rates. SMF ¶ 9. This order, FERC Order No. 888, did not go so far as to require utilities to spin off assets. SMF ¶ 11.

Also, FERC has started to require that electric utilities participate in a regional transmission organization (RTO) or an independent system operator (ISO). These entities would run the transmission network still owned by the individual utilities. SMF ¶ 9. An ISO is an entity that controls, but does not own, the transmission facilities serving a particular geographic area. The ISO concept is a means to separate transmission ownership by electric utilities from transmission control by a network.

According to a vice president for Northwestern Public Service Company, FERC is attempting to ensure that the various components of transmission operations are separately accounted for. Leyendecker Deposition at 11. Thus, FERC is advocating an accounting or functional separation of transmission services to make electric services more competitive for consumers. However, there are no requirements in existence that would require any of the Utility Plaintiffs to actually sell (or in utility nomenclature, "spin off") their assets.

7

Moreover, even if deregulation occurs in a way that would require electric utilities to divest assets, it is not at all clear which assets the Plaintiff Utilities would "spin off" and which they would keep. At present, the Montana-Dakota Utilities' deregulation strategy is to study the issue and does not contemplate selling assets. SMF ¶¶ 10, 11. Northwestern's 2000 Strategic Plan is equally general. Id. The Otter Tail Ten Year Plan does not mention this issue at all. Id. In sum, the regulatory status is uncertain, and the utilities' plans for competition are even more uncertain. A determination on this issue is not warranted at the present time.

C. The Equal Protection Claims Presented by Plaintiffs Have Already Been Determined by the Eighth Circuit.

Count III of the Amended Complaint alleges that Amendment E deprives Plaintiffs of the equal protection of the law in violation of the Fourteenth Amendment to the United States Constitution. Amended Complaint ¶ 31. This motion addresses only the evidence and legal argument associated with the Defendants' assertion that MSM Farms is controlling on this issue. Should the Court determine that MSM Farms is not controlling on this equal protection count, Defendants reserve the right to present additional evidence, authority, and argument demonstrating that Amendment E does not violate the equal protection clause of the United States Constitution.

An identical argument was raised in MSM Farms, Inc. v. Spire, 927 F.2d 330, cert. denied, 502 U.S. 814 (8th Cir. 1991) concerning Article XII, Section 8 of the Nebraska Constitution. Article XII, Section 8 of the Nebraska Constitution was adopted

8

through Nebraska's initiative process. <u>MSM Farms</u>, 927 F.2d at 331. "The objective of the initiative was to prohibit nonfamily farm corporations from owning and operating Nebraska farm and ranch land." <u>Ibid.</u>

Amendment E is substantially similar to Article XII, Section 8 of the Nebraska Constitution, attached hereto as Exhibit A. The major differences between Amendment E and the Nebraska constitutional amendment are:

- (a) Amendment E includes an exemption for certain cooperatives, which the Nebraska provisions do not include.

- (b) Amendment E allows an exemption for corporations and syndicates in which a majority of the ownership is held by members of a family. The Nebraska provision also exempts corporations in which a majority of the ownership is held by family members. The Nebraska provision also exempts limited partnerships in which all the ownership interests are owned by members of a family.

- (c) Amendment E prohibits livestock produced "under contract" for a corporation or syndicate, but also provides a "grandfather clause" for livestock owned by a corporation or syndicate and produced under a contract. The Nebraska provision does not address this issue.

- (d) The Nebraska provision contains an exemption for poultry which is not included in Amendment E.

- (e) The time periods for divestiture are somewhat different.

For the Nebraska version, the Eighth Circuit determined that "voters reasonably could have believed that by enacting the initiative in question they would be promoting family farm operations by preventing nonfamily corporate ownership of farmland." <u>MSM Farms</u>, 927 F.2d at 333. The court stated:

> It is up to the people of the State of Nebraska, not the courts, to weigh the evidence and decide on the

9

> wisdom and utility of measures adopted through the initiative and referendum process. See [Minnesota v.] Cloverleaf Creamery, 449 U.S. [456], 469, 101 S.Ct. [715], 726 [1981]. Whether in fact the law will meet its objectives is not the question: the equal protection clause is satisfied if the people of Nebraska could rationally have decided that prohibiting non-family farm corporations might protect an agriculture where families own and work the land. Id. at 466, 101 S.Ct. at 725 . . .

MSM Farms, 927 F.2d at 333 (emphasis in original). The Nebraska anticorporate farming constitutional provisions were thus held to be consistent with the equal protection clause.

In reaching its decision and determining that a legitimate state purpose existed for the Nebraska measure, the Eighth Circuit looked at: the purpose behind similar laws of other states (MSM Farms, 927 F.2d at 332); the contentions and asserted purpose of supporters of the initiative (MSM Farms, 927 F.2d at 332, 333); reports prepared by Agricultural Extension Services (MSM Farms, 927 F.2d at 333); and the language of the initiative petition itself. A similar review with regard to Amendment E, discussed below, supports the analysis that the purpose of Amendment E was the same as Nebraska's anticorporate farming constitutional provisions.

