FILED

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

NOV 0 8 2000

CLERK

0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0

CIV. 99-3018

SOUTH DAKOTA FARM BUREAU, INC.;    :
SOUTH DAKOTA SHEEP GROWERS
ASSOCIATION, INC.; HAVERHALS       :
FEEDLOT, INC.; SJOVALL FEEDYARD,
INC.; FRANK D. BROST; DONALD       :
TESCH, WILLIAM A. AESCHLIMANN;
SPEAR H RANCH, INC.; MARSTON       :
HOLBEN; MARSTON AND MARION
HOLBEN FAMILY TRUST; MONTANA-      :
DAKOTA UTILITIES CO.; NORTH-
WESTERN PUBLIC SERVICE; and        :
OTTER TAIL POWER COMPANY,

                                   :

        Plaintiffs,

                                   :

vs.

                                   :

JOYCE HAZELTINE, in her official
capacity as Secretary of State of South    :
Dakota and MARK W. BARNETT, in his
official capacity as Attorney General of   :
South Dakota,

                                   :

        Defendants,

                                   :

and

                                   :

DAKOTA RURAL ACTION and SOUTH
DAKOTA RESOURCES COALITION,        :

        Defendant-Intervenors.     :

PLAINTIFFS' OPPOSITION TO
DEFENDANT-INTERVENORS'
MOTIONS FOR PARTIAL
SUMMARY JUDGMENT
REGARDING FORWARD
CONTRACTING AND
GRANDFATHER CLAUSE

0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0

- 2 -

Pursuant to Federal Rule of Civil Procedure 56, Local Rule 56.1, and this Court's Standard Operating Procedures, Plaintiffs submit this Opposition to Defendant-Intervenors' ("Intervenors") Motions For Partial Summary Judgment.  This Opposition Memorandum, along with the Opposition Statement of Material Facts and documentary evidence, is submitted in resistance to Intervenors' Motions.  For the reasons set forth below, Intervenors as the moving party have not satisfied their burden under Rule 56 and Local Rule 56.1, and this Court should deny their motions.  There are numerous disputed issues of material fact that can only be resolved at trial, where the Intervenors' purported evidence can be subjected to proper scrutiny.

## I.     BACKGROUND

The background for understanding the intent of, and significant damage created by, South Dakota constitutional Article XVII, §§21-24 (hereinafter Amendment E) starts with the State's regulatory structure regarding "corporate" farming before the amendment was adopted.  Before Amendment E, the State regulated corporate and syndicate participation in South Dakota agriculture through a comprehensive statutory scheme known as the Family Farm Act of 1974 ("Family Farm Act").  See S.D.C.L. §47-49A, et. seq.  To understand the impact of Amendment E, the Amendment must be compared to the Family Farm Act's regulatory structure.[1]  Collectively, Amendment E's regulatory

---

[1] Contrary to the Intervenors' position, the relevant comparison is between the Family Farm Act and Amendment E—not between Amendment E and the law of Nebraska.

- 3 -

scheme is "more stringent that the Family Farm Act. <u>See</u> Thompson Dep. at 65:17-25;
66:22-25.

For present purposes, there were several significant regulatory changes:
(1) Although the Family Farm Act only banned corporate ownership of <u>farmland,</u>
Amendment E also bans corporate ownership or farming regarding <u>livestock</u>. <u>Compare</u>
*§*21 to S.D.C.L. *§*47-9A-1 ("agricultural land to be used in the business of agriculture");
(2) Amendment E's regulatory scheme has, under section 22(1), a narrower exemption
for the corporate "family farm" than did the Family Farm Act. <u>Compare</u> *§*22(1) to
S.D.C.L. *§*47-9A-14; (3) Enforcement under the Family Farm Act, as with almost every
other regulatory scheme under South Dakota law, rested with the State Attorney
General's Office. <u>See</u> S.D.C.L. *§*47-9A-21. Amendment E's regulatory scheme provides
for significantly more aggressive enforcement by establishing, in section 24, a "citizen
standing" provision. While enforcement under the Family Farm Act was channeled
through the experience and professionalism of the State's chief legal office, Amendment
E's enforcement scheme permits any disgruntled person to institute a civil action against
a farmer or rancher.

