

FILED

NOV 1 5 2000

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

o-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0

CIV. 99-3018

SOUTH DAKOTA FARM BUREAU, INC.;         :
SOUTH DAKOTA SHEEP GROWERS
ASSOCIATION, INC.; HAVERHALS            :
FEEDLOT, INC.; SJOVALL FEEDYARD,
INC.; FRANK D. BROST; DONALD            :
TESCH, WILLIAM A. AESCHLIMANN;
SPEAR H RANCH, INC.; MARSTON            :
HOLBEN; MARSTON AND MARION
HOLBEN FAMILY TRUST; MONTANA-           :
DAKOTA UTILITIES CO.; NORTH-
WESTERN PUBLIC SERVICE; and             :
OTTER TAIL POWER COMPANY,

                                    :

        Plaintiffs,

                                     :

vs.

                                     :

JOYCE HAZELTINE, in her official
capacity as Secretary of State of South    :
Dakota and MARK W. BARNETT, in his
official capacity as Attorney General of    :
South Dakota,

                                     :

        Defendants,

                                     :

and

DAKOTA RURAL ACTION and SOUTH
DAKOTA RESOURCES COALITION,            :

        Defendant-Intervenors.     :

o-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0-0

PLAINTIFFS' OPPOSITION TO
DEFENDANT-STATE'S MOTION
FOR PARTIAL SUMMARY
JUDGMENT REGARDING
EQUAL PROTECTION

- 2 -

Pursuant to Federal Rule of Civil Procedure 56 ("Rule ___"), Local Rule 56.1, and this Court's Standard Operating Procedures, Plaintiffs submit this Opposition to Defendant-State's ("State's") Motion For Partial Summary Judgment. This Opposition Memorandum, along with the Opposition Statement of Material Facts and documentary evidence, is submitted in resistance to State's Motion.

For the reasons set forth below, the State defendants, as the moving party, have not satisfied their burden under Rule 56 and Local Rule 56.1, and this Court should deny these motions. There are numerous disputed issues of material fact that can only be resolved at trial, where the State's purported evidence can be subjected to proper scrutiny.

## I.   BACKGROUND

The background for understanding the intent of, and significant damage created by, South Dakota Constitutional Article XVII, §§21-24 starts with the State's regulatory structure regarding "corporate" farming before the amendment was adopted. Before Amendment E, the State regulated corporate and syndicate participation in South Dakota agriculture through a comprehensive statutory scheme known as the Family Farm Act of 1974 ("Family Farm Act"). See S.D.C.L. §47-49A, et seq. To understand the impact of Amendment E, the Amendment must be compared to the Family Farm Act's regulatory

- 3 -

structure.[1] Collectively, Amendment E's regulatory scheme is "more stringent" than the Family Farm Act.  See Thompson Dep. at  p. 65:17-25; 66:22-25.

For present purposes, there were several significant regulatory changes:

(1) Although the Family Farm Act only banned corporate ownership of farmland, Amendment E also bans corporate ownership or farming regarding livestock.  Compare §21 to S.D.C.L. §47-9A-1 ("agricultural land to be used in the business of agriculture").

(2) Under Section 22(1), Amendment E's regulatory scheme has a narrower exemption for the corporate "family farm" than did the Family Farm Act.  Compare §22(1) to S.D.C.L. §47-9A-14.

(3)  Enforcement under the Family Farm Act, as with almost every other regulatory scheme under South Dakota law, rested with the State Attorney General's Office.  See S.D.C.L. §47-9A-21.  Amendment E's regulatory scheme provides for significantly more aggressive enforcement by establishing, in section 24, a "citizen standing" provision.  While enforcement under the Family Farm Act was channeled through the experience and professionalism of the State's chief legal office, Amendment E's enforcement scheme permits any person to institute a civil action against a farmer or rancher.

---

[1] The relevant comparison is between the Family Farm Act and Amendment E—not between Amendment E and the law of Nebraska.

- 4 -

There are other differences, but these are for Plaintiffs' present purposes, the core background facts for their claims under the Dormant Commerce Clause doctrine, the Equal Protection doctrine, and the Due Process doctrine. All of the Plaintiffs are involved, in various capacities, in the <u>livestock</u> producing aspects of South Dakota agriculture. All of the Plaintiffs are subject to and threatened by the aggressive enforcement provisions of Amendment E, including the narrow family farm exemption.

Another aspect of the background for this case, and this motion, is that the proponents of Amendment E intended that it would favor certain South Dakota livestock producers and protect them against "competition." Long after this lawsuit was started, and after her April deposition, the primary drafter of Amendment E, Nancy Thompson, wrote in a publication for Intervenor Dakota Rural Action ("DRA"):

> South Dakota's first anti-corporate farming law, adopted by the legislature in the 1970s was inadequate. It didn't stop non-family farm entities from unfairly competing against family farmers. Its definitions were vague and it was interpreted by state officials so that even the largest corporations in the country were free to own farmland and livestock in the state . . . .

<u>See</u> Nancy L. Thompson, "Crop and Livestock Production Under Amendment E" (May, 2000) (Attached as Exhibit A). With full knowledge that the purpose of Amendment E was a contested issue in the case, Intervenor DRA publicly announced the underlying anti-competitive purpose of the Amendment.

The record is replete with similar concessions of constitutionally suspect purpose. In her April 6 deposition, for example, Thompson stated:

- 5 -

> "Well, the purpose of Amendment E is to prevent non-family farmers from engaging in production . . . . So I would say that an outgrowth of this Amendment E is to make sure that the benefits of incorporation inure only to family farmers."

Thompson Dep. at 72:4-19.   In the April deposition, counsel for Plaintiffs (Mr. Simko) returned to the topic of Amendment E's purpose:

> Q.    (Mr. Simko) But the purpose is to keep non-family farm corporations or syndicates as they are defined in Amendment E out of the production phase?
>
> A.    (Ms. Thompson) Yes.

Thompson Dep. at 92:2-5.   In sum, Amendment E imposed a much stricter regulatory scheme on participants in South Dakota agriculture, such as the Plaintiffs.  This stricter scheme was designed to favor certain South Dakota livestock producers and to protect certain South Dakota farmers from the competitive forces of interstate commerce.

## II.    THE FACTS

The facts regarding the genesis and development of Amendment E are set forth in Plaintiffs' Memorandum regarding the "Forward Contracting" Motion, and these are incorporated herein by this reference.  This Memorandum will discuss those facts which are constitutionally significant for purposes of the equal protection analysis.

## A.    The Preferential Classes.

The basic, undeniable fact is that Amendment E deliberately and purposefully created classifications.

- 6 -

### 1.   The Basic Classification: Farmers v. All Other Businesses.

The threshold classification under Amendment E is between types of businesses or industries. While other similarly situated businesses can readily use (for a number of legitimate business reasons[2]) corporate formats, those people in the farming industry are now severely restricted in their use of corporate formats. <u>See</u> Amendment E §21. Owners of hardware stores, for example, can use a corporate format, but owners of farms generally may not.  South Dakota lawyers, for another example, can use a limited liability format, but South Dakota farmers under Amendment E may not (unless they satisfy some exemption).

### 2.   Another Classification: §22(1) Farmers v. Other South Dakota Farmers.

Besides the basic classification, Amendment E creates a myriad of sub-classifications.  Among farmers, the preferred class is that group of farmers who can meet the strict criteria, under section 22(1), of "residence" or "daily and substantial labor." Only this sub-classification can use the corporate format.  To use the example of lawyers, can anyone imagine that the regulatory scheme for lawyers would tolerate dividing lawyers into classifications where preference was given to "family law firms" as opposed to "non-family law firms"?  Just to ask this question suggests the absurdity of such a

---

[2] Some of these legitimate reasons would be for estate planning.  Plaintiffs Holben and Brost illustrate this.  Another reason would be to protect assets with limited liability.

- 7 -

classification. Yet—that is the condition imposed by Amendment E on South Dakota

farmers, like Plaintiffs Holben and Brost.

### 3. The Other "Preferred Classes."

Besides creating the favored caste of certain "family farmers," Amendment E

creates other preferred subclasses. One of the most transparent preferred classes under

Amendment E is the corporate processors of alfalfa. See §22(7). While corporate

processors are generally prohibited from leasing any South Dakota agricultural land, <u>see</u>

§21, corporate alfalfa processors are given a preferential exemption.[3] Under Amendment

E, alfalfa corporate processors are a higher caste.

Another preferential sub-classification is created for so-called "Nonprofit

corporations." <u>See</u> §22(3). This classification would permit highly preferential

treatment. For example, lawyers organized as a nonprofit corporation (such as

Intervenors' former counsel, Earthlaw) could engage in South Dakota farming while

Plaintiffs' lawyers such as Mayer, Brown & Platt could not. There is no evidence in the

record that "nonprofit" corporations are any less likely to cause any form of pollution

than "for profit" corporations. The nonprofit corporation's use of a limited liability

format is, as a theoretical matter, just as great a threat to the environment as an limited

_____

[3] The extreme nature of §22(7) is shown by the fact that, if the same corporate processor
sought to lease the same land next year for corn or hay, the corporation would be
prohibited by §21.

