FILED
NOV 1 5 2000
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | |
|---|---|
| SOUTH DAKOTA FARM BUREAU, INC., ) <br> SOUTH DAKOTA SHEEP GROWERS ) <br> ASSOCIATION, INC.; HAVERHALS ) <br> FEEDLOT, INC.; SJOVALL ) <br> FEEDYARD, INC.; FRANK D. ) <br> BROST; DONALD TESCH; WILLIAM ) <br> A. AESCHLIMANN; SPEAR H. ) <br> RANCH, INC.; MARSTON HOLBEN, ) <br> MONTANA-DAKOTA UTILITIES CO.; ) <br> NORTHWESTERN PUBLIC SERVICE; ) <br> AND OTTER TAIL POWER COMPANY, ) | CIV. 99-3018-CBK |
| PLAINTIFFS, ) | |
| -vs- ) | |
| MARK W. BARNETT, IN HIS ) <br> OFFICIAL CAPACITY AS ATTORNEY ) <br> GENERAL OF SOUTH DAKOTA, AND ) <br> JOYCE HAZELTINE, IN HER ) <br> OFFICIAL CAPACITY AS SECRETARY ) <br> OF STATE OF SOUTH DAKOTA, ) | **BIG STONE PARTNERS' REPLY BRIEF OPPOSING STATE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| DEFENDANTS, ) | |
| and ) | |
| DAKOTA RURAL ACTION; AND ) <br> SOUTH DAKOTA RESOURCES ) <br> COALITION, ) | |
| Intervenors/Defendants. ) | |

Montana-Dakota Utilities Company ("MDU"), Northwestern Public Service ("NWPS") and Otter Tail Power Company ("Otter Tail") (or collectively, "Big Stone Partners") provide this brief to the Court opposing that portion of defendants Hazeltine and Barnett's motion for partial summary judgment addressing the ripeness issue as to the factual basis for that portion of the Big Stone Partners' claims that Amendment E violates the United States Constitution.

## SUMMARY OF ARGUMENT

The Big Stone Partners rely upon four factual scenarios to demonstrate the unconstitutional impact of Amendment E upon certain aspects of their business.  Hazeltine and Barnett contend that one of these scenarios lacks factual ripeness, presumably meaning that those facts may not be considered in determining the constitutional impact of Amendment E upon the Big Stone Partners.  Hazeltine and Barnett improperly focus on the factual ripeness of one aspect of the ultimate issue, rather than focusing upon the fundamental question of Amendment E's unconstitutional impact upon the Big Stone Partners' business under all the applicable facts.  Stated another way, ripeness analysis deals with the question of whether a controversy is ripe for adjudication, not whether some of the facts relevant to the controversy are "ripe."  In any event, that factual scenario dealing with deregulation of the utility industry is neither hypothetical nor speculative and carries with it sufficient operational inevitability to warrant consideration.

## FACTS

It may well be that the impact of Amendment E upon the utility industry was a consequence not intended by the drafters and proponents of the enactment.  (Brief Exhibit A, ¶14).  Nonetheless, the broad reach of Amendment E clearly impacts the utility industry.  Section 21 is broadly stated and prohibits corporations not otherwise exempted under Section 22 from engaging in farming or

2

owning any interest in real estate used for farming.  None of the exemptions in Section 22 apply to the Big Stone Partners, except Subsection (10) which exempts agricultural land purchased for a prospective nonfarming use, provided that the nonfarm use must be developed within five years, and during the five-year period any of that land not being put to a nonfarm use may only be used for farming by leasing the property to a qualified entity.  Section 24 requires divestiture after five years.

At least four factual situations exist under which Amendment E impacts the Big Stone Partners, either as owners of the Big Stone Plant or as utilities.

### 1. Impaired Value of the Big Stone Plant

The Big Stone Plant is comprised of approximately 2,100 acres, of which approximately 705 acres are directly dedicated to operation of the power plant.  While the current structure of the plant is grandfathered (Amendment E, Section 22(4)), any change in the ownership regime will terminate grandfathering and subject the plant to the provisions of Amendment E.  (Ralph Brown depo, p. 9) The plant is more valuable to the present owners in their current ownership regime, than to a purchaser of one or more ownership interests.  (Rodney Leyendecker depo, p. 50).  Even the Big Stone Partners themselves could not restructure proportional ownership among themselves, as they once did in 1986 (Mark Rolfes depo, pp. 36 and 37).  The value of the Big Stone Plant to the partners

is impaired because the value of the plant to a purchaser is less than the value of the plant to the existing partners in their existing proportions.  (Ralph Brown depo, p. 16; Ralph Brown expert report, Brief Exhibit B).

According to Rodney Leyendecker of NWPS, the value of the land at the Big Stone Plant to NWPS is impaired by 20 to 50 percent. (Rodney Leyendecker depo, pp. 50, 51).


### 2. Future Generating Facilities Impaired.

The construction of future generating plants in the state of South Dakota is severely restricted by Amendment E.   The restriction deals with the increased cost of developing new generating facilities, when Amendment E restricts ownership (as well as options) to five years when the development of a plant in today's environment is a 10 to 12 year process.  (Bob Krava depo, pp. 37, 38; Ralph Brown Expert Report, p. 4, Brief Exhibit B).


### 3. Future Transmission Line Construction Is Impaired.

Current practice in the construction and maintenance of electrical transmission lines is for the utility to acquire an easement of 150 to 300 feet in width which permits the utility access to the line and control over the easement for safety purposes, but leaves maintenance of the land in the right-of-way easement to the farmer who maintains the land and keeps it free of weeds through his or her farming practices.  (Bob Krava depo, pp.

16-23).   Presently, it is customary in the industry to obtain an easement for about the price of the acquisition of fee title to the land involved.   (Bob Krava depo, pp. 32-36).   Otter Tail's Land Management Director estimates that the cost for acquisition and maintenance of rights-of-way under Amendment E will require the company to purchase fee title and will increase the cost to the company of 200 to 300 percent to obtain easements.   (Bob Krava depo, p. 34).   To this will be added the cost of maintenance of the property to control weeds and underbrush.

### 4. Amendment E Will Exacerbate Deregulation.

As of June, 2000, the District of Columbia and 24 states have adopted some form of restructuring.   (Response[1] ¶1 and Exhibit C) Montana is one of these states, a state in which MDU does business. (Response ¶1).   Two components of restructuring are relevant to consideration of Hazeltine and Barnett's motion.   First, each utility business must have the flexibility to respond to the requirements of restructuring in a manner which best suits that individual company's business objectives.   This may or may not include a sale or spinoff of transmission assets, but this represents one consideration.   The second consideration comes into play when the restructuring order requires action on the part of utilities, such as divestiture of generation assets (the Big Stone Plant) or transmission assets.   A sale or spinoff of the Big Stone

---

[1]Big Stone Partners' Response to Defendants' Statement of Material Facts in Support of Defendants' Motion for Partial Summary Judgment.

Plant by one or more of the Big Stone Partners will adversely affect them because of the value which can be obtained for the ownership interest in the plant.  (See discussion, *supra*, p. 3).

A sale or spinoff of transmission assets will be devastating in terms of costs for all utilities in this state, including the Big Stone Partners.  Amendment E would apply to all existing transmission assets which are either sold or spun off.  This would require the acquisition of fee title for easement properties at an increased cost of 200 to 300 percent of what otherwise would be the acquisition cost.  The companies would be required to purchase fee title to the land and exclude farming of the land after five years. (Bob Krava depo, pp. 33-35, Brief Exhibit A, ¶17, 19, 21 and 23).

## ARGUMENT AND AUTHORITIES

The State takes the unusual position that a particular set of facts (deregulation) should be segregated from all the other facts showing the adverse effect of Amendment E upon the Big Stone Partners.  The State asks the Court through summary judgment to declare deregulation irrelevant to consideration of the issue. This "factual ripeness" argument finds no basis in any of the cases cited by the state.  Each case examines <u>all</u> the facts relevant to the ultimate issue of ripeness of the controversy in determining whether the controversy is mature for resolution.  Interestingly, the Court in <u>*Meadows of West Memphis vs. City of West Memphis*</u>, 800 F2d 212 (8th Cir. 1986) specifically noted that the possible

occurrence of other, future injuries, did not make the action unripe. *Id.* at 215. In fact, the case bears a strong resemblance to the situation of the Big Stone Partners in this case. It involved a suit against West Memphis for blocking the issuance of development bonds for at least a year with the developer losing potential profits during that period. Here, the Big Stone Partners have already seen the value of their generating plant diminished, had a restriction on future land purchases imposed upon them and seen their ability to construct new transmission facilities impaired. Deregulation is immediately on the horizon.

*Bob's Home Service, Inc. vs. Warren County*, 755 F2d 625 (8th Cir. 1985) involved an action for losses due to business restrictions arising from a county master plan. The Appellate Court reversed the District Court on the issue of ripeness and found that there was an immediate injury that was redressable by the relief requested. The court further specifically held that additional factual development would not assist in resolving the case.

While the State properly uses *Pacific Gas & Electric vs. Energy Resources Commission*, 461 US 190 (1983) to state the ripeness test accurately, that is, whether a hardship to the parties exists if the matter is not adjudicated now and whether the matter is appropriately resolved now (*Id.* at 201), the discussion on page 201 of the decision recognizes the need for advance planning, precisely the Big Stone Partners' situation. After

noting that the utilities would suffer substantial hardship from a postponement of the decision, and after quoting from the *Rail Reorganization Act Cases* that "one does not have to await the consummation of threatened injury to obtain preventative relief . . .," the court concluded

> To require the industry to proceed without knowing whether the moratorium is valid would impose a palpable and considerable hardship on the utilities, and may ultimately work harm on the citizens of California. *Id.* at 201, 202.

Restructuring of the utility industry is a valid concern of the Big Stone Partners, as well as other South Dakota utilities, and they should be entitled to know whether their analysis of the impact of Amendment E is correct.

As noted above, it is unnecessary to wait for the inevitable infliction of an injury to establish standing. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143 (1974). Injury is inevitable in this case because the Big Stone Partners will buy or sell property, whether because of deregulation or business requirements and, because the Attorney General "shall" enforce Amendment E (Section 24) they will be forced to divest. The Eighth Circuit has previously recognized this principle in the context of a preenforcement challenge to a mandatory excess premium disbursement program in Minnesota. *In Re: Worker's Compensation Refund*, 46 F3d 813, 821-22 (8th Cir. 1995). In response to the State's assertion that Section 10, the statute's cost shifting

provision, was not ripe because it had not been enforced, the Court stated:

> Section 10's payment provisions are mandatory, and no reason exists to believe that it will not be enforced. A small time delay before enforcement does not keep this controversy from being ripe. (Citation to the *Regional Rail Reorganization Act Cases* omitted). *Id*. at 821, 822.

This is but the other side of the coin of the State's "factual ripeness" argument. It is the sum total of the facts which indicate whether the claim is mature. It is not an isolated, partial set of facts which is either ripe or not ripe, but the entire set of facts dealing with the claimed constitutional damage.

Finally, the courts draw a distinction among the cases as to whether an issue is primarily legal, or factually intensive. If it is factually intensive, ripeness is more difficult to demonstrate than where a facial challenge is made. See, *Hodel vs. Virginia Surface Mining and Reclamation Association*, 452 US 264, 283, 293-94 and *Pacific Gas & Electric*, *supra*, at 201-02. Clearly, this case involves a facial challenge. The broad factual scenario logically and easily contrasts the provisions of Amendment E.