   1.   Other States' Laws.

Kansas and North Dakota have prohibited the corporate ownership of agricultural land since the 1930s. Kan. Stat. Ann. 17-5904; N.D. Cent. Code 10-06-01. Other states have also adopted anticorporate farming laws, prohibiting both agricultural land ownership and the conduct of farm operations by corporations and similar entities. Iowa Code 172C.4; Minn. Stat. Ann. 500.24(a)(c); Mo. Ann. Stat. 350.015; Wis. Stat. Ann.

182.001(1)(a). The North Dakota Supreme Court described the origin and purpose of North Dakota's provision as follows:

> It is a matter of common knowledge that North Dakota is an agricultural state. Its principal industry is that of farming. It is also common knowledge that prior to the enactment of the Corporate Farming law there were corporations in existence which were organized and operated for the purpose of engaging in the business of farming and agriculture. These corporations farmed huge tracts of land in this State in competition with individual farmers. It must be presumed that the people of the State, before enacting the Corporate Farming Law by initiated measure in 1932, and the legislators, when they amended the law in 1933, informed themselves and determined that to prohibit corporate farming as a business, except for qualified co-operatives, was necessary to protect the economy of the State and the welfare of its citizens.

Coal Harbor Stock Farm v. Meier, 191 N.W.2d 583, 591 (N.D. 1971). The Eighth Circuit recognized the purpose of Minnesota's provision in MSM Farms: "to encourage and protect the family farm as a basic economic unit, to insure it as the most socially desirable mode of agricultural production, and to enhance and promote the stability and well-being of rural society . . . and the nuclear family." MSM Farms, 927 F.2d at 332 (quoting Minn. Stat. 500.24(1)). The purpose of Nebraska's provision is discussed supra.

    2.    Asserted Purpose of Proponents of Amendment E.

Amendment E was proposed by Dakota Rural Action, South Dakota Resources Coalition, South Dakota Farmers Union, and various individuals. SMF ¶ 12. Ms. Nancy Thompson, an attorney, was a co-author of the amendment. SMF ¶ 13. Much of the initial draft of Amendment E was taken from Nebraska law. SMF ¶ 14. Ms. Thompson looked at South Dakota's Family Farm Act, SDCL

ch. 47-9A; the proponents believed this law was not adequate to restrict nonfamily farm corporations and syndicates. SMF ¶ 15.

The purpose of Amendment E is to prevent nonfamily farmers from engaging in production of agricultural products by restricting the use of certain business structures that are made up of nonfamily farmers or which do not qualify as a family farm entity. SMF ¶ 16. One of the results of incorporation or the use of limited liability syndicates is the accumulation of capital and, therefore, expansion. The size of operations as a result of that incorporation or syndication has been shown to produce social, environmental, and economic consequences that are adverse to rural communities. SMF ¶ 17.

Dakota Rural Action's purpose in proposing Amendment E was to reverse the trend toward concentration in agriculture and the commensurate elimination of the family farmer. SMF ¶ 12. Nonfamily, corporate poultry production has virtually eliminated the family poultry producer. SMF ¶ 19. Dakota Rural Action organized a series of meetings concerning the concentration of farming in South Dakota after the 1997 Legislative Session. SMF ¶ 20. These meetings were concerned about the "economic, environmental and social ramifications of agriculture coming under the control of non-family farm corporations." SMF ¶ 20. The persons involved in these meetings "decided to target the structure and ownership of agriculture in South Dakota" through Amendment E. SMF ¶ 20.

South Dakota Resources Coalition was also involved in the drafting and passage of Amendment E. South Dakota Resources

12

Coalition was concerned about the environmental devastation caused by large, concentrated livestock operations, often referred to as "factory farms." SMF ¶ 21.

In addition, the South Dakota Farmers Union was involved in the drafting and passage of Amendment E. The Farmers Union asserts that the purpose of Amendment E is to support the family farm way of life, which is threatened by increasing corporate ownership or agricultural production facilities. Amendment E was a response to the social and environmental costs of agricultural production performed by corporations whose owners and shareholders are not personally liable or responsible for the land they use. It was also designed to limit vertical integration of the livestock industry in South Dakota. SMF ¶ 22.

Thus, similar to the purposes of the proponents of Nebraska's anticorporate farming constitutional amendment, the proponents of Amendment E contend that it is to address social, economic, and environmental evils related to corporate farming.

3. <u>Reports</u>.

The <u>MSM Farms</u> court reviewed several reports written by the Agricultural Extension Service in support of its findings as to the purpose of the Nebraska anticorporate farming constitutional amendment. Dr. Linda Lobao, an expert sociologist appearing on behalf of Defendants Hazeltine and Barnett in this case, reviewed the literature concerning corporate[1] farming. SMF ¶ 29. Her

---

[1] Dr. Lobao refers to "industrialized farming" rather than "corporate farming." She uses the term to mean a nonhousehold-based farm production unit, with absentee ownership and control over production factors (SMF ¶ 27), as is, inter alia, a
(continued...)