There are other differences, but these are for Plaintiffs' present purposes, the core
background facts for their claims under the Dormant Commerce Clause doctrine, the
Equal Protection doctrine and the Due Process doctrine. All of the Plaintiffs are involved,

- 4 -

in various capacities, in the <u>livestock</u> producing aspects of South Dakota agriculture (not

crop production).  All of the Plaintiffs are subject to, and threatened by, the aggressive

enforcement provisions of Amendment E, including the narrow family farm exemption.

Another aspect of the background for this case, and this motion, is that the

proponents of Amendment E intended that it would favor certain South  Dakota livestock

producers and protect them against "competition."  Long after this lawsuit was started,

and after her April deposition, the primary drafter of Amendment E, Nancy Thompson,

wrote in a publication for Intervenor Dakota Rural Action ("DRA"):

South Dakota's first anti-corporate farming law, adopted by the legislature in the 1970s
was inadequate.  It didn't stop non-family farm entities from unfairly competing against
family farmers.  Its definitions were vague and it was interpreted by state officials so that
even the largest corporations in the country were free to own farmland and live stock in
the state . . . .

<u>See</u>, Nancy L. Thompson, "Crop and Livestock Production Under Amendment E" (May,

2000).  With full knowledge that the purpose of Amendment E was a contested issue in

the case, Intervenor DRA publicly announced the underlying anti-competitive purpose of

the Amendment.

The record is replete with similar concessions of constitutionally suspect purpose.

In her April 6 deposition, for example, Thompson stated:

"Well, the purpose of Amendment E is to prevent non-family farmers from
engaging in production . . . .  So I would say that an outgrowth of this
Amendment E is to make sure that the benefits of incorporation inure only
to family farmers."

- 5 -

Thompson Dep. at 72:4-19.

In the April deposition, counsel for Plaintiffs (Mr. Simko) returned to the topic of Amendment E's purpose:

> Q.    (Mr. Simko) But the purpose is to keep non-family farm corporations or syndicates as they are defined in Amendment E out of the production phase?
>
> A.    (Ms. Thompson) Yes.

Thompson Dep. at 92:2-5.

In sum, Amendment E imposed a much stricter regulatory scheme on participants in South Dakota agriculture, such as the Plaintiffs. This stricter scheme was designed to favor certain South Dakota livestock producers and to protect certain South Dakota farmers from the competitive forces of interstate commerce.

## II.    INTRODUCTION

This Memorandum opposes Intervenors' attempt to impose unjustifiably expansive interpretations on sections 22(5) and 22(15) of Amendment E. This is what the Intervenors call the "forward contracting" and "grandfather clause" issues.

## III.    STATEMENT OF THE FACTS

Plaintiffs will outline here the factual setting of this case. For present purposes, this factual description is intended to demonstrate that there are many disputed issues of material fact that cannot be resolved at summary judgment.

- 6 -

## A.    An Overview.

In 1997, various special interest groups in South Dakota politics, including the Intervenors, were dissatisfied with the Family Farm Act and other regulatory provisions governing South Dakota agriculture.  These groups, led by Intervenors, formed a coalition to pursue new restrictions on South Dakota agriculture, particularly hog production by out-of-state producers.  The original focus of this coalition was reflected in the title they gave to their meetings: "The Hog Meeting."  Although the Hog Meeting eventually adopted a different name, the coalition's initial, self-selected label regarding "hogs" is an accurate description of its intent and purpose.  Amendment E started out as an effort to restrict the interstate commerce of hog production and marketing.

After some initial meetings, the Hog Meeting group decided to pursue, a state constitutional amendment through the initiative process.  As both Intervenors and the State repeatedly assert, this strategic approach was eventually successful and the voters adopted Amendment E in November of 1998.  What Intervenors do not talk about are two of the factual consequences of the Hog Meeting's choice of strategies.  These are, however, constitutionally significant facts.  First, by choosing to pursue the initiative process, the Hog Meeting group bypassed the normal legislative political process.  As a consequence of using the initiative process, the Hog Meeting group's proposal (i.e., Amendment E) was not subject to the normal give-and-take of the South Dakota political

- 7 -

process; Amendment E's structure was never subjected to the normal moderating influences of the political process.