- 8 -

liability company composed of out-of-state investors.  Neither the State nor the

Intervenors have supplied anything in the record of this case to justify any such

distinction.

Another preferential sub-classification, apparently created for purely political

reasons, is the difference between family farmers like Plaintiffs and "cooperatives."  See

§22(2).  While Plaintiffs recognize that the §22(2) exemption is not as broad as it might

be, the fact remains that business entities which adopt a cooperative structure are given a

preferential exemption.

Additionally Amendment E creates, keep for no logical reason, a classification

among agricultural commodities processors.  Agricultural commodity processors of

livestock are limited, by section 22(15), to ownership of the livestock commodity to only

two weeks before processing (i.e., slaughter).  Agricultural commodity processors of

crops are not limited to ownership for two weeks before processing.  Livestock

processors, including some of the Plaintiffs, are therefore a disfavored class and harmed

in their businesses.

In sum, Amendment E purposefully created preferred classes and preferred

subclasses.  While the State and the Intervenors may now offer so-called "legitimate"

reasons for Amendment E, Plaintiffs contend that these are disputed issues of material

fact.

- 9 -

**B.  The Impact on the South Dakota Political Process.**

The facts of this matter are also clear that beyond creating preferential classes Amendment E further burdens the disadvantaged classes and interstate commerce.  Since Amendment E was placed in the South Dakota constitution (rather than in the statutory law), persons such as the Plaintiffs are almost completely foreclosed from the normal political processes.  Unlike other persons disadvantaged or burdened by South Dakota law, Plaintiffs do not have recourse to the Legislature or State Executive to "remedy" their situation.[4]

**C.  The Facts about the State's Alternatives.**

The State contends that Amendment E seeks to maintain small family farms and to support smaller rural communities.  See State Brief at 12.  As a matter of undisputed fact, the State has any number of alternative means to achieve these ends. For example, the State can preserve smaller farms through educational support about changing consumer preferences from State agencies or educational institutions like South Dakota State University.  As another alternative, the State might preserve smaller farms by the use of tax policy or even cash subsidies.  Instead of these less drastic measures, the State has

_____

[4] The basic rationale of the equal protection doctrine is that, although persons should solve their problems through the political process, judicial review of the majority's distribution of burdens is appropriate.  See Railway Express Agency, Inc. v. New York, 336 U.S. 106, 112-113 (1949) (Jackson, J., concurring).  Here, Amendment E purposefully forecloses the normal political processes to persons like the Plaintiffs.

- 10 -

chosen, in Amendment E, the broader and more blunt means of a ban on corporate

participation in agriculture.  For present purposes, the fact that the State has less intrusive

regulatory means available is constitutionally significant.

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only

when defendants demonstrate that there are "no genuine issues of material fact and that

they are entitled to judgment as a matter of law."  Miller v. Solem, 728 F.2d 1020, 1023

(8th Cir. 1984).  "Summary judgment is 'an extreme remedy and one which is not to be

entered unless the movant has established his right to a judgment with such clarity as to

leave no room for controversy and that the other party is not entitled to recover under any

discernible circumstances.'"  Cummings v. Roberts, 628 F.2d 1065, 1068 (8th Cir. 1980)

(citation omitted).  Moreover, before summary judgment is appropriate in a factintensive

case like this one, "'All evidence must point one way and be susceptible of no reasonable

inferences sustaining the position of the nonmoving party . . . .'"  Kells v. Sinclair Buick-

GMC Truck, Inc., 210 F.3d 827, 830 (8th Cir. 2000) (quoting Johnson v. Minnesota

Historical Soc'y, 931 F.2d 1239, 1244 (8th Cir. 1991)).  "'The evidence of the nonmovant

is to be believed, and all justifiable inferences are to be drawn in his favor.'"  Id. at 832

(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 245 (1986)).

- 11 -

## IV.    ARGUMENT—EQUAL PROTECTION.

The State-Defendants ("State") have moved for partial summary judgment on

Count III, Plaintiffs' equal protection doctrine claim.  Amend. XIV, §1.  The State argues

that Plaintiffs' claim against the classifications created by Amendment E are "controlled"

by a 1991 decision by the Eighth Circuit Court of Appeals regarding the constitutionality

of a Nebraska law, commonly referred to as I 300.  See MSM Farms, Inc. v. Spire, 927

F.2d 330 (8th Cir. 1991).  When the State argues that the MSM Farms decision "controls"

in this case, the State is necessarily arguing that this Court must apply the same standard

of judicial review (i.e., the traditional rational basis standard) as did the MSM Farms

panel and that the traditional rational basis standard applies the same way to the facts of

this case (under Amendment E) as to the facts of MSM Farms (under I 300). Plaintiffs

respectfully disagree.

The MSM Farms decision does not "control" this Court's review.[5]  First, even if

the traditional rational basis test were the appropriate standard, Amendment E's

regulatory structure fails the test.  As applied to the facts created by Amendment E, this

Court can and should conclude that the classifications drawn by Amendment E do not

serve any legitimate state interests or that Amendment E's distinctions are

_____

[5] Plaintiffs would note that the MSM Farms decision did not involve any claim under the
dormant commerce clause doctrine.  Thus, even if this Court would find that MSM Farms
may have some precedential weight, that is only with respect to Count III.

- 12 -

constitutionally irrational as a means to achieve permissible ends.  Second, Plaintiffs will

argue that MSM Farms is not controlling because, in cases such as this one, the traditional

rational basis standard has been superceded by subsequent United States Supreme Court

authority, namely the 1996 decision in Romer v. Evans, 517 U.S. 620 (1996).

**A.      Introduction.**

"No State shall . . . deny to any person . . . the equal protection of the laws."  For

purposes of the equal protection doctrine, a corporation is a "person".  See, e.g.,

Metropolitan Life Ins. Co. v. Ward, 470 U.S. 869, 881 (1985).  While this point is not

explicitly addressed in the State's Memorandum, Plaintiffs believe it is a critical starting

point.  Just because a corporation is not an individual person, it does not lose protection

under the equal protection clause.  Id. at 881.

**B.      The MSM Farms Decision does not control because it Applied the Rational**

**Basis Standard.**

Plaintiffs' primary contention is that this Court, for purposes of the State's Motion

regarding Count III, should apply what is commonly called the rational-basis-with-bite

standard ("the RBB standard").  The MSM Farms decision did not apply this "heightened

rational basis" standard.  For that reason, the MSM Farms decision should not be

considered controlling.  This Court accordingly, should deny the State's Motion and

permit Count III, along with Counts I, IV, and V, to go to trial.   In the sections below,

- 13 -

Plaintiffs will address the rational-basis-with-bite standard which was not considered in

MSM Farms.

### 1.    The Rational Basis With Bite Standard Generally.

The RBB standard varies from the traditional rational basis standard in requiring a

closer "fit" between the State's means and the state's legitimate interest.  See Romer v.

Evans, 517 U.S. 620, 635 (1996).  Thus, under the RBB standard, the State's range of

regulatory choices is more limited.  In Romer the voters in the state of Colorado had

adopted a state constitutional amendment through the initiative process, which had

various adverse impacts on gays and lesbians.  Although the Supreme Court eschewed

any review with strict scrutiny or intermediate scrutiny, it still struck down the Colorado

amendment.  The Court determined that the Colorado amendment "identifies persons by a

single trait and then denies them protection across the board."  517 U.S. at 633.  Under

the rational basis with bite standard, the State may not use overly broad means.

In Romer, for example, the Court determined that "the breadth of the Amendment

is so far removed from these particular justifications that we find it impossible to credit

them."  517 U.S. at 635.  The excessive breadth of the Colorado Amendment lead the

Court to reject as insincere the state's asserted legitimate interests.  Id. See also City of

Cleburne v. Cleburne Living Center, 473 U.S. 432, 450 (1985).  Similarly, in Allegheny

Pittsburgh Coal Company v. County Commission, 488 U.S. 336 (1984), the Court

unanimously struck down a property tax assessment using the enhanced-rational-basis

- 14 -

standard. Id. at 346.  Plaintiffs contend that the Romer majority was applying the RBB

test. Under the circumstances, the RBB test is the appropriate standard for Count III in

this case.

    2.    **The Romer Decision is the Controlling Authority.**

    Plaintiffs contend that the controlling authority here is the Romer decision—and

not MSM Farms.  In this section, Plaintiffs will discuss the determinative factors in the

Romer decision and then apply these factors to the Amendment E factual situation.

    The Romer Court identified three factors in its application of equal protection

analysis.  The first factor was the state's foreclosing of normal channels of political

remedy by using the format of a state constitutional amendment.  517 U.S. at 633.  The

second factor the Romer Court used was the substantive breadth of the enactment.  Id. at

627.  The third factor was the State's use of overbroad regulatory means.  On this point,

the Romer Court concluded: "The breadth of the amendment is so far removed from [the

State's] particular justifications that we find it impossible to credit them."  Id. at 635.