Setting aside the "factual ripeness" issue for a moment, even under the State's view of the case, the issue of Amendment E's impact upon the utilities in a deregulated environment is ripe for decision. The District of Columbia and 24 states have implemented deregulation. At least 12 of those states have required, outright or structurally, some form of divestiture comparable to the issues raised by the Big Stone Partners. (Response ¶1). These are not

9

theoretical requirements.  Additionally, two bills were pending in Congress as of June 9, 2000.  (Response ¶1).  As stated in the *Regional Rail Reorganization Act Cases*, *supra*, it is unnecessary to wait for the inevitable infliction of an injury to establish standing.  Deregulation is an issue which, in fairness, the Court must consider.

## CONCLUSION

The State has sought to fractionalize ripeness analysis for the utilities.  This approach is not supported by the relevant cases on the subject.  In any event, the issue of restructuring is pervasive and legitimately part of the planning process of the utilities.  The State's motion for summary judgment, seeking to segregate facts related to deregulation, should be denied.

Dated this 8th day of November, 2000.

MAY, ADAM, GERDES & THOMPSON LLP


BY: _____
DAVID A. GERDES
Attorneys for the Big Stone Partners
503 South Pierre Street
P.O. Box 160
Pierre, South Dakota 57501-0160
Telephone: (605)224-8803
Telefax: (605)224-6289

## CERTIFICATE OF SERVICE

David A. Gerdes, of May, Adam, Gerdes & Thompson LLP hereby certifies that on the 8th day of November, 2000, he mailed by United States mail, first class postage thereon prepaid, a true and

10

correct copy of the foregoing in the above-captioned action to the following at their last known addresses, to-wit:

Richard O. Gregerson
Woods, Fuller
P.O. Box 5027
Sioux Falls, SD 57117-5027

Timothy S. Bishop
Steffen N. Johnson
Nicola Jackson
Mayer, Brown & Platt
190 S. LaSalle Street
Chicago, IL   60603

David S. Day
University of South Dakota
Law School
414 East Clark Street
Vermillion, SD      57069

Roxanne Giedd
Assistant Attorney General
500 East Capitol Avenue
Pierre, SD  57501-5070

Thomas P. Tonner
Tonner, Tobin & King
P.O. Box 1456
Aberdeen, SD  57402-1456

Virginia Brannon
Jay Tutchton
Earthlaw
University of Denver
Forbes House
1714 Poplar Street
Denver, CO    80202

John H. Davidson
University of South Dakota
School of Law
414 E. Clark Street, Rm. 215
Vermillion, SD   57069

Robert V. Broom
Broom, Johnson & Clarkson
310 Flatiron Building
1722 St. Mary's Avenue
Omaha, Nebraska      68101

Timothy J. Langley
Attorney at Law
401 East 8th Street, #200
Sioux Falls, SD    57103

David A. Gerdes

11

**BRIEF EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | |
|---|---|
| SOUTH DAKOTA FARM BUREAU, INC., )<br>SOUTH DAKOTA SHEEP GROWERS )<br>ASSOCIATION, INC.; HAVERHALS )<br>FEEDLOT, INC.; SJOVALL )<br>FEEDYARD, INC.; FRANK D. )<br>BROST; DONALD TESCH; WILLIAM )<br>A. AESCHLIMANN; SPEAR H. )<br>RANCH, INC.; MARSTON HOLBEN, )<br>MONTANA-DAKOTA UTILITIES CO.; )<br>NORTHWESTERN PUBLIC SERVICE; )<br>AND OTTER TAIL POWER COMPANY, )<br> )<br>　　　　PLAINTIFFS, )<br> )<br>-vs- )<br> )<br>MARK W. BARNETT, IN HIS )<br>OFFICIAL CAPACITY AS ATTORNEY )<br>GENERAL OF SOUTH DAKOTA, AND )<br>JOYCE HAZELTINE, IN HER )<br>OFFICIAL CAPACITY AS SECRETARY )<br>OF STATE OF SOUTH DAKOTA, )<br> )<br>　　　　DEFENDANTS, )<br> )<br>and )<br> )<br>DAKOTA RURAL ACTION; AND )<br>SOUTH DAKOTA RESOURCES )<br>COALITION, )<br> )<br>　　　　Intervenors/Defendants. ) | CIV. 99-3018-CBK<br><br><br><br><br><br><br><br><br><br>**PLAINTIFF BIG STONE PARTNERS'**<br>**RESPONSE TO DEFENDANTS'**<br>**FIRST INTERROGATORIES,**<br>**REQUESTS FOR ADMISSION,**<br>**AND REQUESTS FOR PRODUCTION** |

Answering Defendants' First Interrogatories, Requests for Admission and Requests for Production, dated May 23, 2000, the Big Stone Partners state as follows:

### INTERROGATORIES AND REQUESTS FOR ADMISSION

1. Identify the person or persons answering these interrogatories and requests for admissions, and all persons assisting in their preparation, including:

    a. Every person consulted in order to secure the requested information;

    b. Every person who furnished the information upon which the responses are based;

    c.    Every person who secured the information upon which the responses are based;

    d.    Every person who prepared and participated in the preparation of the responses; and

    e.    Every person involved in furnishing any subsequent modifications to any responses to any of these interrogatories or requests for admissions.

ANSWER.  Todd Guerrero, Esquire, Office of General Counsel, Otter Tail Power Company, 215 South Cascade Street, P.O. Box 496, Fergus Falls, Minnesota, 56538-0496; Susan Anderson Bachman, Attorney, NorthWestern Public Service, 125 South Dakota Avenue, Sioux Falls, South Dakota, 57104; and Douglas W. Shulz, Senior Attorney, Montana-Dakota Utilities Co., 400 North Fourth Street, Bismarck, North Dakota, 58501.

Those consulted, furnishing information and securing information were: Mark Rolfes, Bernadeen Brutlag, Donald R. Ball, Rodney Leyendecker and Bob Krava, all of whom have been deposed by defendants.

2.  Identify all potential witnesses you expect may be called at trial who have not yet been disclosed in the Utilities FRCP 26 disclosures.

ANSWER.  Presently, the witnesses proposed to be called by the utility plaintiffs are those disclosed in the Big Stone Partners initial disclosures, and those disclosed in the Big Stone Partners expert disclosures.

3.  Identify all witnesses you expect to call at trial regarding regulation, deregulation, restructuring, "unbundling," or divestiture of the electric or natural gas industries and the substance of the facts and/or opinions to which the witness is expected to testify, and the grounds for any opinions.

ANSWER.  See answer to interrogatory number 2.  You have deposed Mark Rolfes, Bernadeen Brutlag, Donald R. Ball, Rodney Leyendecker and Bob Krava.  If you wish to depose other disclosed witnesses, they will be made available.  Dr. Brown's expert report

copy of a letter written by counsel for the SDEUC to Daniel J. Todd, President of the Municipal Attorneys Association.   This letter was written at the direction of the Board of Directors of the SDEUC.   Attached as Exhibit E are SDEUC minutes of December 11, 1997, and June 23, 1998, showing attention to the issue by the Board.

12.   Admit that the Attorney General's official explanation and description of Amendment E which was provided to the South Dakota voters was accurate and true.

RESPONSE.   That which is stated is accurate.

13.   If your response to paragraph 12 is anything other than an unqualified admission, state all facts upon which you rely for your response, identify all persons having knowledge of those facts, and identify all documents referring or relating in any way to those facts.

ANSWER.   While the ballot explanation is accurate as far as it goes, it casts the impact of Amendment E in terms of "ownership of land."   In fact, if the plain language of Amendment E is recognized, it affects any ". . . interest, whether legal, beneficial or otherwise, in real estate used for farming. . ."   It is the unstated impact of Amendment E which damages the Big Stone Partners.

14.   Admit that Amendment E was not intended to apply to any land for which any utility currently holds easements or to any future purchase of easements for transmission lines, towers, or ingress and egress for utility maintenance.

RESPONSE.   Witnesses supporting Amendment E have so testified.

15.   If your response to paragraph 14 is anything other than an unqualified admission, state all facts [upon] which you rely for your response, identify all persons having knowledge of those facts, and identify all documents referring or relating in any way to those facts.

ANSWER.   From the standpoint of the Big Stone Partners, this case is about unintended consequences.   Whether the proponents of

Amendment E intended to affect utility easements is irrelevant to the subject matter of the action.

16.   Admit that the purpose of Amendment E is unrelated to existing easements or the future purchase of easements for transmission lines, towers, or ingress and egress for utility maintenance.

RESPONSE.   Denied

17.   If your response to paragraph 16 is anything other than an unqualified admission, state all facts upon which you rely for your response, identify all persons having knowledge of those facts, and identify all documents referring or relating in any way to those facts.

ANSWER.   Amendment E relates to existing easements should restructuring in the electric industry require a spinoff of transmission assets, either from a regulatory standpoint or from a business standpoint.  It affects the future purchase of easements, as testified to by those utility witnesses that have been deposed, in driving up the price of the acquisition of utility easements.

18.   Admit that the utilities have not performed any calculations (other than those disclosed in Dr. Brown's expert report) which would show the extent of damages claimed in Paragraph 5 of the First Amended Complaint for Declaratory and Injunctive Relief, which alleges that "Amendment E . . . will greatly increase the cost of developing transmission facilities."

RESPONSE.   Denied

19.   If your response to paragraph 18 is anything other than an unqualified admission, state all facts upon which you rely for your response, identify all persons having knowledge of those facts, and identify all documents referring or relating in any way to those facts.

ANSWER.   The Big Stone Partners see no necessity to perform a comprehensive study of the financial detriment which will flow to utilities if Amendment E applies to transmission facilities.  The damage is manifest, as testified to by witnesses Brutlag, Ball, Leyendecker and Krava.

20. Admit that the utilities have not calculated the number of easements or total acreage of transmission line easements that it claims are affected by Amendment E.

RESPONSE. Denied.

21. If your response to paragraph 20 is anything other than an unqualified admission, state all facts upon which you rely for your response, identify all persons having knowledge of those facts, and identify all documents referring or relating in any way to those facts.

ANSWER.   MDU has determined that it has 1,317 electric transmission easements in South Dakota.

Otter Tail has determined that it has a total of 2,880 easements in South Dakota, consisting of 613.68 miles of transmission easement and 204.32 miles of distribution easement. Otter Tail estimates that the transmission easements comprise 5,953 acres and the distribution easements comprise 247 acres.

22. Admit that there are currently no regulatory or legal restrictions prohibiting the current title holder (Otter Tail Power Company or the Utilities) from selling agricultural land adjacent to the Big Stone facility to another power company for power production, to a commercial business, to a qualified family farm (as defined in Amendment E), or to an enterprise that is exempt from Amendment E (as defined in Amendment E).

RESPONSE. Denied.

23. If your response to paragraph 20 (sic) is anything other than an unqualified admission, state all facts upon which you rely for your response, identify all persons having knowledge of those facts, and identify all documents referring or relating in any way to those facts.