13

summary of the studies that have been performed by governmental and academic entities indicates that the following conclusions can be reached: Public concern about the consequences of nonfamily owned and operated, industrialized farms for communities dates back to the 1920s. SMF ¶ 26. The extent to which large-scale, industrialized farms adversely affect the communities in which they are located has been investigated by government and academic researchers since the 1930s. SMF ¶ 28. Empirical sociological evidence accumulated over the years shows a repeated trend that large-scale, industrialized farms have adverse impacts on a number of different indicators of community well-being. Consequences of industrialized farming include detrimental impacts on socioeconomic well-being, disruption of the social fabric of communities, environmental threats where livestock production is concentrated, and creation of a new pattern of "haves and have nots" in terms of agricultural production, whereby some communities gain large, industrialized farms (and attendant social problems) and others lose their farming base as production becomes concentrated elsewhere. SMF ¶ 29. Public concern about the detrimental community impacts of industrialized farming is warranted in Dr. Lobao's expert opinion. SMF ¶ 30.

---

(...continued)

nonfamily farm corporation or syndicate. Along with scale (size), legal status as a corporation or syndicate is an organizational variable measured and investigated by social scientists when they research "industrialized farming." Ibid.

Thus, as in <u>MSM Farms</u>, academic and governmental research has found support for the concern that corporate farming and ownership of farmland are leading to the demise of the family farm.

4. <u>Language of Initiative Petition and Pro/Con Statement for Amendment E</u>.

In <u>MSM Farms</u>, the court looked at the Initiative Petition itself. Here, the initiative petition, attached as Exhibit B, contains the language appearing in Amendment E. Its purpose is readily apparent from the language it uses: It prohibits corporate and syndicate forms of businesses from farming or owning farmland. Section 21. It also exempts a number of such businesses from its restriction, especially if the businesses are owned by family farmers. Section 22. Its purpose is clearly to promote family farm operations by preventing nonfamily corporate and syndicate farming.

In addition, it should be noted that state law requires the Secretary of State to provide information to the public regarding constitutional amendments. SDCL 12-13-23. Accordingly, a "Pro-Con Statement" with regard to Amendment E was proposed and published. SMF ¶¶ 23, 24, 25. In <u>SDDS, Inc. v. State of South Dakota</u>, 47 F.3d 263, 268 (8th Cir. 1995), the Eighth Circuit held that the Pro-Con Statement was "legislative history" of an initiated measure.[2] Here, the Pro Statement states in part:

> [L]arge non-family farm corporations increasingly threaten our traditional rural way of life.

---

[2] The Eighth Circuit recognized that the document, as in this situation, was drafted by individual citizens and not developed by the State itself.

> Constitutional Amendment E gives South Dakota voters the opportunity to decide whether control of our state's agriculture should remain in the hands of family farmers and ranchers or fall into the grasp of a few, large corporations.
>
> Constitutional Amendment E is a logical extension of South Dakota's 1974 Family Farm Act and the 1988 amendment prohibiting non-family farm corporation ownership of pork production facilities. The amendment is almost identical to popular and successful constitutional provisions approved by voters in our neighboring state of Nebraska more than 15 years ago. . . .
>
> Constitutional Amendment E expands and strengthens our anti-corporate farming statutes with an additional prohibition of non-family farm, corporate ownership of livestock. . . .
>
> Passage of Constitutional Amendment E will reaffirm South Dakota's commitment to family agriculture. More importantly, it will prevent large, non-family farm corporations from using unfair, anti-competitive advantages to turn independent family farmers and ranchers into a new generation of sharecroppers.

SMF ¶ 25; Mot. Exh. H, Attachment 1.

This language thus supports the analysis that Amendment E, like Nebraska's anticorporate farming constitutional amendment, was to "retain and promote family farm operations" in South Dakota, and control the threat from unrestricted corporate ownership of South Dakota farmland by preventing the concentration of farmland in the hands of nonfamily corporations.

Amendment E, in language and purpose, is strongly similar to Nebraska's anticorporate farming constitutional provisions. The Eighth Circuit found that Nebraska's provisions do not violate the equal protection clause. MSM Farms, 927 F.2d at 334. This decision is controlling with regard to Amendment E in light of the substantial similarity between Amendment E and the Nebraska

16

provision at issue in <u>MSM Farms</u>. As a result, Defendants respectfully request that this Court grant partial summary judgment on this count in favor of Defendants.

Dated this 16th day of October, 2000.

MARK BARNETT
ATTORNEY GENERAL

*[signature: Roxanne Giedd]*

Roxanne Giedd
Assistant Attorney General

Diane Best
Assistant Attorney General

500 E. Capitol Avenue
Pierre, South Dakota 57501-5070
Telephone: (605) 773-3215

usdc104.rg(dh)