The Hog Meeting group's choice to pursue a constitutional amendment rather than a statute also created certain factual consequences. By placing Amendment E's dramatically more rigid regulatory structure into the South Dakota constitution, the Intervenor-led Hog Meeting group effectively foreclosed any chance that those who disagreed with Amendment E had to reform or remedy the situation. As a consequence of the Hog meeting's strategic choices, many family farmers—like the Plaintiffs—were foreclosed from any normal political recourse.

**B.    The Facts Regarding the "Mechanics" of Amendment E.**

The Hog Meeting group eventually concluded that, having decided on the constitutional-amendment-through-initiative goal, a smaller committee would facilitate the preparation of the text of the proposed amendment. Time was of the essence because of the deadline to submit the initiated amendment for the 1998 ballot was November, 1997, and because the text had to be set before the work of securing initiative petitions could start.

**1.    The Drafting Committee: "Not by any stretch of the imagination."**

To address the task of drafting the proposed amendment, the Hog Meeting group appointed five people to a Drafting Committee (hereinafter Committee). All five were volunteers. They were: John Bixler, Jay Davis, Luann Napton, Rene Morog and Brian

- 8 -

Jennings.  <u>See</u> Exhibit 3028, at 4.  Ironically, only Morog actually lived on a farm—and

her views were "dismissed" by the other Committee members.  <u>See</u> Thompson Dep. at

35:2-15; 51:14-25; 52:1-2.

The Committee tasked to design a comprehensive regulatory scheme for South

Dakota agriculture was dominated by non-farmers.  As Napton testified at her deposition:

> Q.    You don't by any chance live on a farm, do you?
> A.    No.
> Q.    You aren't by any chance—you wouldn't be a family farm
>       corporation by Amendment E?
> A.    Not by any stretch of the imagination.  I have never farmed in my
>       life.

Napton Dep. at  43:23-25; 44:1-3.  Proceeding without first-hand knowledge of farming,

the Committee did not employ any economists or other experts—because it did not have

much time.

**2.    The Drafting Process: March 24, 1997 to April 21, 1997.**

The five-person Committee first met on March 25, 1997.  On April 1, 1997, they

hired a lawyer, Nancy Thompson, as their drafting consultant.  With Thompson's help,

the drafting of the text of all substantive provisions of Amendment E was completed by

April 21 when the Hog Meeting group voted to adopt the proposed text. Time was of the

essence, and the Committee responded very quickly.

One by-product of such haste, however, was a lack of precision.  There was no

time to "study" the issues.  <u>See</u> Nemec Dep. at 82:8-13.  Neither the Committee nor the

- 9 -

Hog Meeting group ever employed any economist or other expert in agriculture to advise the drafting. The drafting process was, therefore, accomplished without the input of experts. The Committee did receive some advice from persons with expertise. For example, Jeff Sveen, a South Dakota lawyer, was consulted by one of the Committee members (Jay Davis). Sveen criticized the proposed text, and Davis reported this criticism to the whole committee. See Exhibit 3038. The Committee ignored Sveen's advice.

The Committee also received advice from an economist, Dr. Neil Harl of Iowa State University. At the request of a Committee member (Morog) Dr. Harl reviewed the proposed text of Amendment E and sent Morog a memo severely criticizing the proposed text. See Exhibit 3039. Morog faxed this criticism of Amendment E to the rest of the Committee. Accordingly to Thompson's testimony, the Committee "dismissed" the criticism. Proceeding without studies or other input and summarily "dismissing" the advice of economists and legal experts, the Committee reported to the Hog Meeting group which adopted the committee's text. By the time of the April 21 Hog  Meeting, the drafting process was over.

**C.      The Effect of Amendment E.**

Amendment E for purposes of this case, has several key features:

(1)      Amendment E. targets the livestock production aspect of South Dakota

agriculture.  It outlaws the practice, by meatpackers primarily, of

- 10 -

establishing a "captive supply." <u>See</u> Tweeten Dep. at 115:13-25; 116:1-4.
In addition, Amendment E outlaws all "production contracts" whether a
packer or some non-packer corporation is the owner.

(2)    Amendment E has a narrow exemption for a family farm — more narrow
than under the Family Farm Act.

(3)    Amendment E has an aggressive enforcement provision—because it gives
citizen standing to any person.

(4)    Because it was adopted as a constitutional amendment, Amendment E
forecloses those hurt by the Amendment from the normal political processes
for political change.