    In determining to use a version of rational-basis-with-bite, Justice Kennedy's

majority opinion in Romer relied upon the fact that the Colorado regulation was imposed

- 15 -

by a state constitutional amendment.[6]  The <u>Romer</u> Court described the constitutionally

significant effect of a state's use of its constitution to draw regulatory classifications:

> ... the amendment imposes a special disability upon those persons alone.
> [Challengers] are forbidden the safeguards that others enjoy or may seek without
> constraint.  They can obtain specific protection against discrimination only by
> enlisting the citizenry of Colorado to amend the State Constitution . . ."

517 U.S. at 631.  Later in the opinion, the Court emphasized that the state constitutional

amendment had "The resulting disqualification of a class of persons from the right to seek

specific protection from the law . . . ."  <u>Id</u>. at 633.  It is obvious that the <u>Romer</u> Court

could have been describing the Plaintiffs here: because Amendment E is a state

constitutional provision, it has disqualified a class of persons from seeking a remedy

through the normal political process.

Regarding the use of state constitutional amendment, the <u>Romer</u> Court also

observed, in general terms:  "A State cannot so deem a class of persons a stranger to its

laws."  Again, the Court could have been discussing what Amendment E does to the

Plaintiffs.  Because the Intervenors and the State placed Amendment E's harsh regulatory

scheme in the state constitution, Plaintiffs, and other family farmers, are essentially

"strangers" to South  Dakota's normal law-making process.  As in the <u>Romer</u> decision,

the sweeping substantive breath of Amendment E's regulatory scope inflicts severe

---

[6] Indeed, the Colorado Supreme Court's decision in <u>Romer</u> had been expressly premised
on the infringement of a "fundamental right . . . to participate in the political process."
517 U.S. at 625.

- 16 -

economic injury on the Plaintiffs.  If the target of Amendment E was the captive-supply practices of meatpackers, then the State should have addressed that problem directly.  <u>See</u> Thompson Dep. at 91:6-25; 92:1-8; Exhibit 3025.

Finally, as in <u>Romer</u>, the overbroad means chosen by the State must be compared to the State's justification: preserving family farms.  The breadth of Amendment's means, however, is so far removed from this justification that this Court will find it "impossible to credit them" at trial.  After hearing the evidence, this Court will conclude that such explanations are constitutionally insufficient.   For all these reasons, Plaintiffs urge that this Court deny the State's motion and leave the determination of Count III to the trial of this case.

### 3. Amendment E Fails under the RBB Standard.

Arguably, the <u>Romer</u>-style RBB applies to Amendment E in two other ways.  Like <u>Romer</u>, Amendment E "identifies persons by a single trait"—namely, the corporate form of the prospective farm or ranch operator.  Second, Amendment E is constitutionally defective because the State's chosen means are overly broad.  In practical effect, the corporate farm operator is denied any "protection across the board."  Plaintiffs also contend that the breath of Amendment E undercuts the legitimacy of the State's purported interest in protecting "family farms".  The excessive breadth of Amendment E was an effort to appear as a "neutral" regulation.  Under the RBB standard, the Court will use the

- 17 -

"sincerity scrutiny" to expose the real reasons underlying Amendment E.  For that reason, the issues under Count III must go to trial.

## V.    CONCLUSION

As detailed above, Amendment E involves many excessive and illogical distinctions.  For example, a corporation cannot lease farmland for most cash crops, but it can for alfalfa.  See §22(7).  How can a lease to grow corporate-owned corn be more of a threat to South Dakota's family farms than corporate-owned alfalfa?  Amendment E appears to have been designed to satisfy a series of "political" compromises among its proponents.  As a result of its political origins, the lines drawn by Amendment E do not fit with the protection of the "family farm" justification the State has offered.  For the reasons set forth above and because the MSM Farms decision is not controlling, this Court should deny the State's Motion for Summary Judgment.

Dated this 6th day of November, 2000.

- 18 -

WOODS, FULLER, SHULTZ & SMITH P.C.

By _Susan M. Sabers_

Richard O. Gregerson
Susan M. Sabers
Post Office Box 5027
300 South Phillips Avenue, Suite 300
Sioux Falls, South Dakota 57117-5027
(605) 336-3890
Attorneys for Plaintiffs South Dakota Farm
Bureau, Inc.; South Dakota Sheep Growers
Association; Haverhals Feedlot, Inc.; Sjovall
Feedyard, Inc.; Frank D. Brost; Donald Tesch
and William A. Aeschlimann

**EXHIBIT A**

May 2000

# Crop and Livestock Production Under Amendment E

*Published by Dakota Rural Action*

Written by Nancy L. Thompson,
Attorney at Law.

Published by Dakota Rural Action,
Box 549, Brookings, SD 57006,
605-697-5204

## Introduction to Amendment E

The adoption of state laws prohibiting corporations and other limited liability entities from engaging in farming began very early in this century. Kansas was the first state to adopt an "anti-corporate farming" law, and eight other states (Iowa, Minnesota, Missouri, Nebraska, North Dakota, Oklahoma, South Dakota, and Wisconsin) followed.

South Dakota's first anti-corporate farming law, adopted by the legislature in the 1970s, was inadequate. It didn't stop non-family farm entities from unfairly competing against family farmers. Its definitions were vague and it was interpreted by state officials so that even the largest corporations in the country were free to own farm-



land and livestock in the state. As a result, citizens collected enough signatures on an initiated petition to place a proposed constitutional amendment on the 1998 ballot banning non-family farm corporations and syndicates. The amendment (popularly known as Amendment E) won by a 60% majority and was approved by voters in all but six South Dakota counties. It is now Article XVII, Sections 21-24 of the South Dakota Constitution.

**Inside this publication:**

| | |
|---|---|
| Corporations | 2 |
| General Partnerships | 6 |
| Limited Liability Companies | 8 |
| Sole Proprietorships | 11 |
| Cooperatives | 12 |
| Limited Partnerships | 15 |
| Limited Liability Partnerships | 17 |

## How To Use This Publication

This publication is designed to give South Dakota farmers information about the business structures and strategies for producing crops and livestock (both alone and in cooperation with others) under Amendment E. This publication should not, however, be used as a substitute for legal and tax advice from a producer's own attorney and accountant. Many issues not covered by this book, including estate planning, securities law, and antitrust law must also be considered before making a choice of business organization. When establishing any business entity, a farmer should consult with an attorney and an accountant about the legal and tax implications of that chosen business structure. Individual circumstances will dictate which business structure is the best.

## Why Anti-Corporate Farming Laws Are Needed

The primary reasons corporations and other limited liability business organizations were authorized by law were to limit investors' liability and to allow for centralized management and control. This preferential treatment would allow them to attract outside capital more easily and to build industrial scale enterprises. For example, limited liability reduces risk for investors who do not directly take part in management and labor functions. States often created these limited liability entities for the express purpose to "lure capital to the state."

At times, lower corporate tax rates have also allowed investors to avoid the progressive affect of personal income taxes on farm profits. This is still true for corporations with very large incomes, and corporations of any size can divide taxable income to achieve lower tax rates. Even though there is no South Dakota corporate income tax, federal tax law has often created income tax advantages for corporations. Corporations also get preferred treatment when it comes to paying Social Security taxes and deducting certain business expenses. This preferential tax treatment helps corporations attract investment dollars that allow them to expand beyond what they otherwise could and puts them at a competitive advantage over individual farmers. Even the "double taxation" that some claim puts corporations at a disadvantage is not a significant problem for corporations that simply reinvest dividends in more expansion rather than making payments to shareholders.

A corporate structure also means the separation of ownership, management, and labor among different levels of people.

Almost all studies show that this leads to a decline in community well-being. Nearly twenty studies covering five decades of research have found that a change towards corporate agriculture reduces the quality of life in rural communities.

The purpose of anti-corporate farming laws is to prevent non-family farmers from creating an unlevel playing field because of the preferential treatment afforded through incorporation or the formation of a limited liability entity. In other words, protection from liability and special tax treatment should only be available to family farmers who have the kind of personal daily involvement in a farming operation that helps prevent the undesirable economic, social, and environmental characteristics of corporate farming. States have a right to say who gets these special legal and tax privileges and several have done so through anti-corporate farming laws.

Individuals, with any size operation, can engage in farming in South Dakota or any of the other states with an anti-corporate farming law. However, if they also want to protect themselves from personal liability or obtain special tax advantage by creating a limited liability entity, they must fit the definition of a family farmer.

The following sections describe how family farmers in South Dakota can use a variety of business structures and strategies to farm, including cooperating with others in livestock and crop production. It must be remembered, however, that the courts have not decided some issues about the application of Amendment E, and it is impossible to describe in anything but general terms how they may view some of these strategies.