ANSWER. It is sheer sophistry to suggest that simply because no regulatory body or statute prohibits the sale of agricultural land, the Big Stone Partners or any of them are free to do so. As stated in the complaint, and as stated by numerous witnesses, the practical effect of Amendment E lessens the value of each company's interest in the Big Stone Plant because a sale of any interest will

modify the existing estates in land owned by the partners, thus destroying the grandfather in Amendment E.   This will have an adverse effect upon any purchaser.

24.   Admit that none of the Utilities are currently planning electric or natural gas transmission or electric generation projects to be located in South Dakota and that no applications are pending to any regulatory body for siting approval for any such projects.

RESPONSE.   Admitted, provided that planning is ongoing and projects can be developed at any time.

25.   If your response to paragraph 24 is anything other than an unqualified admission, state all facts upon which you rely for your response, identify all persons having knowledge of those facts, and identify all documents referring or relating in any way to those facts.

ANSWER.   See answer to 24.

26.   For each utility, explain whether it has been in violation of SDCL Ch. 47-9A and explain the circumstances of such violation.

ANSWER.   If Chapter 47-9A applies to utility easements, it raises a question of compliance with that chapter.   However, the Big Stone Partners believe their leasing of the land held for future expansion at the Big Stone Plant would comply with Chapter 47-9A, because of SDCL § 47-9A-12.

27.   For each utility, explain whether it relied on any exemptions from SDCL Ch. 47-9A before November 1998, identifying each exemption claimed.

ANSWER.   No exemptions were relied upon.   No enforcement was ever pursued against the Big Stone Partners.   Had it occurred, the law could have easily been amended, because it was the belief of the utilities that Chapter 47-9A was not intended to affect the operation of utilities.

**BRIEF EXHIBIT B**

## DAMAGES TO BIG STONE PARTNERS
## AS RESULT OF THE PASSAGE OF AMENDMENT E

The Big Stone Power Plant, located in Grant County, South Dakota, is owned as tenants in common by MDU, NWPS, and Otter Tail. The plant employs 76 workers with an annual payroll (including benefits) of $5 million, and annual property tax payment of $1.9 million. The Big Stone Power Plant owns approximately 2,100 acres, of which approximately 1,350 acres are used by the present power plant operation. Currently, 552.8 acres, reserved for potential future development, are cash rented as farmland. The 1999 cash rent was $15,840.

### Loss of Farm Rental Income

If the legal ownership of the Big Stone Plant were to change, the successor owner or owners of the facility would be subject to the provisions of Amendment E. According to the provisions of Amendment E, the successor owners would be required to convert the farmland to non-farm use or divest themselves of the farmland within five years. The economic losses suffered if the land has to be converted to nonfarm use (and left idle) would be the present value of the lost farm rents. That is, after the five year time period (deadline), the loss would be the present value of lost farm rents from that date forward. That is:

$$\text{PV of LOSS (farm rental)} \ = \ \sum_{T=6}^{n} \text{Rent}_T/(1+D)^T$$

Where:

$$552.8$$

Rent$_t$ = rent received from 1,350 acres of farmland,
D =  discount rate for converting future rents to present value,
T = 6, ... , n years.

Using the $15,840 annual cash rent, an 8 percent interest rate, and an assumed inflation rate of 3 percent, the present value of the loss farm rental income over a 25 year, 50 year, and 100 year time horizon is:  $155,000, $221,000, and $246,000, respectively.

Legal ambiguities for successor owners in the interpretation of Amendment E about whether the land could stand idle while awaiting development without divestment could also impair the market value of the whole plant.  Typically, a new generating facility requires a planning, permitting, and construction time period of 10 or more years. Impairment of the value of land could occur if the land reserved for future development must be divested within the five-year deadline, which would preclude future expansion. While this uncertainty in the interpretation of Amendment E is not easily quantifiable it does not preclude this as a potential source of damage.  Clearly, it adversely affects the market value of the plant in the hands of the present owners.

<u>Transmission Lines</u>

In the construction and operation of transmission facilities, electric utility companies take transmission easements, which includes the land between poles or towers. Transmission line easements are typically 100-foot wide strips traversing the property.  To minimize the cost of these easements to the utility (and ultimately the customer), farmers

2

are allowed to farm the land between the poles and towers as they normally would. Amendment E does not allow this for newly-constructed transmission lines because the ownership of the land between poles or towers constitutes a beneficial interest in land which cannot be retained for longer than five years.  Therefore, the utility companies will have to convert this land to solely nonfarm uses.  Since this would preclude the farmer from using this land for farming, it would sacrifice the earning potential of that farmland completely.

Currently, the cost of acquiring a transmission line easement is a payment equal to 100 percent of fee title, with the farmer able to farm between towers.  Under Amendment E utilities will likely have to acquire fee title for new transmission corridors.  If the farmer could not farm the easement strip it would be very disruptive to the farming operation, would raise the cost of land acquisition and would increase the need for condemnation (thus adding more expense to the process).  One company estimates this will add up to 200% to the current cost of right of way acquisition.    In some cases, fences or barriers might have to be installed to separate farm and non-farm land.  This would add additional costs of acquiring transmission line easements.

## Deregulation and Restructuring

The forces of deregulation and restructuring occurring throughout the country will ultimately have an impact in South Dakota.  One likely result of restructuring would be the separation of the generation, transmission, and distribution parts of the business.  The sale

or spin-off of the Big Stone Plant in any restructuring plan would greatly raise the cost due to the Amendment E requirement of selling or holding idle the land set aside for future development.   Likewise, as shown above, the high cost of acquiring transmission line easements would raise the cost of transmission facilities.   That is, the creation of a new transmission corporation would make all grandfathered transmission easements subject to the terms of amendment E, and all easements would need to be reacquired.

<u>Lost Economic Development Potential for South Dakota</u>

All states operate in a competitive environment for new and expanding businesses. Amendment E could damage South Dakota's competitiveness in the siting of new and expanding electrical generation facilities.  The siting of a generation facility in a state brings great economic development opportunities to a state.  Increased property and sales tax base, expanded employment opportunities, increased sales and income for local businesses are all benefits of economic development.  The increased costs of idle land, uncertainty of Amendment E, and increased transmission line costs all reduce South Dakota's potential for economic development in the siting of future generation facilities. Furthermore, not only are new plants less likely to choose South Dakota as a site but also the expansion of existing generation facilities is impaired by the various provisions of Amendment E.

**BRIEF EXHIBIT C**

SD Farm Bureau v. Joyce Hazeltine, et al.    Multi-Page™    Ralph Brown, July 24, 20

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH DAKOTA
 2                   CENTRAL DIVISION

 3

 4    South Dakota Farm Bureau, Inc.;
      South Dakota Sheep Growers
 5    Association, Inc.; Haverhals
      Feedlot, Inc.; Sjovall Feedyard,
 6    Inc.; Frank D. Brost; Donald
      Tesch; William A. Aeschlimann;
 7    Spear H. Ranch, Inc.; Marston
      Holben; Marson and Marian
 8    Holben Family Trust;
      Montana-Dakota Utilities Co.;
 9    Northwestern Public Service;
      and Otter Tail Power Company,
10
                         Plaintiffs,
11
           -vs-
12
      Joyce Hazeltine, in her official
13    capacity as Secretary of State of
      South Dakota, and Mark W. Barnett,
14    in his official capacity as
      Attorney General of South Dakota,
15
16                       Defendants.
17
           -and-
18
      Dakota Rural Action and South
19    Dakota Resources Coalition,
20               Defendant-Intervenors.

21    * * * * * * * * * * * * * * * * * * * * * * *

22

23            D E P O S I T I O N   O F

24               Ralph Brown

25    * * * * * * * * * * * * * * * * * * * * * * *
```

Page 2

```
 1    APPEARANCES:      Mr. David A. Gerdes
                        May, Adam, Gerdes & Thompson
 2                      Pierre, South Dakota

 3                      Attorney for Montana-Dakota Utilities
                        Co., Northwestern Public Service,
 4                      Otter Tail Power Company.

 5                      Ms. Roxanne Giedd
                        Ms. Diane Best
 6                      Assistant Attorneys General
                        Pierre, South Dakota
 7
                        Attorneys for Joyce Hazeltine and Mark
 8                      W. Barnett.

 9                      Ms. Virginia Brannon
                        Earthlaw
10                      University of Denver
                        Denver, Colorado
11
                        Attorney for Dakota Rural Action and
12                      South Dakota Resources Coalition.

13    ALSO PRESENT:     Mr. John Bixler

14                      * * * * * * * * *

15               INDEX OF EXAMINATIONS
```

16    By Ms. Giedd:                          Page 4

17    By Ms. Brannon:                        Page 21

18

```
19               INDEX OF EXHIBITS

20    NUMBER   DESCRIPTION              REFERENCED

21    41       Brown Report on Damages to Big Stone    6, 9
               Partners as Result of the Passage of
22             Amendment E
```

23

24

25

---

Pag

```
 1                S T I P U L A T I O N

 2

 3         It is hereby stipulated and agreed, by and between

 4    the above-named parties through their attorneys of

 5    record, whose appearances have been hereinabove noted,

 6    that the deposition of Ralph Brown may be taken at thi

 7    time and place, that is, at the law offices of Woods,

 8    Fuller, Shultz & Smith, Sioux Falls, South Dakota, on

 9    the 24th day of July, 2000, commencing at the hour of

10    11:00 a.m.; said deposition taken before Carol Johnson,

11    RMR, a Notary Public within and for the State of South

12    Dakota; said deposition taken for the purpose of

13    discovery or for use at trial or for each of said

14    purposes, and said deposition is taken in accordance

15    with the applicable Rules of Civil Procedure as if take

16    pursuant to written notice.  Insofar as counsel are

17    concerned, the reading and the signing of the transcri

18    by the witness are waived.

19

20                * * * * * * * * *

21

22

23            RALPH BROWN,

24    called as a witness, having been first duly sworn,

25    testified as follows:
```

---

Pag

```
 1    EXAMINATION BY MS. GIEDD:

 2    Q  Dr. Brown, you've deposed before, haven't you?

 3    A  I have, yes.

 4    Q  And so you are familiar with some of the important thing

 5       like we can't talk at the same time?

 6    A  I am.

 7    Q  Right.  You're an expert in economics?

 8    A  Yes.

 9    Q  Are you an expert in sociology?

10    A  No.

11    Q  What about socioeconomics?

12    A  Well, depends on how that is defined, but obviously over my

13       years as an economist I've done a variety of economic

14       studies, which some of those would be socioeconomic as well

15       as economic.

16       MR. GERDES:  Excuse me, counsel, why don't we have a

17    stipulation on the record for this deposition.  I don't

18    think this was noticed, was it?