In sum, the facts will show that the Hog Meeting group achieved its goal: to ban
out-of-state hog producers and reduce competition for in-state producers. In the process,
by banning all production contracting, the Amendment E proponents also dramatically
damaged the Plaintiffs and many other family farmers and have impermissibly and
unconstitutionally burdened interstate commerce.

## IV.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only
when defendants demonstrate that there are "no genuine issues of material fact and that
they are entitled to judgment as a matter of law." <u>Miller v. Solem</u>, 728 F.2d 1020, 1023
(8th Cir. 1984). "Summary judgment is 'an extreme remedy and one which is not to be

- 11 -

entered unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances.'" Cummings v. Roberts, 628 F.2d 1065, 1068 (8th Cir. 1980) (citation omitted). Moreover, before summary judgment is appropriate in a fact-intensive case like this one, "'All evidence must point one way and be susceptible of no reasonable inferences sustaining the position of the nonmoving party . . . .'" Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 830 (8th Cir. 2000) (quoting Johnson v. Minnesota Historical Soc'y, 931 F.2d 1239, 1244 (8th Cir. 1991)). "'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" Id. at 832 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 245 (1986)).

## V.   ARGUMENT--FORWARD CONTRACTING

Intervenors have moved for partial summary judgment regarding what they call the "forward contracting" issue. As discussed below, Intervenors' support for the motion is incoherent and unfocused; their arguments are, at times, disingenuous. With the burden on Intervenors as the moving party, Plaintiffs contend that the burden has not been satisfied and that their Motion for Summary Judgment be denied.

### A.   The Term "Forward Contract" does not exist in Amendment E.

Intervenors' argument concludes: "Amendment E does not prohibit forward contracts." Intervenor Memorandum at 8. Actually, Amendment E does not contain the phrase "forward contract" at all. Amendment E never mentions "forward contracting."

- 12 -

Intervenors have not supplied any evidence in the record to support their position. This Court should, under Local Rule 56.1, deny their motion.

**B.      The Court Should Reject Intervenors' Broad Definition of "Forward Contracting" because of the flaws in Intervenors' Argument.**

The Court should recognize that the representatives of Intervenors and their legal counsel, Nancy Thompson, were the drafters of Amendment E. See Thompson Aff., Intervenors' SMF at B6. If Intervenors had intended to exempt "forward contracts" from Amendment E's sweeping prohibition, Intervenors had the opportunity to do so. Actually, the Intervenors' drafting regarding "forward contracts" is illustrative of the hasty and careless drafting of many parts of Amendment E. See e.g., §21; §22(5). The lack of precision has led understandably to confusion and uncertainty in South Dakota agriculture, and this uncertainty has magnified the burden of Amendment E on interstate commerce.

Evidence in the record in this case establishes that Amendment E's adverse impact on the industry's "forward contracting" practices has harmed Plaintiffs. For example, Plaintiff Haverhals Feedlot, Inc. ("Haverhals") has lost business with national meatpacker, IBP, Inc. because of Amendment E. See Plaintiff Haverhals Feedlot, Inc.'s Answers to Defendant-Intervenors' First Set of Interrogatories and Request for Production of Documents, Response No. 4.

- 13 -

Plaintiff Haverhals has also lost business because of Amendment E with one of its out-of-state suppliers, MCP (Minnesota Corn Processors of Marshall, Minnesota). <u>See id.</u>, at Response No. 5. Plaintiff Haverhals has also lost business with an Illinois corporation which, prior to Amendment E, fed cattle at Haverhals for sale to a Kansas corporation. <u>See id.</u> at Response No. 9. The record accordingly demonstrates that there are disputed issues of material fact regarding forward contracting practices under Amendment E.

Having failed to place the exemption into Amendment E's text, Intervenors should not expect this Court to declare, as a matter of law, that all contracts labeled as "forward contracts" are somehow protected against Amendment E.