## Corporations

Corporations are one of the oldest forms of business organization, and the largest businesses usually operate as corporations. For tax purposes, there are two types of corporations. The first is regular or "C" corporations. The second is Subchapter S corporations. Smaller, closely held businesses frequently are organized as "S" corporations. For Amendment E purposes there is no distinction between "C" and "S" corporations.

Under Amendment E, only corporations that meet the definition of a family farm corporation may own farmland or engage in farming in South Dakota. A family farm corporation is defined as a corporation in which:

- The majority of the stock is held by members of a family (or a trust created for the benefit of a member of that family) or their spouses;
- the family members are all related to each other within the fourth degree of kindred (generally, first cousins);
- at least one of the stockholder family members either resides on or actively engages in the day-to-day labor and management of the farm. Day-to-day labor and management requires both daily or routine substantial physical exertion and administration;
- none of the stockholders are non-resident aliens; and

- none of the stockholders are corporations or other business entities unless all the stockholders or members of those entities are people related within the fourth degree of kindred to the majority of stockholders in the family farm corporation.

If a family farm corporation (or any other family farm entity) ceases to meet the criteria for a family farm entity, it will have 20 years to re-qualify as a family farm corporation or other entity before it must either stop farming or owning farmland or be dissolved and return to personal ownership. This provision is allowed only if the majority of the stock continues to be held by the family. This allows family farmers to use corporations to pass land on to their children, but requires that another generation of the family eventually return to live on or operate the farm.

The Mechanics of Incorporating
Corporations are formed under the South Dakota Business Corporation Act by filing articles of incorporation with the Secretary of State. Corporations organized under the laws of other states must also register with the Secretary of State to do business in South Dakota. After it is incorporated, a corporation may make an election with the Internal Revenue Service to be taxed as an "S" corporation. If it fails to do that, it will be taxed as a "C" corporation. A family farm corporation can be either a "C" or "S" corporation.

A corporation may issue stock for cash, for property, or for services rendered to the corporation. The tax consequences of each type of stock sale are different and must be carefully considered by the corporation and the stockholder. A "C" corporation can issue different classes of common stock with voting rights, or preferred, non-voting stock. It can have an unlimited number of stockholders. The Internal Revenue Code

prohibits an "S" corporation, however, from having more than one class of stock. An "S" corporation is also limited by the Internal Revenue Code to 75 stockholders and there are restrictions on who may own "S" corporation shares. A corporation has a perpetual life unless the stockholders vote to dissolve the corporation.

Under Amendment E, all corporations and other limited liability entities are required to file a claim for exemption with the Secretary of State listing the land and livestock owned in the state and the factual basis for their exemption. Any contracts for the keeping and feeding of livestock must also be provided in the claim for exemption. Annual disclosure reports must also be filed with the Secretary of State describing any changes since the claim of exemption or last annual report.

Limited liability
A corporation is a legal entity separate from its shareholders, directors, officers and employees, so a corporation's liability is limited to its assets. Creditors of the corporation and other claimants usually cannot look to the personal assets of officers, directors, shareholders, or employees for satisfaction. One exception may be officer liability for certain taxes. Also, a corporation cannot shield an officer, director, shareholder, or employee from liability for his or her own illegal conduct, even if the conduct occurs while performing the corporation's business.

For example, an employee or corporate president who runs down a pedestrian while driving a farm truck to the packing plant will be liable for his or her own negligence. The corporation may be liable for the harm to the pedestrian as well. However, the other corporate officers and the directors, stockholders and other employees of the corporation will not be personally liable for the actions of the negligent employee or president.

In addition, depending on the corporation's financial condition and the amount to be borrowed, some lenders, before approving a loan to a corporation, will require stockholders to personally guarantee the loans. In fact, obtaining capital by any kind of farm business entity increasingly requires personal loan guarantees.

In rare circumstances, it may also be possible to "pierce the corporation's veil" and impose personal liability on officers or directors. This may occur when there is fraud or when the corporation neglects to maintain corporate bank accounts separate from those of its officers. It may also occur when the corporation fails to have required meetings or when a corporate officer operates the business as if it were individually owned without regard for the rights of others in the corporation. Usually, though, it takes a combination of such circumstances before a court will pierce a corporate veil.

Tax treatment
The income of "C" corporations may be taxed twice by the federal government, once when it is earned by the corporation and again when it is paid to the shareholders, if the payment is not deductible by the corporation, such as dividend payments on corporate stock. "C" corporations often avoid the double tax by making payments to shareholders that are deductible, such as wages to shareholder employees and rents to shareholder lessors. If the payments are deductible by the corporation when paid to the shareholders, the earnings are taxed only once, at the shareholder level.

The income of an "S" corporation, on the other hand, is generally only taxed once. The corporation pays no tax itself, not even federal income taxes. Instead, corporate income is passed through to the stockholders in proportion to their ownership interest in the corporation. This

is the case whether or not that income is actually distributed to the stockholders. The same applies to corporate losses. An "S" corporation files an informational return with the Internal Revenue Service to account for its income, but only the stockholders are taxed on that income.

Advantages and Disadvantages

One advantage of a "C" corporation over an "S" corporation is that federal tax law imposes no limitations on who may own shares in a "C" corporation. It therefore provides greater flexibility, even when subject to Amendment E requirements. Corporations, partnerships and other shareholders that are not individuals may generally not own "S" shares. Also, "S" corporations are limited to 75 shareholders while there is no similar limitation on "C" corporations.

Some financial or legal planners recommend "C" corporations when the family does not need all of the net earnings. For example, a "C" corporation might distribute much of its earnings to members as deductible wages and rents, which could bring its taxable income down to levels that will be taxed at lower rates than if it were taxed to the family.

The obvious advantage of an "S" corporation over a "C" corporation is its single tax treatment. For a family farm operation, this is likely to be the main determining factor in choosing between the two types of corporations. For smaller, closely held businesses, the advantages of a "C" corporation will be limited.

The choice for many farmers, however, is not between a "C" corporation and an "S" corporation, but between an "S" corporation and a limited liability company (LLC) or between an "S" corporation and a general or limited partnership. LLCs and partnerships are discussed in other

sections of this guide but some general comparisons should be made here.

Family farm corporations, general partnerships, family farm limited partnerships, family farm limited liability partnerships, and family farm LLCs can all own farmland and engage in farming under Amendment E. Only a corporation and an LLC provide complete limited liability. Partners in a general partnership are all personally liable for the debts and other liabilities of the partnership. The liability of limited partners in a limited partnership is restricted to their investment in the partnership, but the general partner in a limited partnership is personally liable. Limited partners cannot participate in the direct management of the partnership.

Only "C' corporations are taxed by the IRS as a separate entity. Partnerships and LLCs receive single tax treatment similar (but not identical) to "S" corporations. One major difference between the taxation of corporations and partnerships is the treatment of contributions and distributions of property. A contribution of property by a shareholder to a corporation may be a taxable event (although contributions to small, closely held corporations will often not be taxed).

However, the distribution of appreciated property from a corporation to a shareholder usually results in tax being paid both by the corporation and by the shareholder. For this reason, farmers are generally advised not to put land into a corporation. The farm business may be incorporated, but many advisors recommend that farmland should be leased to the corporation rather than owned by the corporation. Contributions and distributions of property to and from partnerships and LLCs are generally not taxed. This makes them a much better choice of entity for holding title to agricultural land, according to tax advisors.

### Use of Corporations in Farming

There are many ways a family farm corporation can engage in livestock and crop production, either alone or with others. For example, a family farm Subchapter S corporation in western South Dakota ranches and has cattle custom fed by another producer. The corporation uses futures contracts to gain better prices for the cattle. Two of the members of the corporation are also in a general partnership to produce cattle and own land together.

A family farm corporation could also enter into general partnerships with other family farm business entities to produce or market hogs. The separate entities could engage in different stages of production, for instance one family farm doing the farrowing and another the finishing, or they might build new facilities owned by the general partnership. This would allow a family farmer to limit his or her liability to only the investment in the corporation that is a partner in the general partnership.

A family farm corporation can not enter into the same type of partnership with a non-family farm corporation or other non-family business entity. The non-family farm corporation or other entity is prohibited from owning farmland or engaging in agriculture by Amendment E. It can not avoid this prohibition by entering a partnership with a family farm entity.

Another method of using the family farm corporation is to have individual farmers become minority shareholders in a family farm corporation. For example, a family farm corporation could build a nursery to supply feeder pigs to be finished in facilities owned by the minority shareholders in the corporation.

Remember, however, that the minority shareholders in a family farm corporation (or any other limited liability entity) cannot be other corporations or business entities, unless all the shareholders or members of those entities are also related to the majority shareholders of the family farm corporation.

The creation of a family farm corporation with a beginning farmer (whether related or not) as a minority shareholder is an excellent method of transferring farm assets to the next generation. Over time, stock in the corporation can be transferred to the beginning farmer until the older farmer is ready to retire and the younger farmer can become the majority shareholder.