19       MS. GIEDD:  No, it was not.  That's fine.

20       MR. GERDES:  May it be stipulated that the deposition of

21    Ralph Brown may be taken at this time and place, without

22    prior notice, and for all purposes authorized by the

23    Federal Rules of Civil Procedure, and that insofar as

24    counsel are concerned, reading and signing of the

25    deposition by the deponent may be waived.
```

Case 3:99-cv-03018-CBK   Document 124   Filed 11/15/00   Page 26 of 39 PageID #: 767

SD Farm Bureau v. Joyce Hazeltine, et al.     Multi-Page™     Ralph Brown, July 24, 20

Page 9

1  A That's my understanding.
2  Q Do you know what -- are they using the land for grazing or
3    for hay, or do you know?
4  A I think in one of the agreements I saw the word "corn," so
5    I suspect they're -- well, I don't know exactly how they're
6    using the land in terms of cropping and pasture or
7    whatever, but they're using it for agriculture uses, that's
8    -- that's obvious.
9  Q Okay. You make a statement in Exhibit 41, this is right
10   under -- on Page 1, there's a section entitled "Loss of
11   Farm Rental Income," and the first sentence under that
12   says:  "If the legal ownership of the Big Stone Plant were
13   to change. . . ."
14     Now, is this entire section of your expert report based
15   upon that premise?
16 A My understanding is that Chapter 22, Subchapter 4 is a form
17   of a grandfather clause.  So if -- if the ownership stays
18   as it is, it's not subject to provisions of Amendment E.
19   If that were to change in some manner, ownership
20   proportions or whatever, then my understanding is that it
21   would then invoke Subchapter, I think 10, which gives a
22   five-year period of time which it could be farmed, and then
23   after that it would have to -- it would be disposed of or
24   -- or they could no longer farm it, lease it or whatever as
25   agriculture land.

Page 10

1  Q Dr. Brown, all I'm -- just to make sure I understand, the
2    loss calculation you do in this section of your report is
3    based on the idea that this would occur if the legal
4    ownership of the Big Stone property changes, is that right?
5  A That's right.
6  Q Okay.  Now, are you aware of any plans the Big Stone
7    Partners have to sell the facility at this time?
8  A No.
9  Q If there were any sale, certainly all the partners would
10   have to agree, isn't that right?
11 A Yes.
12    MR. GERDES:  That's objected to as calling for a legal
13   conclusion, without proper foundation.  Answer if you can.
14 A I think so.
15 Q Did Mr. Krava indicate to you that there was a sale that
16   was a possibility at the current time?
17 A Well, anything is possible, but he didn't indicate that
18   there was any current pending sale.
19 Q Now, the next sentence of that section under "Loss of Farm
20   Rental Income" says, quote:  "According to the provisions
21   of Amendment E, the successor owners would be required to
22   convert the farmland to non-farm use or divest themselves
23   of the farmland within five years."
24     Do you see that sentence?
25 A I do.

Page

1  Q I think that you said that the provision of Amendment E
2    that that's referring to would be Subsection 22-10?
3  A Yes.
4  Q In this section of the report you do a calculation of a
5    loss over three different time horizons, correct?
6  A That's correct.
7  Q Now, am I correct that the loss you're calculating there is
8    dependent upon the sale of the Big Stone property?
9  A Yes.
10 Q And would you agree with me that if there is a sale, these
11   calculations are presuming that the new owners would not
12   immediately develop that land?
13 A Yes.
14 Q Does this land that's being held for future development
15   have some intrinsic value over -- because it's being held
16   for development that's over and above the value of the
17   property for farming?  Do you understand that question?
18 A I think what you're asking is -- is the potential value of
19   that land greater than farmland value?  Is that the
20   question you're asking?
21 Q Well, basically is it worth more to whoever owns the Big
22   Stone property than it would be just when -- as farmland?
23 A I would think so.
24 Q And do you think that the -- that intrinsic value is
25   probably more significant than the value of the land that

Page

1    could be -- the value of the land for a cash rental to
2    farmers?
3  A I think that's the same question.
4  Q So your answer would be you think so?
5  A Well, I think -- you asked me if the value of the land,
6    intrinsic value of the land, was greater than its cash
7    value of the rent, which obviously determines the value of
8    the land as farmland.  And so what you're asking is the
9    value of the land intrinsically more than its farmland
10   value, and the answer is yes.
11 Q Now, does Section 22-10 in your understanding require th
12   the land be divested within five years?
13 A Well, I'm no legal expert, and I don't see the word
14   "divest" in Subsection 10.  So I don't know.
15 Q I think that your report refers to either selling the land
16   within five years or keeping it idle.  Are those the two
17   alternatives that -- to your understanding?
18    MR. GERDES:  Or converting to non-farm use is what it
19   says.
20 Q So it's three things:  You can either sell it, convert it
21   to non-farm use, or hold it idle?
22 A Well, let's read it.  It says:  "The economic losses
23   suffered if the land has to be converted to non-farm use
24   (and left idle). . . ."  You know, I'm reading --
25   ". . . convert the farmland to non-farm use or divest

SD Farm Bureau v. Joyce Hazeltine, et al.     Multi-Page™     Ralph Brown, July 24, 20

Page 13

1  themselves of the farmland within five years." So --
2  Q Go --
3  A Go ahead.
4  Q Is that two things, non-farm use, you have -- and left
5    idle, or are there three things, non-farm use, left idle,
6    or sale?
7  A Well, you could have non-farm use that isn't idle. So that
8    would be one use. You could have non-farm use that's idle.
9    That would be a third -- or second, and then you would have
10   divesting, but that would be a third.
11 Q On Page 2 you indicate that a new generating facility
12   requires a planning, permitting, and construction type
13   period of 10 or more years?
14   Yes.
15 Q Do you see that section?
16 A I see that.
17 Q Is that what information you received from Mr. Krava?
18 A Yes.
19 Q Do you know how long it takes to construct a new generation
20   facility?
21 A No.
22 Q If this future land is developed at some point, do you know
23   whether some of the facilities at the present plant would
24   be able to be utilized?
25 A Okay. Future land, you mean --

Page 14

1  Q The 552.8?
2  A You asked me if the future land. I think you mean if the
3    land would be developed in the future -- would you restate
4    that again.
5  Q Sorry. Okay.
6  A That caught me right away, and then I forgot everything
7    else from that point.
8  Q If the 552.8 acres --
9  A Thank you.
10 Q -- are used to build an expansion or a new generation
11   facility on that, do you know whether some of the
12   facilities at the current Big Stone Plant could be utilized
13   as part of the new generation facility?
14 A I don't know that.
15   MR. GERDES: Off the record.
16   (Off the record discussion.)
17 Q On Page 2 you state, quote: Impairment of the value of
18   land could occur if the land reserved for future
19   development must be divested within the five-year
20   deadline. . . ."
21   And just to make sure -- do you see that sentence,
22   Doctor?
23 A Give me some direction there. Which paragraph is it in?
24 Q The first full paragraph, five lines down.
25 A Okay. "Impairment of the value of the land could occur if

Page

1  land reserved for future development must be divested
2  within the five-year deadline. . . ." Yeah. If we follow
3  the premise that the value of land had intrinsic value
4  greater than farmland and we had do divest it within five
5  years so we couldn't use it for that purpose, it would be
6  an impairment of its value.
7  Q And where is this requirement that it be divested within
8    five years?
9  A As indicated, it doesn't say that in Subsection 10. I
10   think the legal interpretation is yet to be made by the
11   courts, and there are some who are concerned, particularly
12   utilities, that it might be interpreted as if the
13   development doesn't take place within five years, one
14   possibility could be that it would require the land be
15   divested after that. They would have to divest themselves
16   of the land. That's one possibility. As we indicated,
17   otherwise it could be idle, or it could be put into other
18   non-farm uses. So -- that's my answer.
19 Q So you're not suggesting that they have to divest it. It
20   still goes back to the three possibilities we discussed
21   earlier?
22 A That's correct.
23 Q The last sentence of that paragraph states, quote:
24   Clearly, it adversely affects the market value of the plant
25   in the hands of the present owners, end quote. Do you see

Page

1  that line?
2  A Yes.
3  Q Do you know what the market value of the plant is right
4    now?
5  A No. No, I don't.
6  Q Now, are you suggesting that the market value of the plan
7    is adversely affected by the inability to rent 552.8 acres
8    for farming?
9  A Yes.
10 Q And how -- I mean, in terms of a percentage of the value o
11   the whole plant, what are we talking about?
12 A I haven't done any quantification of that. I don't know
13   what the current value of the plant is, so I couldn't
14   answer that question.
15 Q Now, your next section of your report entitled
16   "Transmission Lines," as I understand it, assumes that
17   Amendment E would not allow farming to occur between
18   poles and the towers, is that correct?
19 A That's the interpretation that I've used in my report here,
20   yes.
21 Q Do you know what provision of Amendment E that's based on?
22 A Well --
23   MR. GERDES: First of all, I'll just object that it
24   calls for a legal conclusion. Go ahead and answer it if
25   you can.


Page 1

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF SOUTH DAKOTA

3             CENTRAL DIVISION
   *  *  *  *  *  *  *  *  *  *  *  *  *  *
4
SOUTH DAKOTA FARM BUREAU, INC.;
5 SOUTH DAKOTA SHEEP GROWERS
  ASSOCIATION, INC.; HAVERHALS
6 FEEDLOT, INC.; SJOVALL FEEDYARD,
  INC.; FRANK D. BROST; DONALD
7 TESCH; WILLIAM A. AESCHLIMANN;
  SPEAR H. RANCH, INC.; MARSTON
8 HOLBEN; MARSON AND MARIAN
  HOLBEN FAMILY TRUST;
9 MONTANA-DAKOTA UTILITIES CO.;
  NORTHWESTERN PUBLIC SERVICE;
10 and OTTER TAIL POWER COMPANY,

11               Plaintiffs,

12      -vs-            CIV. NO. 99-3018

13 JOYCE HAZELTINE, in her official capacity,
   as Secretary of State of South Dakota, and
14 MARK W. BARNETT, in his official capacity
   as Attorney General of South Dakota,

15               Defendants.

16

17      And

18
DAKOTA RURAL ACTION and SOUTH
19 DAKOTA RESOURCES COALITION,

20               Defendant-Intervenors.
   *  *  *  *  *  *  *  *  *  *  *  *  *  *
21

22      D E P O S I T I O N   O F

23         RODNEY LEYENDECKER
   *  *  *  *  *  *  *  *  *  *  *  *  *  *
24

25



Page 2

1 APPEARANCES:

2      Woods, Fuller, Shultz & Smith
       Attorneys at Law
3      300 South Phillips Avenue
       Sioux Falls, South Dakota  57104
4      By Mr. John Simko

5      for South Dakota Farm Bureau, Inc., South Dakota
       Sheep Growers Association, Haverhals Feedlot, Inc.
6      Sjovall Feedyard, Inc., Frank D. Brost, Donald
       Tesch, William A. Aeschlimann;
7
       Tonner, Tobin & King
8      Attorneys at Law
       P. O. Box 1456
9      Aberdeen, South Dakota  57402
       By Mr. Thomas Tobin
10
       for Spear H. Ranch, Inc.; Marston Holben; Marston
11     and Marian Holben Family Trust;

12     May, Adam, Gerdes & Thompson
       Attorneys at Law
13     P. O. Box 160
       Pierre, South Dakota  57501
14     By Mr. David A. Gerdes

15     for Montana-Dakota Utilities Co., Northwestern
       Public Service, Otter Tail Power Company;
16
       South Dakota Attorney General
17     Attorneys at Law
       500 East Capitol
18     Pierre, South Dakota  57501
       By Ms. Diane Best & Ms. Roxanne Giedd
19
       for Joyce Hazeltine & Mark W. Barnett;
20
       Earthlaw
21     Attorneys at Law
       University of Denver - Forbes House
22     1714 Poplar Street
       Denver, Colorado  80220
23     By Ms. Virginia Brannon

24     for Dakota Rural Action and South
       Resources Coalition.
25

Page

1          INDEX TO EXAMINATIONS

2 EXAMINATION BY MS. BEST ..................... 4

3 EXAMINATION BY MS. BRANNON ................. 38

4 EXAMINATION BY MR. GERDES ................. 50

5 EXAMINATION BY MS. BRANNON ................. 50

6 EXAMINATION BY MS. BEST ..................... 51

7

8

9

10

11

12

13

14          INDEX TO EXHIBITS

15     32     NWPS Service Territory Map ....... 34

16     2054   Easement for NWPS by Larry
17 Wasland .......................................... 46

18

19

20

21

22

23

24

25

Pag

1      S T I P U L A T I O N

2      It is stipulated and agreed by and

3 between the above-named parties, through their attor

4 of record, whose appearances have been hereinabove

5 noted, that the deposition of Rodney Leyendecker, may be

6 taken at this time and place, that is, at the offices of

7 May, Adam, Gerdes & Thompson, Pierre, South Dakota, o

8 the 16th day of May, 2000, commencing at the hour o

9 4:00 p.m.; said deposition taken before JERRY MAY, a

10 Registered Professional Reporter and Notary Public

11 within and for the State of South Dakota; said

12 deposition taken for the purpose of discovery or for u

13 at trial or for each of said purposes, and said

14 deposition is taken in accordance with the applicable

15 Rules of Civil Procedure as if taken pursuant to writ

16 notice.

17

18      RODNEY LEYENDECKER,

19 called as a witness, being first duly sworn, deposed a

20 said as follows:

21

22 EXAMINATION BY MS. BEST:

23      Q.  We are taking the deposition of Rodney

24 Leyendecker for the purpose of hearing testimony

**Page 49**

1  A.  That's correct.

2  Q.  Did you have any dealings with Northwestern
3 Public Service Company when you were president and CEO
4 of Northwestern Energy Corporation?

5  A.  Provided regulatory consultation, rate
6 making, economic analysis.

7  Q.  So then the person who really would be the
8 key person to talk to about easements would be somebody
9 on the operating side of Northwestern Public Service
10 Company, is that correct?

11  A.  And specifically the right-of-way guy, the
12 guy that secures the rights-of-way.

13  Q.  And his name eludes you at the moment?

14  A.  At the moment it does.  Age, I think.

15  Q.  Starts with an H?

16  A.  No, I said it is age I think.

17  Q.  Mr. Leyendecker, I would like to direct your
18 attention to Exhibit 2052 which is a letter by, excuse
19 me, article in the Farmer's Union News titled Rural
20 Electric Association Won't Oppose Amendment E.  In the
21 second paragraph, first sentence, it says the SDREA,
22 which stands for the South Dakota Rural Electric
23 Association's legislative committee has voted to adopt a
24 position of neutrality on Amendment E.  Were you aware
25 of their position on Amendment E?

**Page 50**

1  A.  No.  If I was, I have forgotten, but I would
2 say no.

3  Q.  Do you have any knowledge as to how or why
4 they adopted a position of neutrality on Amendment E?

5  A.  No, I would have to think of all the
6 political ramifications before I come up with
7 conclusions on that.  I don't have a conclusion at this
8 point.

9       MS. BRANNON:  Thank you, that's all I
10 have.

11 EXAMINATION BY MR. GERDES:

12  Q.  One question hopefully.  You had some
13 discussions about the value of the Big Stone partnership
14 interest.  Hypothetically, given the fact that Amendment
15 E has now been adopted, and let's say Western Public
16 Service Company wanted to sell its share in the Big
17 Stone plant, would you expect that a willing buyer would
18 pay more or less for that share now than before
19 Amendment E having been adopted.

20  A.  All other things being equal as you say, then
21 I would say less, obviously.

22 EXAMINATION BY MS. BRANNON:

23  Q.  I how much less in percentage terms?

24  A.  With regard to the land?  It would be a

**Page**

1  Q.  And why?

2  A.  Because obviously if we were selling part of
3 our power plant, the buyer would be a power plant
4 operator, therefore the land itself, and I know your
5 position is it is insignificant to the plant, it is
6 significant to itself, the land would depreciate in
7 value significantly, because there is no value for the
8 matter of fact, as I understand the test of five years
9 or take no, or change the form of its use.

10  Q.  So are you saying that the value of the Big
11 Stone plant to Northwestern would decrease by 40 t
12 percent?

13  A.  The land, the land.  Obviously the plant not.

14  Q.  Just the land in question would decrease
15 because of that loss of rental income in the amount o
16 approximately $3,500 a year?

17  A.  Yes, most certainly.

18 EXAMINATION BY MS. BEST:

19  Q.  First of all, I referred throughout your
20 deposition to Northwestern Public Service Company
21 the parent company as Northwestern.  Now I was ta
22 about electric utility operations.  You didn't
23 understand that I was talking about Northwestern Energy
24 natural gas marketing, did you?

25  A.  Northwestern Public Service Company was th

**Page**

1 original company commonly referred to as Northwestern,
2 assumed you were talking utility.  The other one was
3 very specific.

4  Q.  Then one other question is are you aware of
5 anything that would prohibit Otter Tail and Big Ston
6 partners from selling off those 552 acres over to the
7 Big Stone Cheese plant, or to a new ethanol facility,
8 something like that, commercial business?

9  A.  Am I aware of anything that would prohibit
10 it?  No.  The only thing I would say is if we own it,
11 assume we own it for a reason.  If that reason ceased
12 exist, I know of no reason we couldn't do it, but I
13 would like to be on the buyer side of the negotiations

14  Q.  Meaning if you have to divest, it would be
15 essentially a fire sale and you would like to be the
16 buyer, is that where you are going with that?

17  A.  I am saying that it obviously has an
18 impairment, so you would rather be a buyer than a s
19 in such a transaction.

20  Q.  Well, there is nothing to keep you from
21 selling it to a family farmer, is there?

22  A.  I again would like to be the buyer, not the
23 seller.

24       MS. BEST:  I have nothing further.

Brost v. Hazeltine                    Multi-Page™ COPY                    Mark Rol
                                                                          5/16

---

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              DISTRICT OF SOUTH DAKOTA
 3                  CENTRAL DIVISION
 4   * * * * * * * * * * * * * * * *
     SOUTH DAKOTA FARM BUREAU, INC.;
 5   SOUTH DAKOTA SHEEP GROWERS
     ASSOCIATION, INC.; HAVERHALS
 6   FEEDLOT, INC.; SJOVALL FEEDYARD,
     INC.; FRANK D. BROST; DONALD
 7   TESCH; WILLIAM A. AESCHLIMANN;
     SPEAR H. RANCH, INC.; MARSTON
 8   HOLBEN; MARSTON AND MARIAN
     HOLBEN FAMILY TRUST;
 9   MONTANA-DAKOTA UTILITIES CO.;
     NORTHWESTERN PUBLIC SERVICE;
10   and OTTER TAIL POWER COMPANY,
11                      Plaintiffs,
12         -vs-              CIV. NO. 99-3018
13   JOYCE HAZELTINE, in her official capacity,
     as Secretary of State of South Dakota, and
14   MARK W. BARNETT, in his official capacity
     as Attorney General of South Dakota,
15                      Defendants.
16
17         And
18
     DAKOTA RURAL ACTION and SOUTH
19   DAKOTA RESOURCES COALITION,
20                 Defendant-Intervenors.
21   * * * * * * * * * * * * * * * *
22          D E P O S I T I O N   O F
23                  MARK ROLFES
24   * * * * * * * * * * * * * * * *
25
```