**C.** **The Scope Of The Section 22(15) Exemption for "Livestock Futures Contracts" is much Narrower than Intervenors' Position.**

Intervenors' disingenuousness on the forward contract issue is further exposed by the recognition that the text of Amendment E does contain an exemption for a narrow category of "Livestock futures contracts." <u>See</u> §22(15). It is significant that the term "Livestock futures contracts" is never mentioned in Intervenors' Memorandum—not even by citation. Plaintiffs would also note that the term "Livestock futures contracts" is never defined in Amendment E. Plaintiffs do not know, accordingly, what the scope of the exemption may be. But, for purposes of this motion, Plaintiffs believe that the term

- 14 -

"Livestock futures contracts" is a term that is much narrower than the term "forward contract."[2]

One way in which §22(15) is narrower than "forward contract" is that §22(15) only applies to the "livestock" industry.  Intervenors apparently seek, without a proper record, to have this Court expand the scope of §22(15) to include crop production and the use of certain marketing techniques in crop production.  Whatever the ultimate merits of this suggestion, the Court should wait until trial when this complex technical and factual issue can be resolved.  This Court should, accordingly, deny Intervenors' motion regarding forward contracting.

**D.**    **Intervenors have not Established a Proper Record on this Issue**.

Intervenors' argument on the forward contracting issue rests in large part on their citation to the USDA's definition of a "forward contract."  The Intervenors' authority for this definition is a citation to the Federal Register, published on March 17, 2000.  See Intervenors' Memorandum at 6.  For several reasons, this "authority" is inadequate to meet Intervenors' burden.

First, to satisfy their burden of proof, Intervenors need to establish, by reference to the record in this case, that the term "forward contract" existed as of the November 1998 adoption of Amendment E.  See Local Rule 56.1(B).  The citation to the Federal Register

---

[2] Plaintiffs would suggest that the term "Livestock futures contracts" was taken from Nebraska law, I 300.  But, the term is not defined in I 300 either.

- 15 -

fails to satisfy this burden.  The proposed regulation, dated March 17, 2000, is a new

regulation regarding a new Congressional Act—the "Livestock Mandatory Report Act of

1999."  This Act was not adopted until after November 1998.  Neither the Act nor the

proposed regulation existed at the time Amendment E was drafted and adopted.  The

proposed regulation, therefore, cannot be authority for interpreting Amendment E.  The

citation to the <u>Federal Register</u> fails to satisfy Intervenors' burden for yet another reason.

Intervenors have never made the USDA definition part of the record in this case.  Several

of the drafters of Amendment E were deposed, and Intervenors could have tried to

establish that "forward contracting" was not prohibited by Amendment E.  Alternatively,

Intervenors might have had an expert economist testify on the concept of forward

contracting.  Although they had the opportunity, Intervenors did not make the proper

record.

Second, Intervenors did not inform this Court that their citation to the <u>Federal</u>

<u>Register</u> is only to a <u>proposed</u> USDA regulation.[3]  A proposed regulation is not much

authority under any circumstances, and it certainly does not satisfy the moving party's

burden at summary judgment.  Third, Intervenors' argument suggests that Plaintiffs'

expert economist agreed with Intervenors' broad definition of "forward contract."  The

record does not support that argument.  While Dr. Tweeten, one of the world's foremost

---

[3] As far as Plaintiffs' research can tell, the proposed regulation has never even been
finally adopted.

- 16 -

agricultural economists, recognized that certain marketing arrangements—i.e., "Livestock futures contracts,"—are exempt from Amendment E, Dr. Tweeten never took as broad a position as Intervenors. See Tweeten Dep. at 113:18-25; 114:1-3. For purposes of summary judgment, Intervenors cannot rely on Dr. Tweeten's testimony because Intervenors did not ask the right questions to establish a proper foundation for their present arguments.

Fourth, the Court should reject Intervenors' reliance on the proposed USDA regulation because Intervenors did not attempt to have the Court make the proposed regulation part of the record through judicial notice. Again, the Intervenors did not make a proper record for this motion. The Intervenors had opportunities to make a proper record, but they failed to fulfill the conditions of admissibility.

E.     **The Thompson Affidavit Lacks Proper Foundation And Should Not Be Considered.**

There is another reason that Intervenors fail their burden under Rule 56 and Local Rule 56.1(B): the Intervenors have put forward--as an economist--the affidavit of one of the lawyers for Dakota Rural Action, Nancy Thompson.