A family farm corporation may contract with non-family farm entities for supplies and for the sale and marketing of livestock. These contracts will probably not violate Amendment E. For example, cattle or pork producers may enter into a forward contract with a packer to lock in a better price than would be possible in the cash market. An exception would be where a sales or marketing contract provides that a non-family farm corporation or other prohibited entity shall hold title to the livestock while the family farm corporation is raising them. Such a contract provision would cause the non-family farm entity to violate Amendment E.

Amendment E may be violated if the family farm corporation gives authority over farming operations to a prohibited business entity. A contract that gives a non-family farm corporation, LLC or limited partnership the right to make the farming and business decisions concerning the family farm corporation's agricultural operations may result in the entity engaging in farming. Depending on the facts and circumstances of the situation, this may violate Amendment E.

Service contracts with non-family farm entities, however, should generally not violate Amendment E. A family farm corporation can hire consultants, veterinarians and other professional and non-professional contractors, even if these contractors are organized as non-family corporations, LLCs, or limited partnerships. These contractors will probably not be deemed to be engaged in farming as long as responsibility for the day-to-day labor and management of the farm remains with the family farm corporation.



# General Partnerships

A partnership is defined as the association of two or more people for the purpose of conducting business for profit. Partnerships are sometimes called joint ventures when they are formed for specific projects and no continuing business relationship is intended. A partnership involves the common ownership of a business and sharing of the profits and losses. All partners have the right to participate in the management of the business. As a general matter, any partner may bind the partnership to a contract or otherwise incur liability on behalf of the partnership.

Partnership property is held in the name of the partnership. No partner has a right to specific partnership property, only an interest in common with the other partners. Under Amendment E, general partnerships

may own farmland and engage in farming unless one of the partners is a non-family farm corporation or other prohibited entity. Amendment E does not restrict general partnerships because they do not enjoy limited liability status.

The Mechanics of Creating a General Partnership

While a general partnership can be created without a formal written agreement, it is advisable that any partnership involving business transactions be established by a written agreement clearly setting out how the partnership is to be managed and how profits and losses are to be divided. Putting everything in writing also helps partners anticipate issues they may not consider in an oral agreement. Even with a formal written agreement, however, creating a general partnership is relatively easy compared to the formation of other entities.

General partnerships do not have to register with the Secretary of State. A partnership agreement can include a date when the partnership will dissolve or it may have no date, meaning any partner can dissolve the partnership at any time. If a partner dies, the partnership is automatically dissolved. The partnership then has a period of time in which to wrap up its affairs. The partnership agreement may, however, contain provisions regarding the disposition of the dead partner's interest and the formation of a new partnership by the surviving partners to continue the business. The deceased partner's estate is not entitled to any specific partnership property but to the value of the partnership interest previously held by the deceased partner.

Under Amendment E, all corporations or other limited liability entities, including those involved in a general partnership, are required to file a claim for exemption with the Secretary of State listing the land and

livestock owned in the state and the factual basis for their exemption. Any contracts for the keeping and feeding of livestock must also be provided in the claim for exemption. Annual disclosure reports must also be filed with the Secretary of State describing any changes since the claim of exemption or last annual report. General partnerships made up only of individuals do not have to report this information or file a claim for exemption.

<u>Limited Liability</u>
General partnerships do not enjoy limited liability. Both the partnership and its partners are liable for the partnership's debts and other liabilities. Partnership liabilities may be satisfied from partnership property and from the personal assets of the partners. A partner's responsibility for partnership debts is not limited to the amount the partner has invested in the partnership. However, partnership liabilities do not include personal debts of the partners unrelated to the partnership business. A personal creditor of a partner does not have the right to seize specific partnership property but may obtain a lien against that partner's interest in the partnership.

Given unlimited liability, an individual farmer may be reluctant to join a general partnership. An alternative would be for the farmer to form a family farm entity such as a corporation or an LLC and make that entity a partner in the general partnership. The assets of the family farm entity would be available to satisfy partnership debts, but the farmer's personal assets would not. However, depending on the financial condition of the partnership and the amount borrowed, some lenders may be unwilling to lend to a general partnership when the partners are corporations or other entities, unless the principals in those entities also agree to personally guarantee loans to the partnership. This is becoming increasingly true for all farm

lending, regardless of state restrictions on limited liability entities.



<u>Tax Treatment</u>
A general partnership is not a separate entity for tax purposes, meaning it pays no federal income or capital gains tax itself. It files a tax return for informational purposes only. Instead, the income is passed through to the individual partners who must pay tax on their share of the profits, if any. Partnership losses are passed through to partners in the same manner.

There are two other aspects of the tax treatment of general partnerships. First, a partner may include his or her share of the partnership's liabilities in calculating the basis limitation for deducting losses. Second, unlike corporations, contributions of property by a partner to a general partnership and distributions of property from a partnership to a partner are generally not taxed.

<u>Advantages and Disadvantages</u>
The biggest advantages to general partnerships are that creation is relatively simple and they may allow partners to combine resources to increase certain aspects of the operation, such as marketing power. Another advantage is the tax treatment provided a general partnership. The biggest disadvantage of a general partnership is the lack of limited liability, although as mentioned above, family farm limited liability entities could be formed to be the partners. One disadvantage is that if a partner dies or withdraws, the partnership is automatically dissolved. However, a well-defined partnership agreement should plan for such an event in advance, allowing the

partnership to continue with little interruption. Another disadvantage may be the equal authority general partners have in management and decision-making. Again, however, a carefully thought out partnership agreement can eliminate disagreements over how and when decisions get made. In short, careful planning can make any arrangement work.

Use of General Partnerships in Farming
General partnerships made up of individual farmers or family farm entities may engage in production, marketing, or processing of livestock or crops and may own either facilities, livestock, or both. One could, for instance, build a farrowing facility from which weaned pigs are sent to be finished by partners in the partnership. An example from South Dakota is a general partnership between a sole proprietor and a family farm corporation involved in dairy production. A general partnership could also be used to simply pool livestock to increase the number going to market over what an individual producer could provide.

One example of a general partnership is two farmers in southeast South Dakota who own their land as tenants in common. All crops and livestock are owned in equal shares. Their arrangement has lasted for over fifteen years. These two farmers are brothers but a similar arrangement could be made among unrelated farmers also. Some equipment is owned separately but they share maintenance and repair costs equally. The partners have a contract with an out-of-state company to produce organic soybeans that pays them well above the cash market price. The contract specifies that the soybeans are the property of the partnership until payment is received.

Under Amendment E, general partnerships may not be made up of non-family farm entities, except where the general partnership is involved, not in the ownership and production of livestock or crops, but in marketing or processing. Amendment E's prohibitions involve production, not marketing or processing. For instance, a general partnership created to process or market high quality pork or beef produced by family farmers would not be restricted.

## Limited Liability Companies

The limited liability company, or LLC, is an increasingly popular form of business organization. A hybrid between a corporation and a partnership, it combines the limited liability advantage of corporations with the tax status of partnerships. It affords flexibility both in management and in the allocation of income and deductions among members. LLCs did not exist in the United States prior to 1977, and only two states permitted them before 1988. Family farm LLCs are permitted to own farmland and to engage in farming provided:

- a majority of the ownership interest in the LLC are held by members of the same family (a family member includes a trust created for the benefit of a family member) or their spouses;
- the family members are related to each other within the fourth degree of kindred (generally first cousins);
- at least one family member/LLC member either resides on the farm or actively engages in day-to-day labor and management of the farm. Day-to-day labor and management requires both daily or routine substantial physical exertion and administration; and
- none of the members are nonresident aliens.

### The Mechanics of Creating a Limited Liability Company

The South Dakota Limited Liability Company Act is similar to those that have been adopted in most states. Participants in an LLC are called members rather than stockholders or partners. An LLC is formed by filing articles of organization with the South Dakota Secretary of State, who in turn issues a certificate of organization. Unless otherwise specified in the articles, the LLC is authorized to conduct business immediately upon issuance of the certificate.

The articles of organization describe the relationship between the members and how the LLC will conduct business. The Act gives members flexibility in how they organize the LLC, and the articles can contain certain provisions that override contrary requirements in the Act. If the articles are silent on these matters, the Act will control. Matters required to be addressed in the articles are:

- the name of the company;
- the purpose for which the company is organized;
- the address of the LLC's principal place of business and the name and address of its registered agent;
- the amount of cash and other property contributed by each member and requirements for additional capital contributions that the members have agreed to make in the future;
- the names and addresses of the managers of the LLC, unless no managers are to be appointed; and
- the period of the LLCs duration, which may not exceed thirty years.

The articles may also contain anything else about the regulation of the internal affairs of the LLC that the members elect to include. The members may manage the LLC themselves or they may appoint one or more managers. The managers do not have to be members. The cost of organizing an LLC is modest, and setting up an LLC is often less complicated than creating a new corporation or limited partnership.