---

**Page 2**

```
 1   APPEARANCES:
 2        Woods, Fuller, Shultz & Smith
          Attorneys at Law
 3        300 South Phillips Avenue
          Sioux Falls, South Dakota  57104
 4        By Mr. John Simko
 5        for South Dakota Farm Bureau, Inc., South Dakota
          Sheep Growers Association, Haverhals Feedlot, Inc.
 6        Sjovall Feedyard, Inc., Frank D. Brost, Donald
          Tesch, William A. Aeschlimann;
 7
          Tonner, Tobin & King
 8        Attorneys at Law
          P. O. Box 1456
 9        Aberdeen, South Dakota  57402
          By Mr. Thomas Tobin
10
          for Spear H. Ranch, Inc.; Marston Holben; Marston
11        and Marian Holben Family Trust;
12        May, Adam, Gerdes & Thompson
          Attorneys at Law
13        P. O. Box 160
          Pierre, South Dakota  57501
14        By Mr. David A. Gerdes
15        for Montana-Dakota Utilities Co., Northwestern
          Public Service, Otter Tail Power Company;
16
17        South Dakota Attorney General
          Attorneys at Law
18        500 East Capitol
          Pierre, South Dakota  57501
19        By Ms. Diane Best & Ms. Roxanne Giedd
20        for Joyce Hazeltine & Mark W. Barnett;
21        Earthlaw
          Attorneys at Law
22        University of Denver - Forbes House
          1714 Poplar Street
23        Denver, Colorado  80220
          By Ms. Virginia Brannon
24
          for Dakota Rural Action and South
25        Resources Coalition.
```

---

**Page ...**

```
 1              INDEX TO EXAMINATIONS
 2   EXAMINATION BY MS. BEST ..................... 4
 3   EXAMINATION BY MS. BRANNON ................. 21
 4   EXAMINATION BY MS. BEST .................... 32
 5   EXAMINATION BY MR. GERDES ................. 34
 6   EXAMINATION BY MR. GERDES ................. 36
 7   EXAMINATION BY MS. BEST .................... 37
 8   EXAMINATION BY MR. GERDES ................. 37
 9
10
11
12
13
14
15              INDEX TO EXHIBITS
16
17      30      Map of Big Stone Power Plant ..... 10
18      2050    Mr. MacFarlane's Letter to
                Pastor Krahling 3/21/00 .......... 24
19      2051    Big Stone Plant Ownership
                Agreement ........................ 25
```

---

**Page ...**

```
 1        S T I P U L A T I O N
 2        It is stipulated and agreed by and
 3   between the above-named parties, through their atto
 4   of record, whose appearances have been hereinabove
 5   noted, that the deposition of Mark Rolfes, may be ta
 6   at this time and place, that is, at the offices of May,
 7   Adam, Gerdes & Thompson, Pierre, South Dakota, on the
 8   16th day of May, 2000, commencing at the hour of 11:30
 9   a.m.; said deposition taken before JERRY MAY, a
10   Registered Professional Reporter and Notary Public
11   within and for the State of South Dakota; said
12   deposition taken for the purpose of discovery or for
13   at trial or for each of said purposes, and said
14   deposition is taken in accordance with the applicable
15   Rules of Civil Procedure as if taken pursuant to writ
16   notice.
17
18        MARK ROLFES,
19   called as a witness, being first duly sworn, deposed a
20   said as follows:
21
22   EXAMINATION BY MS. BEST:
23        Q. Mark, my name is Diane Best, I am an
24   Assistant Attorney General, and I am representing th
25   two Constitutional Officers that are named as defendants
```