1.     **The Court should Strike the Thompson Affidavit.**

Initially, Plaintiffs move this Court to strike the Thompson Affidavit. It lacks proper foundation. Thompson is not an economist or other expert. Under Federal Rule of Evidence 702, she is not qualified to give an expert opinion on the scope or effect of

- 17 -

forward contracting.  This point was firmly established by Plaintiffs' counsel (Mr. Simko)

at Thompson's deposition in April, 2000:

> Q.    You were paid a fee to do the work that you did as a lawyer for the
>        Coalition?
> A.    Yes.
> Q.    And are you being paid to appear here today?
> A.    Yes.
> Q.    And your expenses are being reimbursed?
> A.    Yes.
> Q.    By the same Coalition?
> A.    Well, by Dakota Rural Action.
> Q.    Incidentally, that reminds me that I have a witness check here for
>        you.  I will give it to you now.  Do you claim to be an expert for
>        purposes of offering opinions regarding biology?
> A.    No.
> Q.    As an economist?
> A.    No.
> Q.    As a sociologist?
> A.    No.
> Q.    Or as an agricultural economist?
> A.    No.

Thompson Dep. at  12:6-25.

Thompson admitted, at her deposition, that she was not an expert in economics (or

other relevant topics).  Yet, Intervenors seek to use the Thompson Affidavit as if it were

the testimony of an economist.  It is unlikely that she gained the expertise in the

intervening six months since her April deposition, and her Affidavit does not provide any

indication that she had developed qualifications as an economist.  Moreover, Intervenors

never properly disclosed, under Rule 26(a), that Thompson would testify as an expert.

Therefore, the Thompson Affidavit does not provide a satisfactory foundation, under

- 18 -

Federal Rule of Evidence 702, for the opinion she offers on the scope and effect of forward contracting.  This Court should strike the Thompson Affidavit.

**2.      Alternatively, the Court Should Not Consider the Substantive Assertions of the Thompson Affidavit.**

Even if the Court would not strike the Thompson Affidavit, the Court should not consider the substantive assertions in it.  The Thompson Affidavit expresses certain economic opinions about forward contracting, but there has not been a proper foundation.  Thompson is not an economist.[4]  To the extent that the Thompson Affidavit is offered as a legal opinion, there is, again, no proper foundation.  There also is no relevance.  It should not be given any weight.

Plaintiffs also oppose Intervenors' Motion for Summary Judgment on section 22(5) of the Amendment (hereinafter the "grandfather clause"), in that it represents an attempt to impose an unjustifiably expansive interpretation on section 22(5).  As with the forward contracting issue, Intervenors ask this Court to adopt an interpretation of the grandfather clause that is unjustified as a matter of Amendment E's text, history, or policy as well as the record in this case.[5]

---

[4] In the event that the Court would consider Thompson's substantive assertions, Plaintiffs request that the Court order that her deposition be taken regarding her Affidavit and its contents.

[5] The real issue is the scope of the Section 22(15) "Livestock futures contracts" exemption.  This is, however, a disputed matter of material fact to be resolved at trial.

- 19 -

## VI.   ARGUMENT—GRANDFATHER CLAUSE

Intervenors have moved for partial summary judgment regarding the scope of section 22(5) of Amendment E.[6] This motion is only two paragraphs in length and relies on only one paragraph of Intervenors' SMF (¶16). Intervenors do not support their motion with any economic expert. This is an inadequate basis for summary judgment, and this Court should deny the motion. See D.S.D.L.R. 56.1(B). Plaintiffs can only guess at what the Intervenors think will be accomplished with this motion. But, whatever Intervenors' goals may be, this motion is not a proper means because it is inadequately supported. See D.S.D.L.R. 56.1(B). Intervenors have not made a record that supports this motion.

### A.   The Grandfather Clause Does Not Immunize the Custom Feeder Plaintiffs.

It appears that Intervenors wish to convey the impression that section 22(5)'s exemption is broad and generous. Intervenors seem to argue that, because of the allegedly generous grandfathering provision, the impact of Amendment E will not be harmful to South Dakota farmers and ranchers. This is, apparently, Intervenors' story—but nothing could be more fictional.

---

[6] Plaintiffs note that—unlike the forward contracting issue—the Intervenors acknowledge that a provision of Amendment E's text is at issue.