Under Amendment E, all limited liability companies are required to file a claim for exemption with the Secretary of State listing the land and livestock owned in the state and the factual basis for their exemption. Any contracts for the keeping and feeding of livestock must also be provided in the claim for exemption. Annual disclosure reports must also be filed with the Secretary of State describing any changes since the claim for exemption or last annual report.

### Limited liability

The South Dakota Limited Liability Company Act states that members and managers of an LLC shall not be personally liable for any judgment, debt, obligation or other liability of the LLC. This affords LLCs the same limited liability status enjoyed by corporations. Usually the liability of LLC members is limited to the amounts they have invested in the LLC. One exception is member liability for certain, but not all, unpaid taxes. This tax liability is identical to that of corporate officers. Depending on the financial condition of the LLC and the amount to be borrowed, some lenders may also require individual members of an LLC to personally guarantee loans to the LLC. It may also be possible to "pierce the veil" of the LLC, similar to what is sometimes allowed with a corporation.

### Tax treatment

Multiple member LLCs are taxed as partnerships with net operating income or loss and capital gains or losses passing through to the LLC members. Members pay federal taxes on LLC income and gains. The LLC itself pays no federal tax. Single member LLCs are taxed as sole proprietorships.

LLC tax status was somewhat uncertain until the Internal Revenue Service issued new regulations in 1996. The new regulations, dubbed "check the box", allow LLCs and certain other unincorporated businesses to elect whether to be taxed as a partnership or a corporation. The regulations provide that an LLC that fails to make the election will be automatically treated as a partnership (except for single member LLCs).

Advantages and Disadvantages
LLCs are starting to replace partnerships and Subchapter "S" corporations as the preferred organizational form for many businesses. Some LLC advantages include:

- The LLC members enjoy limited liability even if they participate in management of the LLC. In contrast, general partners of a partnership are personally liable for the obligations of the partnership and limited partners of a limited partnership lose their limited liability status if they participate in management.
- A severance of management from ownership is possible with an LLC, but not with a partnership.
- There is no specific limit on the number of members an LLC may have, while Subchapter "S" corporations are limited to 75 members. There are no restrictions on LLC membership while there are restrictions on who may be a Subchapter "S" shareholder. LLCs may also have more than one class of members, while "S" corporations can issue only one class of stock.
- An LLC member may include the member's share of the LLC's liabilities in calculating the basis limitation for deducting losses. An "S" corporation shareholder's losses are limited to the shareholder's basis in his or her stock and debt, without regard to the corporation's liabilities.

- Contributions of property by a member to an LLC and distributions of property from an LLC to a member are generally not taxed. With both "S" and "C" corporations, however, a contribution of property to the corporation may be a taxable event (although contributions to small, closely held corporations will often not be taxed). Distributions of appreciated assets from a corporation to a shareholder may result in tax being paid both by the corporation and the shareholder.

The disadvantage of LLCs is that while their use has increased since the adoption of the "check the box" regulations, they are still a relatively new form of business organization. Very few court decisions and administrative rulings interpreting either the South Dakota Act or the LLC Acts of other states have been issued, so early users of LLCs may find little guidance in addressing difficult or unusual questions concerning the organization or operation of LLCs.

Use of LLCs in Farming
Like other entities, there are many ways a family farm LLC can be used in livestock and crop production, either alone or with others. An LLC has the power to enter into contracts with other entities. For family farm LLCs under Amendment E, this would include supply, marketing and service contracts. Amendment E may be violated if a contract allows a non-family farm corporation or other non-family farm entity to engage in farming indirectly through the family farm LLC.

Since only a majority of the ownership interest in an LLC must be held by members of a family, a family farm LLC, like a family farm corporation or other entity, could have minority owners who are farmers or non-farmers who wish to help capitalize a production venture. A minority

owner may also wish to eventually acquire control of the LLC. For example, a beginning farmer could be a minority owner and gradually acquire more interest in the LLC. Remember though that minority interests may not be held by a limited liability entity unless the ownership is held by people related to the family owning the family farm LLC within the fourth degree of kinship.

A family farm LLC could enter into a general partnership with other family farm business entities to produce livestock or crops. A family farm LLC cannot enter into the same type of partnership with a non-family farm corporation or another non-farm family entity. The non-family farm corporation or non-family farm entity is prohibited from owning farmland or engaging in agriculture by Amendment E. It may not avoid this prohibition by entering into a partnership with a family farm entity.

A family farm LLC may contract with non-family farm entities for supplies and for the sale and marketing of livestock. These contracts will probably not violate Amendment E. An exception would be where a sales or marketing contract provides that a non-family farm corporation or other prohibited entity holds title to livestock while they are being raised by the family farm LLC. Such a contract provision would cause the non-family farm entity to violate Amendment E. For example, a forward contract to sell livestock at a future date to lock in a better price does not violate Amendment E if the meatpacker does not take ownership more than two weeks in advance of slaughter.

Amendment E may be violated if the family farm LLC delegates authority over farming operations to a prohibited business entity. A contract that gives a non-family farm corporation, LLC or limited partnership the right to make the farming and business decisions concerning the family farm LLC's

agricultural operations may result in the non-family farm entity engaging in farming. Depending on the facts and circumstances of the situation this might violate Amendment E.

Service contracts with non-family farm entities, however, should generally not violate Amendment E. A family farm LLC can hire consultants, veterinarians and other professional and non-professional contractors even if they are organized as non-family farm corporations, LLCs or limited partnerships. These contractors will probably not be deemed to be engaged in farming as long as responsibility for the day-to-day management and labor of the farm operation remains with the family farm LLC.

# Sole Proprietorships

Despite the fascination with new (and old) business organizations, most farmers still use the sole proprietorship as the method of doing business. It is the simplest form of owning and operating a business and is used by many farmers in South Dakota to network with others in the production and/or marketing of livestock or crops. There are no restrictions in Amendment E that apply to sole proprietorships. Farms owned and operated by individuals can become as large as they want and engage in any form of production.

The Mechanics of Creating a Sole Proprietorship
Do nothing and you are a sole proprietor. The business and the individual producer are one and the same.

Limited Liability
There is no limited liability for producers operating as a sole proprietor. All debts and other claims are the responsibility of the individual farmer.

<u>Tax Treatment</u>
While the business and any personal income are included together on a farmer's federal tax return, it is wise to keep separate books and accounts. Farmers file a Schedule F with their individual federal tax returns to report business income and business expenses and losses can be deducted.

<u>Advantages and Disadvantages</u>
One aspect of sole proprietorships that may be an advantage or disadvantage, depending on a farmer's interest, is that the responsibility for management decisions and labor lies with the farmer, although employees can be used for any and all management and labor if the farmer desires. All profits and losses belong to the individual farmer. The greatest disadvantage may be that debts or claims against the business are the responsibility of the owner, as well as the business. Personal assets, as well as business assets, are at risk in a sole proprietorship.

<u>Use of Sole Proprietorships in Farming</u>
As mentioned above, the vast majority of farmers use the sole proprietorship to do business. Many of these individual farmers have also found ways to "network" with others in a variety of ways, from sharing information to marketing. For example, in Nebraska, where a similar law has been in place since 1982, a group of twelve producers meets 3-4 times each year to compare production records and listen to guest speakers. Another group of eight producers networks to buy segregated early weaned (SEW) pigs from a single source. The producers each purchase part of the 70,000 SEW pigs shipped. The group saves some in transportation costs and is able to again pool the pigs when they're ready for market. The producers meet once a month to compare production records and help one another identify problems each might be having in production.

A producer in southwest Nebraska coordinates transportation of pigs going to market with his neighbors and also has a contract with four other producers who purchase isowean pigs from him. These producers prefer buying from other producers and by working together they can be sure that a high quality of pigs is maintained in each of their operations. A network in southeast Nebraska involves 25 different producers, some with nursery buildings, some with finishing facilities, and some with both. There is no shared ownership of the facilities or pigs but the producers share profits and losses through contracting. Producers with sow units contract with finishers and receive a base price when they are sold to a finisher. These producers also receive part of the profit (or loss) when the hogs are later sold to a packer. Members of the network feel they've been able to upgrade genetics and have developed a system where everyone is paid fairly for their individual part in the group.

These kinds of networks could also be made up of or include family farm entities.

# Cooperatives

Farmers have used cooperatives extensively since the Civil War to purchase inputs and to store and market commodities. Cooperatives are business organizations based on historic principles of cooperation. These principles include democratic control, with each farmer/member holding one vote, and income to members based primarily on patronage rather than capital investment. Cooperatives may permit farmers and ranchers to obtain discounts on quantity purchases of supplies and to receive higher prices for livestock sold cooperatively with

those of fellow cooperative members. They may increase farmers' market share and bargaining power. Cooperatives enjoy a limited anti-trust exemption under the federal Capper-Volstead Act of 1922, which permits farmers to set prices for their products without running afoul of anti-trust and price fixing laws.