Page 33

1  Q. At some point in time in that ten year
2 process you break ground and take the land out of ag
3 production, or a significant portion of it, isn't that
4 correct?
5  A. If things would go in the normal sequence or
6 an expected sequence, yes.
7  Q. And it takes three to five years to build a
8 plant?
9  A. Correct.
10  Q. So if you lease the ground for ag production
11 for five years, and you don't start building until the
12 sixth or seventh year, it is a year or two that the
13 ground would have to sit idle waiting for you to start
14 turning ground on building the plant, is that basically
15 what your position is?
16  A. If you follow the sequence, and you are able
17 to, not to get delays that extend it, yes.
18  Q. And if you don't get your regulatory
19 authority, then you don't continue to own the land,
20 correct?
21  A. That would be my assumption that you would
22 dispose of the land if you knew you weren't going to
23 build.
24     MS. BEST: That's all.
25     MR. GERDES: Let me ask just a few

Page 34

1 questions for clarification.
2 EXAMINATION BY MR. GERDES:
3  Q. Mr. Rolfes, you indicated that the preference
4 of the Big Stone partners would be to keep the property,
5 there was a series of questions by Mrs. Best dealing
6 with you could sell the property, that kind of thing.
7 What do you mean by the first preference would have been
8 to keep the property, would be to keep the property,
9 excuse me?
10  A. If at all possible, we would keep the
11 property.
12  Q. And then why? I think you have probably
13 already answered that, but I want you to tell me why you
14 want to keep the property, why that's your preference?
15  A. Because of a number of complications, one
16 being future expansion which we have touched upon. The
17 other is still maintaining the buffer zone for noise,
18 dust, any other permitting, it is much simpler to have
19 the land under our control than to have it sold with the
20 possibility of residences being built there, or we would
21 lose control of what could be done with the land.
22  Q. Another question. You talked about the
23 possibility that if there were an expansion of the plant
24 there would need to be new transmission. Are the
25 current transmission corridors sufficient, or would

Page

1 there have to be new transmission corridors to go al
2 with the new transmission facility?
3  A. To the best of my knowledge on the existing
4 property that the plant owns there is sufficient, but
5 once it leaves the boundary new corridors would hav
6 be purchased.
7  Q. So what you are saying is there would have to
8 be new transmission corridors as that new energy lea
9 the property and it would have to somehow intersect with
10 existing transmission facilities somewhere, correct?
11  A. All the studies we have done, new
12 transmission lines would have to be built.
13  Q. You talked about if there was a plant
14 expansion, either with reference to the NSP request fo
15 proposal or for other reasons, this would involve
16 different ownership. Are you talking about a
17 reconfiguration of the existing ownership, or are you
18 talking about a side by side ownership situation? D
19 you understand my question?
20  A. You have to realize it is speculation on my
21 part, but the speculation is that the new facility wou
22 have different ownership than the existing facility.
23  Q. So it would stand side by side to the
24 existing ownership configuration, is that correct?
25  A. That's correct.

Pag

1  Q. Would there be a necessity to acquire more
2 land to put this expansion on?
3  A. The odds are very good that it would need
4 additional land purchased.
5     MR. GERDES: That's all I have. Under
6 the rules you can read and sign the deposition or trus
7 in the accuracy of the Court Reporter and you can w
8 the reading and signing. I would recommend that yo
9 waive it, so you have to say on the record that you
10 waive the reading and signing.
11     THE WITNESS: I agree to waive the
12 reading.
13     MR. GERDES: I would like to put
14 Mr. Rolfes back on the stand for one question I forg
15 to ask, specially since I feel you might want to cross
16 examine on it.
17 EXAMINATION BY MR. GERDES:
18  Q. Mr. Rolfes, has the ownership configuration
19 of the Big Stone plant changed since it was first put
20 into production?
21  A. Yes, it has.
22  Q. And that happened when?
23  A. I believe it was 1986.
24  Q. Would you tell us how that occurred, please?
25  A. It is the same three owners, but the

Page 37

1  ownership percentage changed, Northwestern Public
2  Service sold roughly 10 percent of the plant with
3  roughly half going to Otter Tail and half going to MDU.
4      MR. GERDES:  That's all I have.
5  EXAMINATION BY MS. BEST:
6      Q.  Did the change in structure require
7  regulatory approval?
8      A.  Oh, yes.
9      Q.  State PUC approval?
10     A.  I believe it was State PUC.
11     Q.  Did that also require Federal Energy
12 Regulatory Commission approval?
13     A.  I believe it did not.
14     Q.  Nothing further.
15 EXAMINATION BY MR. GERDES:
16     Q.  Why did NWPS sell that share, if you know?
17     A.  To the best of my knowledge they felt they
18 had more facilities than they needed, and Otter Tail and
19 MDU were looking for additional facilities, additional
20 resources, so it seemed to work very well.
21     MR. GERDES:  Thank you very much.
22
23
24
25

Page 38

1  STATE OF SOUTH DAKOTA )
2                  :SS              CERTIFICATE
3  COUNTY  OF  MINNEHAHA )
4
5
6          I, JERRY MAY, Court Reporter and Notary
7  Public within and for the State of South Dakota:
8          DO HEREBY CERTIFY that the witness was
9  first duly sworn by me to testify to the truth, the
10 whole truth, and nothing but the truth relative to the
11 matter under consideration and that the forgoing pages
12 1-37, inclusive are a true and correct transcript of my
13 stenotype notes made during the time of the taking of
14 the deposition of this witness.
15          I FURTHER CERTIFY that I am not an
16 attorney for, nor related to the parties to this action,
17 and that I am in no way interested in the outcome of
18 this action.
19          In testimony whereof, I have hereto set
20 my hand and official seal this 20th day of May, 2000.
21
22
23          _____
24                     NOTARY PUBLIC
25

Brost v. Hazeltine                     Multi-Page™            Robert Kra
                                                                5/16/

Page 1

```
 1        UNITED STATES DISTRICT COURT
 2          DISTRICT OF SOUTH DAKOTA
 3             CENTRAL DIVISION
 4    * * * * * * * * * * * * * * * * *
      SOUTH DAKOTA FARM BUREAU, INC.;
 5    SOUTH DAKOTA SHEEP GROWERS
      ASSOCIATION, INC.; HAVERHALS
 6    FEEDLOT, INC.; SJOVALL FEEDYARD,
      INC.; FRANK D. BROST; DONALD
 7    TESCH; WILLIAM A. AESCHLIMANN;
      SPEAR H. RANCH, INC.; MARSTON
 8    HOLBEN; MARSON AND MARIAN
      HOLBEN FAMILY TRUST;
 9    MONTANA-DAKOTA UTILITIES CO.;
      NORTHWESTERN PUBLIC SERVICE;
10    and OTTER TAIL POWER COMPANY,
11              Plaintiffs,
12        -vs-          CIV. NO. 99-3018
13    JOYCE HAZELTINE, in her official capacity,
      as Secretary of State of South Dakota, and
14    MARK W. BARNETT, in his official capacity
      as Attorney General of South Dakota,
15
                Defendants.
16
17        And
18
      DAKOTA RURAL ACTION and SOUTH
19    DAKOTA RESOURCES COALITION,
20            Defendant-Intervenors.
21    * * * * * * * * * * * * * * * * *
22       D E P O S I T I O N   O F
23           ROBERT KRAVA
24    * * * * * * * * * * * * * * * * *
25
```

Pa

```
      INDEX TO EXAMINATIONS
 2    EXAMINATION BY MS. BEST ................. 4
 3    EXAMINATION BY MS. BRANNON ............. 14
 4    EXAMINATION BY MS. BEST ................ 28
 5    EXAMINATION BY MR. GERDES ............. 32
 6    EXAMINATION BY MS. BRANNON ............. 38
 7    EXAMINATION BY MR. SIMKO .............. 38
 8
 9
10
11
12
13        INDEX TO EXHIBITS
14
      2053   Easement Form ................. 21
15
16
17
18
19
20
21      INDEX TO DOCUMENT REQUESTS
22    1  Data Request Reference ............... 38
23
24
25
```

Page 2

```
 1    APPEARANCES:
 2       Woods, Fuller, Shultz & Smith
         Attorneys at Law
 3       300 South Phillips Avenue
         Sioux Falls, South Dakota  57104
 4       By  Mr. John Simko
 5       for South Dakota Farm Bureau, Inc., South Dakota
         Sheep Growers Association, Haverhals Feedlot, Inc.
 6       Sjovall Feedyard, Inc., Frank D. Brost, Donald
         Tesch, William A. Aeschlimann;
 7
         Tonner, Tobin & King
 8       Attorneys at Law
         P. O. Box 1456
 9       Aberdeen, South Dakota  57402
         By  Mr. Thomas Tobin
10
         for Spear H. Ranch, Inc.; Marston Holben; Marston
11       and Marian Holben Family Trust;
12       May, Adam, Gerdes & Thompson
         Attorneys at Law
13       P. O. Box 160
         Pierre, South Dakota  57501
14       By  Mr. David A. Gerdes
15       for Montana-Dakota Utilities Co., Northwestern
         Public Service, Otter Tail Power Company;
16
         South Dakota Attorney General
17       Attorneys at Law
         500 East Capitol
18       Pierre, South Dakota  57501
         By  Ms. Diane Best & Ms. Roxanne Giedd
19
         for Joyce Hazeltine & Mark W. Barnett;
20
         Earthlaw
21       Attorneys at Law
         University of Denver - Forbes House
22       1714 Poplar Street
         Denver, Colorado  80220
23       By  Ms. Virginia Brannon
24       for Dakota Rural Action and South Dakota
         Resources Coalition.
25
```

Page

```
 1         S T I P U L A T I O N
 2         It is stipulated and agreed by and
 3   between the above-named parties, through their attorne
 4   of record, whose appearances have been hereinabove
 5   noted, that the deposition of Robert Krava, may be tak
 6   at this time and place, that is, at the offices of May,
 7   Adam, Gerdes & Thompson, Pierre, South Dakota, on the
 8   16th day of May, 2000, commencing at the hour of 2:
 9   p.m.; said deposition taken before JERRY MAY, a
10   Registered Professional Reporter and Notary Public
11   within and for the State of South Dakota; said
12   deposition taken for the purpose of discovery or for us
13   at trial or for each of said purposes, and said
14   deposition is taken in accordance with the applicable
15   Rules of Civil Procedure as if taken pursuant to writte
16   notice.
17
18         ROBERT KRAVA,
19   called as a witness, being first duly sworn, deposed an
20   said as follows:
21
22   EXAMINATION BY MS. BEST:
23      Q.  For the record, this deposition is being
24   taken on May 16 at the offices of May, Adam, Gerdes
25   Thompson in Pierre, South Dakota.  The parties have
```

Page 13

1 need to be done for transmission lines for planned
2 projects?
3     A.  Not that I am aware of.
4     Q.  In other words, you don't have any sitting on
5 your desk?
6     A.  No, I don't have any sitting on my desk.
7     Q.  Have you been, your company takes the
8 position that it will cost money to comply with
9 Amendment E with respect to transmission lines or
10 easements for transmission lines.  Have you been
11 involved in any calculations of how much complying with
12 Amendment E will cost for procuring easements?
13     A.  No formal studies, no.
14     Q.  What about informal, please discuss that
15 issue?
16     A.  I have thought about it since this has come
17 to light, and in my opinion it would cost two to
18 probably three hundred percent more to acquire easements
19 for transmission lines.
20     Q.  Have you yet been in the position where
21 acquisition of easements has doubled and tripled due to
22 Amendment E?
23     A.  No, we haven't purchased any to my knowledge
24 since Amendment E has come in to light.
25     Q.  Wouldn't you be the person that would be