- 20 -

As illustrated dramatically by certain of the Plaintiffs (e.g., the custom feeders—Don Tesch, Bill Aeschlimann, John Haverhals, and Ivan Sjovall), the grandfather clause is not generous.  The custom feeding business does not—and, by its nature, cannot—always use long-term contracts.  Thus, the "custom feeder" Plaintiffs are not protected by section 22(5).  It is disingenuous for Intervenors to suggest to this Court that the grandfather clause alleviates the crushing burden imposed by Amendment E on Plaintiffs.  Although Intervenors' may seek to create a facade of reasonableness, the Plaintiffs know the severe burdens created by Amendment E.

Ironically, one of Intervenors witnesses, Nicholas Nemec, would not adopt the facade.  Nemec, who was a participant in the development of Amendment E, gave a deposition where he was represented by Intervenors.  When asked by Plaintiffs' counsel (Mr. Simko) about the impact of Amendment E on the custom livestock feeders, Nemec candidly admitted that it was just "tough luck" for the family farmers who would be put out of business.

EXAMINATION BY MR. SIMKO:

Q.   Nicholas, I have got a question.  Did the Coalition or anybody else associated with the effort to promote Amendment E. ever do any studies regarding the impact that Amendment E would have on family farmers like Ivan Sjovall, Don Tesch, John Haverhals, Bill Aeschlimann, Marston Holben or Frank Brost?

A.   The only one of those people that you mentioned that I even could pick out of a line up is Frank Brost, and I don't know the nature of his operation. Potentially if any one of those guys is a non-qualifying entity, it could

- 21 -

        prevent them from having an operation, or having a majority interest in an operation.

Q.    My question is this.  Did the Coalition or anyone associated with the effort to promote Amendment E ever do a study on how Amendment E. would impact family farmers like the people I just mentioned?

A.    I don't think they ever funded a study to study that.

Q.    Was there ever any consideration among the discussions with the large corporations about the South Dakota family farmers who would be adversely impacted by Amendment E?

A.    I don't specifically recall any discussions.  I am sure it was discussed, but I can't remember any of the specific details of the discussions.

Q.    And what was the result of the discussion about the concerns for those family farmers who would be adversely affected by Amendment E?

A.    If there were farmers who were non-qualifying entities under Amendment E, and they would be adversely affected because they were non-qualifying, I would think it was kind of tough luck for them.

Nemec Dep. at 81:19-83:2.  The record by Intervenors is inadequate.  They should have had an economist support their position regarding the effect of Section 22(5), but they did not.  Since the record is inadequate, this Court should deny the motion.  See D.S.D.L.R. 56.1(B).

    To the extent that there is a record on this issue, it does not support Intervenors' theory of a "generous" grandfather clause.  If anything, the record shows that Intervenors have only one message for the custom feeder Plaintiffs and the rest of the South Dakota livestock industry: "tough luck."  Such attitudes by the political majority against a political minority are, of course, not uncommon.  But, that is why the federal Constitution protects people like the custom feeder Plaintiffs against discriminatory and protectionist state practices.  See, e.g., West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 200 (1994);

- 22 -

Mark Tushnet, **Rethinking the Dormant Commerce Clause**, 1979 <u>Wis. L.Rev.</u> 125, 131.

The Plaintiffs have properly challenged the State's protectionist practices under the Dormant Commerce Clause doctrine, the Equal Protection doctrine and the Due Process doctrine. There are disputed issues of material fact regarding the scope and effect of the grandfather clause especially regarding the custom feeder Plaintiffs. Accordingly, this Court should deny the Intervenors' motion concerning section 22(5).

## VII. CONCLUSION

The Intervenors have not met their burden of establishing their entitlement to summary judgment. There are disputed issues of material fact surrounding both the "forward contracting" and "grandfather clause" issues. Under these circumstances, this Court should deny the Intervenors' Motions for Summary Judgment.

Dated this 6th day of November, 2000.

- 23 -

WOODS, FULLER, SHULTZ & SMITH P.C.

By _____
Richard O. Gregerson
Susan M. Sabers
Post Office Box 5027
300 South Phillips Avenue, Suite 300
Sioux Falls, South Dakota 57117-5027
(605) 336-3890
Attorneys for Plaintiffs South Dakota Farm
Bureau, Inc.; South Dakota Sheep Growers
Association; Haverhals Feedlot, Inc.; Sjovall
Feedyard, Inc.; Frank D. Brost; Donald Tesch
and William A. Aeschlimann