Recently, there has been increased interest in the formation of value-added cooperatives. Value-added cooperatives attempt to capture a larger share of dollars spent on food for producers.  Examples include cooperatives that mill grain, make pasta or slaughter chickens. Cattlemen have formed cooperatives to supply particular market niches such as organic beef or lean, grass fed beef.

Cooperatives are organized as a corporation in South Dakota. As such, they are subject to Amendment E restrictions and may not own farmland or engage in farming, unless they qualify under a specific exemption in the law for certain cooperatives. Under that exemption, farmland or livestock may be owned by a cooperative if a majority of the ownership in the cooperative is held either by individuals actively engaged in the day-to-day labor and management of a farm or by family farm corporations or syndicates. These majority members must also either acquire livestock or crops from the cooperative's holdings or deliver crops to it for the feeding of cooperative-owned livestock. Minority ownership in the cooperative may be held by any individual or entity.

In addition, any cooperative can engage in supply, marketing, or processing functions since these do not constitute farming under Amendment E. As a result, cooperatives provide many opportunities for farmers to network with other farmers.

## The Mechanics of Creating a Cooperative

Cooperatives must file articles of incorporation with the Secretary of State. The members or shareholders (depending on whether the cooperative chooses to have capital stock) elect a board of directors and the board of directors elects officers and a general manager. In most cooperatives, each member exercises only one vote, regardless of the amount of business the member does with the cooperative.



The net earnings of a cooperative are generally referred to as "margins" or "net margins," rather than profits. Margins are distributed to members, and sometimes to non-member patrons of a cooperative, in the form of patronage refunds. Those refunds may be paid entirely in cash. More likely they are paid partially in cash and partially in certificates. These certificates are often referred to as equity credits or retained patronage refunds. Business conducted in this manner is referred to as business done on a patronage basis.

Patronage refunds are calculated based on the amount of business the member patron or non-member patron has done with the cooperative. This is done either on the total dollar volume of patronage during the year or through "per-unit retains". A per-unit retain is an amount of money kept by the cooperative for each unit of a commodity marketed by a patron through the cooperative. For example, the cooperative might retain $.25 cwt. for every hog the

cooperative sells for the patron. At the end of the year, all or a portion of the patron's per-unit retains will be refunded to the patron.

The non-refunded portion of patronage refunds is used to finance the operation of the cooperative. Over time, the cooperative may redeem equity certificates, thus returning part or all of retained patronage refunds to its patrons. Some cooperatives have mandatory equity redemption programs, with all equity that is more than a certain number of years old being redeemed. In other cooperatives, equity redemption is at the discretion of the board of directors. Most cooperatives will redeem any remaining equity at a patron's death. The retention of patronage refunds provides cooperatives with a low cost source of financing, as cooperative patrons are its lenders.

<u>Limited Liability</u>
Since cooperatives are corporations, cooperative members have the same limited liability status as shareholders in a corporation.

<u>Tax treatment</u>
Cooperatives have a special tax status under the Internal Revenue Code. Cooperatives are generally taxed as "C" corporations except they are entitled to claim certain deductions that regular "C" corporations cannot claim. These include patronage refunds, whether paid in cash or by qualified non-cash allocations to members' accounts. Cooperative income is passed through to its patrons, who pay federal tax on that income rather than the cooperative. This includes both income distributed to patrons as cash refunds and retained patronage refunds. Retained patronage refunds are taxable to patrons in the year in which they were earned by the cooperative. They are not taxed when distributed to patrons in later years.



<u>Advantages and Disadvantages</u>
Since cooperatives are corporations, they cannot be used to raise livestock or to grow crops unless they qualify under the exemption in Amendment E discussed above. However, a cooperative qualifying under that exemption would be an excellent method of pooling resources and labor. For example, a group of pork producers could form a cooperative to build a nursery from which cooperative members could acquire feeder pigs. If necessary, capital for the new venture could come from any number of minority members or stockholders.

Cooperatives that don't qualify for the exemption may also be a good choice for livestock and crop activities not considered farming under Amendment E. For instance, crop and livestock producers can form a cooperative to purchase feed, seed, and other supplies. Buying inputs in large quantities may produce substantial discounts.

<u>Use of a Cooperative in Farming</u>
Farmers can form cooperatives meeting the Amendment E exemption to produce livestock in a variety of ways, including the ownership of facilities and/or livestock.

One cooperative in western South Dakota that qualifies under Amendment E owns a nursery facility for pigs and contracts with a producer for finishing. The seven farmer-members of the cooperative deliver corn to the cooperative nursery.

Marketing cooperatives could also be created to obtain higher prices and lower transportation costs from volume sales. A marketing cooperative in turn could contract with a packing plant to process the members' pigs. The cooperative could then sell the processed pork directly to supermarkets and restaurants. An ambitious cooperative with a large membership might consider building its own slaughterhouse. Marketing cooperatives are in a good position to develop specialty markets. For example, a cooperative could specialize in organic pork or in consumer friendly, pre-cooked products that can be heated and eaten on the run.

## Limited Partnerships

Limited partnerships were first authorized in this country in the early 1800s to allow capital investment and limited liability for people not wanting to be responsible for management. They were used extensively in the 1970s by industries such as real estate, oil and gas, and cattle feeding to offset personal income with business deductions and losses.

In many ways, limited partnerships are similar to general partnerships. They are made up of at least one general partner and one or more limited partners. The limited partners are generally protected from liability for claims beyond the amount of their investment. The general partner, however, is fully and personally liable for all debts and actions of the limited partnership, and is often paid a fee for

management services. Both general and limited partners may share in the profits and losses.

Limited partners are not allowed to control the management of the partnership although they are allowed to exercise functions such as participating in partnership meetings, voting on the nature of the business or the sale of partnership assets, and consulting with the general partner on management activities. In South Dakota, only limited partnerships that are family farm limited partnerships are allowed to own farmland or engage in farming. To qualify as a family farm limited partnership, a majority of the partnership's ownership interests must be held by members of a family related to one another within the fourth degree of kindred (generally, first cousins) and one of the family members must either live on the farm or be actively engaged in the day-to-day labor and management of the farm.

The Mechanics of Creating a Limited Partnership
Unlike a general partnership, limited partnerships must file a certificate with the Secretary of State setting out the name and address of the general partner(s). There is no limitation on the number of limited partners and contributions may be in the form of cash, property, services, or a loan. A limited partnership may have different classes or groups of limited or general partners. The general partners are charged with the management of the partnership while limited partners must remain uninvolved in management in order to retain their limited liability. The partnership agreement can be as simple or as complex as is necessary and desired by the partners. Unless the partnership agreement says otherwise, profits and losses are divided based on the value of each partner's investment. New limited partners may be added relatively easily, usually upon consent of all existing

partners. Limited partnerships are required to file a claim for exemption and annual disclosure reports with the Secretary of State similar to those required of all other limited liability entities.

Limited Liability
All partnerships are liable for the loss or injury caused someone as a result of the wrongful act of a partner acting under authority of the partnership. The issue of limited liability involves whether individual partners can be held personally liable. In a limited partnership, limited partners are protected from liability for any claims beyond the amount of their investment, while the general partner, who is responsible for management of the partnership, is personally liable for all partnership debts, claims, and other liabilities. If limited partners participate in the control of the partnership business, they can lose their limited liability. Depending on the financial condition of the partnership and the amount to be borrowed, some lenders, prior to approving a loan to the partnership, will require limited partners to personally guarantee the loans of the partnership.

Tax Treatment
Limited partnerships are treated the same as general partnerships for tax purposes. They are required to file a federal tax return, but it is used for informational purposes only. Since income flows through to the individual partners, the partners pay tax on that income on their own federal tax returns. Partnership losses are passed through to partners in the same manner.

Advantages and Disadvantages
A limited partnership provides less protection from liability than a corporation. However, the single tax treatment of a partnership is often more appealing to farmers. Like a general partnership, a limited partnership is dissolved upon the death or withdrawal of the general partner

(but not a limited partner), unless there is more than one general partner or unless the partnership agreement makes other arrangements for continuation. Upon dissolution, assets are distributed first to creditors and then to partners.

Use of Limited Partnerships in Farming
To own farmland or engage in farming in South Dakota, a limited partnership must be a family farm limited partnership, meaning a majority of the ownership in the partnership must be held by members of a family and one of the family members must either live on the farm or be actively engaged in the day to day labor and management of the farm. Again, since family members must hold only a majority of the ownership interest, individual minority owners may help capitalize the partnership's activities.

A family farm limited partnership could network with other family farm producers through the formation of a general partnership or through contracts. These contracts could be for the purpose of sharing in production or marketing. For instance, just like any other family farm entity, a family farm limited partnership might create a general partnership to build farrowing facilities that supply feeder pigs to partners. The family farm limited partnership (like other family farm entities) could also enter into contracts with others to either supply or receive pigs. Any of these entities might also engage in group purchasing or group marketing, which are not covered by Amendment E.