Page

1     A.  Yes.
2     Q.  And in relation to leasing land to farmers
3 around at the Big Stone plant, is that the only cost
4 associated with, in other words, is that loss of income
5 the only cost that comes to your mind, or are there
6 other problems as well?
7     A.  Well, there has been a discussion that that
8 land may have to be sold if it is not farmed.  I mean I
9 have heard that in discussions.
10     Q.  Why is that, why would it have to be sold if
11 it is not farmed?
12     A.  I am not sure.
13     Q.  One of the allegations in the complaint, and
14 I am trying to understand the factual basis for that, is
15 that sale of the plant would require successor owners t
16 divest themselves of those lands now held for future
17 development.  I don't understand the factual basis for
18 that, and I was wondering if you could help me out?
19     A.  No, I can't.
20     Q.  So based on your understanding, you could
21 hold onto the land as long as you are willing to forgo
22 that rental income, is that correct?
23     A.  I have heard discussions that that is one
24 interpretation, another that it would have to be sold.
25     Q.  But you are not sure why it would have to be

Page 14

1 aware of it if the cost of an easement doubled or
2 tripled?
3     A.  Yes.
4     Q.  So it's pretty safe to say that there haven't
5 been any yet, isn't that correct?
6     A.  That's correct.
7     MS. BEST:  I am going to stop here, I
8 know Ginny has some questions.
9 EXAMINATION BY MS. BRANNON:
10     Q.  Mr. Krava, I am Ginny Brannon, attorney for
11 Dakota Rural Action and South Dakota Resources
12 Coalition.
13     A.  Okay.
14     Q.  I have some follow-up questions.  Not too
15 many, but I indulge your patience if I covered something
16 the State already covered because sometimes I need some
17 clarification?
18     A.  Okay, that's fine.
19     Q.  I would like to talk first about farming
20 around the Big Stone plant.
21     A.  Okay.
22     Q.  What is the -- my understanding is that
23 potentially there is a worry that you might lose out on
24 rental income from leasing land to farmers around the
25 Big Stone plant, is that correct?

Page

1 sold, is that correct?
2     A.  That's correct.
3     Q.  Let's move on to the transmission facilities
4 and the easement issue, which is sort of the other,
5 seems to me, based on the complaint, big issue probler
6 utilities are having with Amendment E.
7     A.  Okay.
8     Q.  My understanding is that the utility
9 companies are concerned, Otter Tail specifically is
10 concerned that Amendment E might increase the cost o
11 purchasing easements, is that correct?
12     A.  Yes.
13     Q.  And also that it might increase the cost of
14 constructing and maintaining transmission facilities, is
15 that correct?
16     A.  Yes.
17     Q.  Could you explain to me how it will increase
18 the cost of constructing and maintaining transmission
19 facilities?
20     A.  Well, if it can't be farmed, there would be
21 the maintenance or weed control, we would face that even
22 on existing farmed right-of-way, because we do have t
23 treat or chemically treat just the area around the pole
24 that is not being farmed.  This way if we can't farm th
25 100, 120 feet, 200 feet, depending on what the

Page 17

1  right-of-way width is for that specific line voltage or
2  line size, or line construction method, the maintenance
3  of that many acres is certainly going to be an
4  additional cost. As far as construction, typically you
5  can't construct a transmission line on the right-of-way
6  strip, so we would have to buy additional property to do
7  the construction from. Whereas in an easement
8  situation, we have the easement strip, and we also have
9  the right to enter on the rest of the encumbered
10  property for construction purposes, maintenance
11  purposes.
12  Q. I am not following that, Mr. Krava. Could
13  you explain, I don't understand.
14  A. Okay, which part?
15  Q. Let's take an example.
16  A. Okay.
17  Q. Let's say that you have got this say 100 foot
18  width transmission corridor, and you can't farm on it.
19  A. Right.
20  Q. Okay, what, how, first of all, how just
21  practically are you going to work that? Are you just
22  going to do weed control along that area, is that the
23  only thing you would need to do, and then the farmer
24  could go back and forth across the land, or how would it
25  work?

Page

1  facilities on. We have the right to basically go any
2  place on the farm to get to this construction site.
3  Whereas if we had to buy it, we would be in trespass
4  unless we bought a lease for construction, or we are
5  granted some other method of getting there.
6  Q. So you could buy an easement, for example, a
7  right-of-way easement just to get to the spot, get to
8  the transmission corridor?
9  A. My understanding is we would have to buy an
10  additional easement for ingress-egress at least, and for
11  construction.
12  Q. Mr. Krava, can you explain to me why you
13  would necessarily have to buy the transmission corrid
14  in fee as opposed to simply paying a higher price for
15  the easement based on the farmer's now inability to farm
16  on that land?
17  A. I believe that is the only way we could
18  acquire it. I don't think they will give us an easement
19  through that property, even paying more, if they are n
20  able to farm it.
21  Q. Has your company engaged in any discussions
22  with farmers on this issue?
23  A. No, we haven't.
24  Q. So you are just speculating then?
25       MR. GERDES: I will object to that as

Page 18

1  A. I am speculating here because we don't have
2  any instances that are actually in that situation. It
3  depends on what we are required to do. There is talk
4  that it may have to be fenced, okay. That is an
5  additional maintenance cost with the fencing, it also
6  makes that land much more difficult to acquire if you
7  are basically separating the farmed say 160 acres and
8  now separating in to two pieces so that they can't cross
9  that strip.
10  Q. Okay.
11  A. The acquisition will be in my opinion
12  impossible except through an eminent domain or
13  condemnation situation, based on experience.
14  Q. Is there any other way, you were talking
15  before about having to buy additional land around, I
16  wasn't following that. What were you talking about?
17  A. I was talking about if we have to buy the
18  strip, the right-of-way strip, whatever width it may be,
19  in fee so that we actually own it, not an easement
20  situation, typically we can't construct in what we buy
21  as an easement strip. In the easement document there is
22  a piece of land that is encumbered which may be 80 acres
23  or 160 acres, whatever that landowner has title to, then
24  there is also the legal description of this 100 or
25  whatever width strip that we have the right to place our

Page

1  argumentative. Go ahead and answer if you can. Are you
2  speculating?
3  A. Based on my experience, no, I am not
4  speculating, that's the way I would see it playing out.
5  Q. Mr. Krava, I think you told the State that
6  your estimation was that the cost of acquiring an
7  easement would be two to three hundred percent more than
8  it currently is?
9  A. Um-hum.
10  Q. What is it currently?
11  A. Our current payments for easements are based
12  on the land value for the easement strip, and then a
13  structure payment which is reviewed basically annual
14  So it's a combination of paying for the land encumbered,
15  and then for each structure, or any part of the facility
16  that is placed on that property.
17  Q. How much do you typically pay, do you have
18  dollar estimate based on all of those factors?
19  A. No, I don't, I would have to have a specific
20  situation where we would know the land value, then I
21  can, then I could give you that estimate of what it
22  would cost.
23  Q. I would like to introduce a document as an
24  Exhibit. This is an example of a right-of-way easeme
25  drafted by Otter Tail Power Company. It is not fillec

Page 21

1  in, but it is an example of one drafted by Otter Tail
2  Power Company.  Take a look at that.
3
4         (Krava Deposition Exhibit 2053 marked For
5         identification.)
6
7     Q.  This example of a right-of-way easement
8  contemplates consideration of the sum of $1.00 to give
9  Otter Tail Power Company an easement for a period of 99
10  years.
11     A.  Okay, we have many different forms.  Okay,
12  yes.
13     Q.  Is that correct?
14     A.  That's correct.
15     Q.  So is this a typical example of a
16  right-of-way easement?
17     A.  Yes, it is.
18     Q.  And what does this $1.00 mean then?
19     A.  That is basically just a terminology on the
20  easement form.  There is another form that goes with it
21  that is not recorded which is called a easement payment
22  agreement.
23     Q.  Does this mean that Otter Tail pays the
24  farmer $1.00 for an easement on their property for a
25  period of 99 years?

Page 22

1     A.  No.
2     Q.  What does it mean?
3     A.  The language that is used in most common
4  easements.
5     Q.  I am sorry, I don't understand, Mr. Krava,
6  what is the $1.00 for?
7     A.  There has to be some, there has to be a money
8  exchange for title to property, or partial title as an
9  easement is, and it doesn't specify that you have to
10  identify the full amount, but that there is a monetary
11  exchange for the easement.
12     Q.  Yes, there needs to be consideration we call
13  it, correct?
14     A.  Right.
15     Q.  And the consideration in this contract is
16  $1.00, is that correct?
17     A.  $1.00 and other good and valuable
18  consideration, yes.
19     Q.  Okay, what would constitute that other good
20  and valuable consideration?
21     A.  More money, could be conditions other than
22  money such as cutting trees and leaving them for the
23  landowner, could be consideration of building an access
24  road.  There is many, many different other
25  considerations.

Page 2

1     Q.  Mr. Krava, do you have -- not with you, of
2  course, but do you have examples of such contracts th
3  would show other considerations for the easement beyond
4  just this?
5     A.  Do we have other easement forms?
6     Q.  Yes, maybe even signed documents that are
7  filled out?
8     A.  Oh, sure, we have in excess of 65,000
9  easement forms that are public record, recorded in eve
10  courthouse that we operate in.
11     Q.  Mr. Krava, how did you arrive at the
12  estimation that the increased costs to acquire an
13  easement would be two to three hundred times, percen
14  more than what it is now?
15     A.  Talking with some of the people in our
16  department, we tried to arrive at some amount, but unt
17  we actually go to court and have to pay for one I don't
18  think that anyone knows that.  It is just basically the
19  people in my department and myself discussing this issue
20  and how it would affect, our feelings as experienced
21  acquirers of easements and real estate how it would
22  affect it.
23     Q.  Is there anything in writing, any documents,
24  any studies, any data, any market analysis, anything?
25     A.  No, there is not.