## Limited Liability Partnerships

Limited liability partnerships are similar to limited partnerships except that all partners in a limited liability partnership may participate in the management of the business. LLPs are syndicates under Amendment E and prohibited from owning

farmland or engaging in farming in South Dakota. The law creates an exception for family farm limited liability partnerships identical to that for other limited liability entities.

### The Mechanics of Creating a Limited Liability Partnership

Limited liability partnerships must register with the Secretary of State's office listing the name and address of the partnership, a brief statement of the partnership's business, and the name and address of the registered agent. There is no limitation on the number of partners. General partnerships may be converted to limited liability partnerships by registering as such with the Secretary of State. Limited liability partnerships are required to file a claim for exemption and annual disclosure reports with the Secretary of State, similar to all other limited liability entities.

### Limited Liability

Partners in a limited liability partnership are not personally liable for the general debts and obligations of the partnership or for any debts or claims that arise out of the negligence or misconduct of another partner. However, a partner is personally liable for claims arising out of his or her own negligence or misconduct, or that of someone under his or her direct supervision and control.

### Tax Treatment

Limited liability partnerships are treated the same as other partnerships and limited liability companies. Partnership income and losses "flow-through" to individual partners.

### Advantages and Disadvantages

Limited liability partnerships are preferable to limited partnerships if the partners wish to participate in management. Limited partners in a limited partnership lose their liability protection if they participate in the "control" of the business. This is not the case with LLPs. Limited liability partnerships would provide liability protection not found in general partnerships.

### Use of Limited Liability Partnerships in Farming

Under Amendment E, limited liability partnerships could be used in the same manner as limited liability companies or limited partnerships. In other words, it could operate as a family farm LLP either alone or in a general partnership with other family farmers or family farm entities. To qualify as a family farm LLP, a majority of the ownership must be held by members of a family (or a trust created for the benefit of a family member), and one of those family members must either live on the farm or be actively engaged in the day to day labor and management. The LLP could also contract with other family farmers and entities.

## Conclusion

If South Dakota farmers feel they need to network or join with other producers to become more profitable in their business, there are a variety of ways to do so under Amendment E. The law, while allowing only family farmers to use business organizations that give limited liability and tax benefits, also provides those same family farmers with the ability to creatively structure how they produce, market, and perhaps even process livestock. It is our intent that this publication help beginning and other family farmers design a business that suits their individual needs and goals, whether it is a sole proprietorship, a family farm corporation, or other family farm entity.

# The following is the full text of Article XVII, Sections 21-24 of the Constitution of the State of South Dakota (also known as Amendment E):

§ 21. No corporation or syndicate may acquire, or otherwise obtain an interest, whether legal, beneficial, or otherwise, in any real estate used for farming in this state, or engage in farming. The term, corporation, means any corporation organized under the laws of any state of the United States or any country. The term, syndicate, includes any limited partnership, limited liability partnership, business trust, or limited liability company organized under the laws of any state of the United States or any country. A syndicate does not include general partnerships, except general partnerships in which nonfamily farm syndicates or nonfamily farm corporations are partners. The term, farming, means the cultivation of land for the production of agricultural crops, fruit, or other horticultural products, or the ownership, keeping, or feeding of animals for the production of livestock or livestock products.

§ 22. The restrictions in § 21 of this Article do not apply to:

(1) A family farm corporation or syndicate. A family farm corporation or syndicate is a corporation or syndicate engaged in farming or the ownership of agricultural land, in which a majority of the partnership interests, shares, stock, or other ownership interests are held by members of a family or a trust created for the benefit of a member of that family. The term, family, means natural persons related to one another within the fourth degree of kinship according to civil law, or their spouses. At least one of the family members in a family farm corporation or syndicate shall reside on or be actively engaged in the day-to-day labor and management of the farm. Day-to-day labor and management shall require both daily or routine substantial physical exertion and administration. None of the corporation's or syndicate's partners, members, or stockholders may be nonresident aliens, or other corporations or syndicates, unless all of the stockholders, members, or partners of such entities are persons related within the fourth degree of kinship to the majority of partners, members, or stockholders in the family farm corporation or syndicate;

(2) Agricultural land acquired or leased, or livestock kept, fed or owned, by a cooperative organized under the laws of any state, if a majority of the shares or other interests of ownership in the cooperative are held by members in the cooperative who are natural persons actively engaged in the day-to-day labor and management of a farm, or family farm corporations or syndicates, and who either acquire from the cooperative, through purchase or otherwise, such livestock, or crops produced on such land, or deliver to the cooperative, through sale or otherwise, crops to be used in the keeping or feeding of such livestock;

(3) Nonprofit corporations organized under state non-profit corporation law;

(4) Agricultural land, which, as of the approval date of this amendment, is being farmed, or which is owned or leased, or in which there is a legal or beneficial interest, directly or indirectly owned, acquired, or obtained by a corporation or syndicate, if such land or other interest is held in continuous ownership or under continuous lease by the same such corporation or syndicate. For the purposes of this exemption, land purchased on a contract signed as of the approval date of this amendment is considered as owned on that date;

(5) Livestock, which as of the approval date of this amendment, is owned by a corporation or syndicate. For the purposes of this exemption, livestock to be produced under contract for a corporation or syndicate are considered as owned, if the contract is for the keeping or feeding of livestock and is signed as of the approval date of this amendment, and if the contract remains in effect and is not terminated by either party to the contract. This exemption does not extend beyond the term of any contract signed as of the approval date of this amendment;

(6) A farm operated for research or experimental purposes, if any commercial sales from the farm are only incidental to the research or experimental objectives of the corporation or syndicate;

(7) Land leases by alfalfa processors for the production of alfalfa;

(8) Agricultural land operated for the purpose of growing seed, nursery plants, or sod;

(Continued on Back)

(9) Mineral rights on agricultural land;

(10) Agricultural land acquired or leased by a corporation or syndicate for immediate or potential nonfarming purposes, for a period of five years from the date of purchase. A corporation or syndicate may hold such agricultural land in such acreage as may be necessary to its nonfarm business operation, but pending the development of the agricultural land for nonfarm purposes, such land may not be used for farming except under lease to a family farm corporation or family farm syndicate or a non syndicate or noncorporate farm;

(11) Agricultural lands or livestock acquired by a corporation or syndicate by process of law in the collection of debts, or by any procedures for the enforcement of a lien, encumbrance, or claim thereon, whether created by mortgage or otherwise. Any lands so acquired shall be disposed of within a period of five years and may not be used for farming before being disposed of, except under a lease to a family farm corporation or syndicate, or a nonsyndicate or noncorporate farm. Any livestock so acquired shall be disposed of within six months;

(12) Agricultural lands held by a state or nationally chartered bank as trustee for a person, corporation or syndicate that is otherwise exempt from the provisions of sections 21 to 24, inclusive, of this Article;

(13) A bona fide encumbrance taken for purposes of security;

(14) Custom spraying, fertilizing, or harvesting;

(15) Livestock futures contracts, livestock purchased for slaughter within two weeks of the purchase date, or livestock purchased and resold within two weeks.

§ 23. If a family farm corporation or family farm syndicate that has qualified under all the requirements of a family farm corporation or a family farm syndicate ceases to meet the defined criteria, it has twenty years, if the ownership of the majority of the stock of such corporation, or the majority of the ownership interest of such syndicate, continues to be held by persons related to one another within the fourth degree of kinship or their spouses, and their land holdings are not increased, to either requalify as a family farm corporation or family farm syndicate or dissolve and return to personal ownership.

§ 24. Any corporation or syndicate that owns agricultural land or engages in farming is required to report information necessary for the enforcement of sections 21 to 24, inclusive, of this Article to the Secretary of State on an annual basis, under rules promulgated by the Secretary pursuant to state law. The Secretary of State shall monitor such reports and notify the Attorney General of any possible violations, and any resident of the state may also notify the Attorney General of any possible violations. If a corporation or syndicate violates any provision of sections 21 to 24, inclusive, of this Article, the Attorney General shall commence an action in circuit court to enjoin any pending illegal purchase of land or livestock, or to force divestiture of land or livestock held in violation of sections 21 to 24, inclusive, of this Article. The court shall order any land held in violation of sections 21 to 24 of this Article to be divested within two years and any livestock to be divested within six months. If land so ordered by the court has not been divested within two years, the court shall declare the land escheated to the state. If the Attorney General fails to bring an action in circuit court to enforce sections 21 to 24, inclusive, of this Article, any resident of the state has standing in circuit court to sue for enforcement.

## Your Voice is Needed...

*Crop and Livestock Production Under Amendment E* is a publication of Dakota Rural Action (DRA). DRA is working to ensure that Amendment E is understood by people across the state. Our members are also working to ensure that this law is upheld and properly enforced by the courts and public officials. You are invited to become a member of DRA and work on this and other important efforts to build a brighter future for our rural communities. To join, simply fill out the form below and send it with your dues to: DRA, Box 549, Brookings, SD, 57006.

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — —

Name _____

Address _____

E-mail Address_____

$35 Family Membership __$55 Contributing Membership