Page 2

1     Q.  Just based on conversations then, is that
2  correct?
3     A.  That's right.
4     Q.  In the event of deregulation, what would be
5  the harm to Otter Tail if deregulation or restructuring
6  occurred, obviously in connection with Amendment E'
7     A.  In my opinion the restructuring or
8  transferring easement documents or real estate fee title
9  to a new corporation would therefore make the easements
10  invalid, so you lose the asset of however many thousan
11  easements we would have in South Dakota.
12     Q.  So then what would you do?
13     A.  My understanding is we would have to buy,
14  re-buy those existing facilities, locations, not
15  necessarily the poles and wires, but the real estate
16  that it sits on, or the new corporation would have to.
17  I am not saying we, Otter Tail Power Company, but th
18  new corporation, the new owner who had those easements
19  assigned.
20     Q.  And that is the factual basis for one of the
21  allegations that is made in the complaint.  There is
22  another allegation that is made in the complaint in
23  regard to deregulation, and I would like to see if you
24  can help me with the factual basis for it.  It says
25  there will be less money from the sale or spin off of

Page 29

1  Register of Deeds?
2      A. Yes, I do.
3      Q. Do you know what an easement consists of
4  versus a lease, versus some other land property
5  interest, correct?
6      A. I don't know the legal interpretations of
7  what is a lease. I feel I have a good understanding of
8  the easement process, yes.
9      Q. Is an easement an interest in title?
10         MR. GERDES: I object to that as calling
11  for a legal conclusion and without proper foundation.
12  If you know, you can answer it.
13     A. Yes.
14     Q. Is an easement a legal interest in real
15  estate?
16         MR. GERDES: Same objection.
17     A. Yes, it is.
18     Q. Is there, I mean you have been in the
19  easement business for a long time, is there a difference
20  in your mind between an easement interest in title and
21  an easement interest in real estate?
22         MR. GERDES: Same objection. Calls for a
23  legal conclusion without proper foundation.
24     A. Can you restate that? Is there a difference?
25     Q. We talked about an easement, were we talking

Page 30

1  about an easement being an interest in title, or an
2  easement being an interest in land, or is it the same
3  thing?
4          MR. GERDES: Same objection, no proper
5  foundation.
6      A. My understanding of your question is an
7  easement gives you partial interest to that real estate.
8      Q. I want to ask you about this, who would be in
9  a position to determine whether land has to be fenced
10  along the electric utility corridor, or excuse me, the
11  electricity transmission line corridor?
12     A. Who would determine if it had to be fenced?
13     Q. Yes.
14     A. I have no idea.
15     Q. That is not something you think you would be
16  negotiating with the individual farmer?
17     A. No. I think that that is something that
18  would have to be arrived at through the interpretation
19  of the law or Amendment E.
20     Q. And apparently that determination has not yet
21  been made in terms of Otter Tail Power Company's
22  operations?
23     A. Not to my knowledge.
24     Q. Then finally questions came up about the
25  power plant. Are there appraisals of the Big Stone

Page

1  power plant?
2      A. I am not aware of any appraisals. It was
3  acquired before I was employed by Otter Tail Power
4  Company.
5      Q. Do you have anything in the land office that
6  would indicate what Otter Tail sees as the worth of th
7  plant, the value of the plant and real estate?
8      A. Not in the land management office, no.
9      Q. So you don't have an inventory of utility
10  property with a value associated with it for the land
11  management office?
12     A. No, we don't.
13     Q. That would be something more the depreciation
14  people would have?
15     A. My understanding that would be the property
16  accounting area.
17     Q. One question comes up, Otter Tail takes the
18  position now that its acquisition of easements, yeah,
19  acquisition of easements for land use for farming wou
20  violate Amendment E. Does it take a similar position
21  with regard to the Family Farm Act that was previous
22  in effect?
23         MR. GERDES: I object to that question as
24  misstating Otter Tail's position. Go ahead and answe
25  it if you can.

Page

1          MR. SIMKO: I also object because the
2  Family Farm Act of 1974 is dramatically different tha
3  Amendment E, so the question is misleading.
4      A. I am not aware of the Family Farm Act of
5  1974, or whatever date, so I can't make a comparison.
6      Q. So the first time you ever heard anything
7  about any easements, problems with corporate farming
8  laws being a restriction on obtaining easements has to
9  do with this Amendment E, that's the first time that
10  came up with Otter Tail?
11     A. Yes.
12         MS. BEST: I have nothing further.
13  EXAMINATION BY MR. GERDES:
14     Q. Mr. Krava, Mrs. Best just got done going
15  through your qualifications in that you have negotiate
16  a large number of easements over the years, is that
17  correct?
18     A. That's correct.
19     Q. And over those years have you developed an
20  understanding as to the cost of those easements to Ott
21  Tail when they are negotiated?
22     A. Yes.
23     Q. And have you developed an understanding of
24  the factors that go in to determining that cost?
25     A. Yes.

Page 33

1    Q. And so you believe that you right now as you
2  sit there can take a look at a piece of property knowing
3  the per acre value of that property and determine about
4  what it should cost to buy a transmission easement?
5    A. Once a survey has been conducted, yes.
6    Q. Let's just say we are talking about a piece
7  of land that is worth $900 an acre, how much is it going
8  to cost you before Amendment E to acquire a transmission
9  line easement across that property?
10    A. $900 an acre, and I would have to know the,
11  how much of the quarter, 80, 40, that we are crossing.
12    Q. Let's say you are going across a section of
13  land, 640 acres?
14    A. So 900 times about fourteen and a half acres,
15  and then that would be the land value of the easement.
16  The structure value of the easement payment would be
17  based on the number of structures placed on that. At
18  the current time that is $1,000 per two pole structure,
19  and then various down guys or guy wires would be
20  additional added in, and this is where the survey would
21  determine actually what facilities are placed on that
22  piece of property. So $900 an acre, I would look that
23  we would be paying, with a two pole 230 volt, just as an
24  example, I would look that we would be paying
25  approximately $20,000 if it is straight. If there is

Page 34

1  angles in the line, it would be considerably more based
2  on the number of angles and down guys associated with
3  that angle.
4    Q. How is that being paid, is it paid in one
5  lump sum, or how is it paid typically, again before
6  Amendment E?
7    A. Typically it depends on the state.
8    Q. South Dakota?
9    A. South Dakota would be paid in a lump sum
10  payment.
11    Q. You have said that with Amendment E you
12  believe it would cost two to three hundred percent more
13  for that same transmission easement, correct?
14    A. Yes, that's correct.
15    Q. You were asked by Ms. Brannon whether or not
16  that was based on conversations. Actually that opinion
17  was based upon more than conversations, wasn't it?
18    A. It was based on conversations with my, with
19  people working.
20    Q. Was it based on your experience?
21    A. Based on my experience, overall the members
22  taking part in the conversation, I guess that is.
23    Q. And each of the members have had experience?
24    A. Why yes.
25    Q. And were able to think of for instances when

Page

1  they came up with the figures that they were talking
2  about, is that correct?
3    A. Certainly.
4        MS. BRANNON: I have to object to this,
5  Mr. Gerdes fed the deponent, Diane said, that did not
6  come from the deponent's mouth.
7        MR. GERDES: Are you objecting to my
8  question as leading?
9        MS. BRANNON: Yes, extremely.
10    Q. So, when you say two to three hundred percent
11  then, what are you basing that on in terms of why are
12  you saying 200 percent rather than 100 percent, or 150
13  percent, what is the thought process that you go
14  through?
15    A. The thought process is past jobs or past
16  easements that we have had to condemn where we couldn't
17  buy a voluntary easement, where we had to condemn
18  piece of property to acquire either the easement or fee,
19  and these were basically the amounts that were, you
20  know, we are talking about.
21    Q. When you are talking about acquiring the fee,
22  you are not talking about acquiring an easement in the
23  fee, you are talking about acquiring fee title, are you
24  not?
25    A. Yes, I am. When I am speaking fee, I am

Page

1  talking about buying the real estate property. Otter
2  Tail Power or the subsidiary company that we are working
3  for is owning that in fee title, whereas easements
4  acquisition would be just a partial interest in that
5  fee.
6    Q. When we lawyers were in law school and when
7  we talked about fee title, our property teacher talked
8  about owning the entire bundle of sticks, have you hav
9  ever heard that analogy?
10    A. Many times.
11    Q. And fee title is the whole bundle of sticks,
12  correct?
13    A. Fee title is the bundle of sticks remaining
14  at the time of acquisition, yes.
15    Q. And then easements and leases and whatever,
16  they are something less than the whole bundle of stick
17  would that be correct?
18    A. Yes.
19    Q. You were asked some questions by Ms. Best
20  concerning what you do for permitting and things like
21  that when you are acquiring land. Would it be true th
22  this whole process is done in consultation with legal
23  counsel?
24    A. Yes.
25    Q. You had a conversation with Ms. Brannon

Page 37

1 about, or excuse me, Mrs. Best about fencing. Assuming
2 that Amendment E were interpreted by the Court to say
3 that farmers could not have access to that corridor, how
4 would you keep them out, would you have to fence it?
5    A. A fence would be one method. I don't know
6 what other methods, they would have to be explored if
7 they can't cross that piece of property.
8    Q. That would be an expense of developing a
9 power line easement that was affected by Amendment E,
10 would it not?
11    A. Yes.
12    Q. Looking at Mr. MacFarlane's letter that you
13 and Ms. Brannon were talking about, when he is talking
14 about a five year development for a power plant, he is
15 talking about the fact that it would take more than five
16 years to develop a new facility with Amendment E being
17 in place. Read that paragraph, isn't that what he is
18 talking about?
19    A. I would, my opinion is that is what he is
20 talking about. He did not confer with me when he wrote
21 this.
22    Q. I just wanted to make sure that you and
23 Ms. Brannon were connecting up here in what he is
24 talking about. It is new power plants in general, not
25 talking about adding onto the Big Stone plant, is he?

Page 38

1    A. I think when he states that it took longer
2 than five years to develop Big Stone, he was using that
3 as an example that, from what I have heard prior even to
4 today, that it is ten to twelve years for siting a
5 plant, and I think that is what he is referring to,
6 although like I said, he wrote it.
7    Q. And it means what it says, right?
8    A. Yes, it does.
9       MR. GERDES: That's all I have, thank
10 you.
11       MS. BEST: Nothing else.
12 EXAMINATION BY MS. BRANNON:
13    Q. One follow-up, Mr. Krava. I am wondering if
14 you would be willing to produce at some future time an
15 example of, some examples of the easements you were
16 talking about? The only thing that we got was this form
17 Exhibit 2053 which is not even filled in, and it has the
18 consideration of $1.00 and then what would be attached
19 is the and other good and valuable considerations,
20 that's of course what I would be interested in?
21       MR. GERDES: We will take a look at it
22 and produce some.
23 EXAMINATION BY MR. SIMKO:
24    Q. Mr. Krava, you have seen thousands of
25 easements such as Exhibit 2053 in completed form?

Page

1    A. Right.
2    Q. Have you also seen many warranty deeds where
3 title has actually been conveyed from a seller to a
4 buyer in which the consideration is recited within that
5 warranty deed?
6    A. Yes, we write many warranty deeds.
7    Q. Have you seen warranty deeds where the
8 purchase price for the property is hundreds of thousand
9 of dollars, and the title, the warranty deed says for
10 $1.00 and other good and valuable consideration?
11    A. Yes.
12       MR. SIMKO: That's all I have.
13       MR. GERDES: Do you waive the reading and
14 signing of the deposition.
15       THE WITNESS: Yes, I do.
16
17
18
19
20
21
22
23
24
25

Page

1 STATE OF SOUTH DAKOTA )
2                           :SS        CERTIFICATE
3 COUNTY OF MINNEHAHA )
4
5
6       I, JERRY MAY, Court Reporter and Notary
7 Public within and for the State of South Dakota:
8       DO HEREBY CERTIFY that the witness was
9 first duly sworn by me to testify to the truth, the
10 whole truth, and nothing but the truth relative to the
11 matter under consideration and that the forgoing pages
12 1-39, inclusive are a true and correct transcript of my
13 stenotype notes made during the time of the taking of
14 the deposition of this witness.
15       I FURTHER CERTIFY that I am not an
16 attorney for, nor related to the parties to this action,
17 and that I am in no way interested in the outcome of
18 this action.
19       In testimony whereof, I have hereto set
20 my hand and official seal this 21st day of May, 2000.
21
22
23
24       _____
                 NOTARY PUBLIC
25