



UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| SOUTH DAKOTA FARM BUREAU, INC.; SOUTH DAKOTA SHEEP GROWERS ASSOCIATION, INC.; HAVERHALS FEEDLOT, INC.; SJOVALL FEEDYARD, INC.; FRANK D. BROST; DONALD TESCH; WILLIAM A. AESCHLIMANN; SPEAR H. RANCH, INC.; MARSTON HOLBEN; MARSTON AND MARIAN HOLBEN FAMILY TRUST; MONTANA-DAKOTA UTILITIES CO.; NORTHWESTERN PUBLIC SERVICE; and OTTER TAIL POWER COMPANY, ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civ. No. 99-3018 CBK |
| Plaintiffs, ) ) | |
| v. ) ) | DEFENDANTS' TRIAL BRIEF |
| JOYCE HAZELTINE, in her official capacity as Secretary) of State of South Dakota, and ) MARK W. BARNETT, in his official capacity as Attorney ) General of South Dakota, ) ) | |
| Defendants, ) ) | |
| and ) ) | |
| DAKOTA RURAL ACTION and SOUTH ) DAKOTA RESOURCES COALITION, ) ) | |
| Defendant-Intervenors. ) | |

A.    Summary of the Case.

This case concerns state regulation of certain business organizations' conduct of farming.  Sections 21 through 24 of Article XVII of the South Dakota Constitution are constitutional amendments adopted by vote on an initiated measure.  The amendments became effective November 16, 1998, and have been

referred to in this litigation as "Amendment E," a reference to their placement on the 1998 ballot.  The amendments prohibit certain business structures from farming and owning farmland. S.D. Const. art. XVII, § 21.  The business structures involved (corporations, limited partnerships, limited liability partnerships, business trusts, and limited liability companies) are entities already regulated by the State.  See, e.g., SDCL titles 47 and 48.  Such business structures are artificial beings that exist only as permitted by law, and possess "only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence." Trustees of Dartmouth College v. Woodward, 4 Wheat 518, 636, 4 L.Ed. 659 (1819) (discussion regarding corporations).

The Plaintiffs challenge Amendment E's constitutionality under the commerce, equal protection, and due process clauses of the United States Constitution.[1]  The Plaintiff Utilities' claims that are unique are addressed separately below.

B.    Constitutional Standard of Review.

A statute will be upheld unless its unconstitutionality is shown beyond a reasonable doubt.  Knowles v. United States, 829

---

[1] The Complaint also asserted that Amendment E violated the Americans with Disabilities Act.  This Count was dismissed for lack of subject matter jurisdiction on September 14, 2000. Doc. 93.  Also, a privileges and immunities claim was raised by Plaintiffs Marston Holben and the Marston and Marian Holben Trust.  This claim was dismissed for lack of standing.  Doc. 93.

F. Supp. 1147 (D.S.D. 1993), aff'd in part and questions certified, 29 F.3d 1261 (1994), rev'd in part, 91 F.3d 1147 (8th Cir. 1996); South Dakota Education Ass'n, et al. v. Barnett, et al., 1998 S.D. 84, ¶ 22, 582 N.W.2d 386, 392; AFSCME Local 1922 v. South Dakota, 444 N.W.2d 10, 14 (S.D. 1989). Although the present action involves a state constitution provision, the State submits that the "reasonable doubt" standard applies here too.

The Supreme Court has held that the "purpose" or "legitimate end" of state legislation should be considered in various types of constitutional challenges such as those raised here. Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252 (1977) (equal protection); Washington v. Davis, 426 U.S. 229 (1976) (equal protection); Lemon v. Kurtzman, 403 U.S. 602 (1971) (First Amendment challenge); Personnel Adm'r v. Feeney, 442 U.S. 256 (1979) (equal protection); Kassel v. Consolidated Freightways Corp., 450 U.S. 552 (1981) (commerce clause); SDDS, Inc. v. South Dakota, 47 F.3d 263 (8th Cir. 1995) (commerce clause).

However, evidence of the specific motives and intent of individual drafters or legislators is generally not permissible to prove the "purpose" of the challenged legislation. Expressions made by individual legislators should not substitute for the intent of the Legislature (or in this case the electorate

itself) as a whole.[2]  Cummings v. Mickelson, 495 N.W.2d 493, 499 n.7 (S.D. 1993) (individual members may have diverse reasons for a proposition and evidence of a draftsman is not competent to aid a court).  See also Palmer v. Thompson, 403 U.S. 217, 224-25 (1971) (individual motives of local decision makers should not be considered because even if impermissible motives operated to invalidate legislation, the legislation could be valid as soon as it was passed again based on valid motives); United States v. O'Brien 391 U.S. 367, 383-384 (1968) (relying on motives of individual congressmen is problematic because motives may vary among legislators); Government Suppliers Consolidating Services, Inc. v. Bayh 753 F. Supp. 739, 769 (S.D. Ind. 1990) (motives of individual legislators are irrelevant).  "Purpose" must, as discussed infra, be determined by the objective intent of the voters as evidenced by prior law, information generally available to the public such as government statistics and studies, academic research, and traditional forms of legislative history.  It is the objective knowledge and purpose of the voters enacting Amendment E that must be determined here, not the subjective

---

[2] In SDEA, the State Supreme Court relied on affidavits submitted by legislative leaders.  Justice Gilbertson, concurring, explained that these statements of individual legislators were not used to ascertain the intent of the legislative body as a whole.  Instead, "this documentation was provided as background as to the nature of the problem and why and how the legislature sought to address it."  582 N.W.2d at 397.  He stated that "the Legislature does not address a problem in an evidentiary vacuum."  Id.

purpose and intent of the individuals involved in drafting Amendment E.

C.   The History of Corporate Farming Regulation.

The constitutional provisions established by Amendment E are not unique and, in fact, have a historical basis.  Prior to Amendment E, anticorporate farming laws had been enacted in a number of states, including South Dakota.  SDCL ch. 47-9A; Iowa Code Ann. § 172C.4; Kan. Stat. Ann. § 17-5904; Minn. Stat. Ann. § 500.24(1)(c); Mo. Ann. Stat. § 350.015; N.D. Cent. Code § 10-06-01; Wis. Stat. Ann. § 182.001(1)(a).  Indeed, the Nebraska voters adopted provisions similar to Amendment E in their state constitution in 1982.  Neb. Const. art. XII, § 8. Oklahoma also has a constitutional provision and legislation prohibiting corporate farming.  Okla. Const. art. XXII, § 2; Okla. Stat. Ann. tit. 18, § 951.

The purpose of the Nebraska anticorporate farming law (a measure very similar to the one at bar) was described by the Eighth Circuit Court of Appeals in MSM Farms, Inc. v Spire, 927 F.2d 330, 332-33, cert. denied, 502 U.S. 814 (1991):

> [T]he Nebraska law was intended to address the social and economic evils supporters perceived as related to corporate farming.  According to evidence presented by defendant-intervenors, supporters of the Nebraska initiative believed that a rise in corporate farming in Nebraska would lead to the decline of the family farmer, who would be unable to compete fairly with the ability of corporations to raise capital and benefit from the tax laws.  Supporters further maintained that corporate farming would lead to absentee landowners and tenant operation of farms, would adversely affect the rural social and economic structure, and would result in decreased stewardship and preservation of soil, water and other natural resources. . . . [N]ot only

> would family farmers find their situation vastly
> changed if concentrated or corporate farming were to
> prevail throughout the country, but . . . firms
> supplying the farmer/producer, firms marketing and
> processing farm products, rural communities, and
> consumers would also be affected.

(Citations omitted.)

This problem--the changing face of agriculture in the United States and the diminishing number of family farmers--is unquestionably real, and has long been recognized at the federal level.  The United States Department of Agriculture has studied and reported this threat to the family farmer and rural way of life.  A Time to Choose: Summary Report on the Structure of Agriculture. USDA. Washington, D.C. January 1981.  In January 1998, the United States Department of Agriculture National Commission on Small Farms issued a report entitled, "A Time to Act."  The Commission noted:

> When Secretary Bergland's report, A Time to Choose, was
> published, it warned that ". . . unless present
> policies and programs are changed so that they counter,
> instead of reinforce or accelerate the trends towards
> ever-larger farming operations, the result will be a
> few large farms controlling production in only a few
> years."

> Looking back now nearly 2 decades later, it is evident
> that this warning was not heeded, but instead, policy
> choices made since then perpetuated the structural bias
> toward greater concentration of assets and wealth in
> fewer and larger farms and fewer and larger
> agribusiness firms. . . .

> Today we have 300,000 fewer farmers than in 1979, and
> farmers are receiving 13 percent less for every
> consumer dollar.  Four firms now control over
> 80 percent of the beef market.  About 94 percent of the
> Nation's farms are small farms, but they receive only
> 41 percent of all farm receipts.

> Like most major industries, the ownership and control over agricultural assets is increasingly concentrated in fewer and fewer hands.  Farmers have little to no control over setting the price for their products.  The basic tenets of a "competitive" market are less and less evident in crop and livestock markets today.

A Time to Act, USDA National Commission on Small Farms, Washington, D.C. (1998), at Executive Summary.

This problem has also been recognized by the South Dakota Legislature.  In 1974, the South Dakota Legislature enacted the Family Farm Act, SDCL ch. 49-9A.  These statutes limited corporate ownership of agricultural land.  In enacting this legislation, the Legislature recognized "the importance of the family farm to the economic and moral stability of the state," and further recognized that "the existence of the family farm is threatened by conglomerates in farming."  SDCL 47-9A-1.

These statutes concerned the "cultivation of land."  A South Dakota statute was enacted through initiated measure in 1988 amending the Family Farm Act to address confined hog enterprises.  SDCL 47-9A-13.1.  This amendment applied only to corporations that bred, farrowed, and raised swine.  SDCL 47-9A-13.1.  Attorney General Memorandum Opinion 89-05.  Swine operations that did not engage in breeding were still exempt.  Thus, since 1974, the Family Farm Act's corporate farming restrictions applied to entities cultivating farmland and entities operating some swine facilities.  Corporate cattle and sheep producers (and some swine enterprises) are not restricted by SDCL ch. 47-9A.

During roughly the same period, agricultural land ownership and livestock ventures changed from traditional agricultural

business structures (single proprietorship and partnerships) to
business structures such as limited liability corporations and
other types of corporations.  From 1978 to 1997, the number of
farm corporations in South Dakota increased from 776 to 1298.
1997 Census of Agriculture, vol. 1, pt. 41, South Dakota State
and County Data, tbl. 1.  While the number of corporations grew,
the number of farms declined.  By 1997, South Dakota had
approximately 14,500 fewer farmers than in 1969.  Id.  The number
of farm operators (by principal occupation) in South Dakota fell
from around 36,821 in 1974 to approximately 22,704 in 1997.  Id.

It will be shown at trial that this situation formed the
background of Amendment E.  This background, along with the
anticipated adverse effect on family farms and local communities
discussed infra, constitutes the purpose of Amendment E.

D.    Equal Protection.

Count III of the Amended Complaint challenges Amendment E
under the Equal Protection Clause.  Amended Complaint ¶ 31.  The
equal protection clause of the Fourteenth Amendment mandates that
no person[3] be denied the equal protection of the law.  This
clause, however, coexists "with the practical necessity that most
legislation classifies for one purpose or another, with resulting
disadvantage to various groups or persons." Romer v. Evans, 517
U.S. 620, 631 (1996).  The Romer Court explains that this

---

[3] A corporation is a "person" under the Fourteenth Amendment and
under equal protection analysis.  MSM Farms v. Spire, 927 F.2d
330, 332, cert. denied, 502 U.S. 814 (8th Cir. 1991).

dichotomy between "the principle with the reality" is reconciled by the test applied to equal protection analysis. Id. Under this test, if a law neither burdens a fundamental right nor targets a suspect class, it will be upheld so long as it bears a rational relationship to some legitimate end. Central State University v. American Association of University Professors, 526 U.S. 124, 127-28 (1999); Romer, 517 U.S. at 631; City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 440 (1985). Legislation which employs a suspect classification or impinges on a fundamental constitutional right merits stricter scrutiny and will survive only if it is narrowly tailored to serve a compelling governmental interest. Id.

Plaintiffs here have not alleged that Amendment E targets a suspect classification. Doc. 135 at 5. Plaintiffs also did not allege in the Amended Complaint that Amendment E burdens a "fundamental right." Thus, the equal protection analysis applicable to this case is whether Amendment E bears a rational relation to some legitimate end. United States v. Mound, 149 F.3d 799, 801 (8th Cir. 1998), cert. denied, 525 U.S. 1089 (1999) (equal protection challenge to Federal Rule of Evidence 413); Von Kerssenbrock-Praschma v. Saunders, 121 F.3d 373, 378 (8th Cir. 1997) (legislation prohibiting transfer of farmland to aliens).

The question therefore at issue in this case is what the "legitimate end" of Amendment E is, and whether it bears a rational relationship to that end. As is obvious, Article XII, Section 8 of the Nebraska Constitution was the model for

Amendment E.   Nebraska's provision has been determined by the Eighth Circuit to bear a rational relationship to the legitimate end of protecting family farms.   MSM Farms, 927 F.2d at 333.   The Eighth Circuit stated:

> It is up to the people of the State of Nebraska, not the courts, to weigh the evidence and decide on the wisdom and utility of measures adopted through the initiative and referendum process.   See [Minnesota v.] Cloverleaf Creamery, 449 U.S. [456], 469, 101 S.Ct. [715], 726 [1981].   Whether in fact the law will meet its objectives is not the question:   the equal protection clause is satisfied if the people of Nebraska could rationally have decided that prohibiting non-family farm corporations might protect an agriculture where families own and work the land.   Id. at 466, 101 S.Ct. at 725 . . . .

MSM Farms, 927 F.2d at 333 (emphasis in original).   Protection of family farms by prohibiting nonfamily farm corporations and syndicates is thus a legitimate end.

The evidence in this case will show that Amendment E was addressed to this legitimate end.   Evidence will demonstrate that Amendment E was proposed by a group of individuals and groups (including Dakota Rural Action, South Dakota Resources Coalition, and South Dakota Farmers Union) to restrict limited liability business structures from farming or owning farmland.   Evidence will show that the "evil" sought to be remedied by this restriction is to prevent the consequences of the accumulation of capital, and commensurate expansion, by limited liability entities.   The use of limited liability business structures has resulted in concentration in agriculture, and the commensurate decline in family farmers.

Dr. Linda Lobao, an expert sociologist testifying on behalf of Defendants, reviewed the professional literature concerning corporate[4] farming.  She will testify that public concern about the consequences on communities of nonfamily owned and operated industrialized farms dates back to the 1920s.  This issue has been investigated by government and academic researchers since the 1930s.  Sociological evidence shows a trend that large-scale, industrialized farms have adverse impacts on different indicators of community well-being, such as socioeconomics, the "social fabric" of communities, environmental threats where livestock production is concentrated, and a new pattern of "haves and have nots" in terms of agricultural production, whereby some communities gain large, industrialized farms (and attendant social problems) and others lose their farming base as production becomes concentrated elsewhere.

This legitimate end is most clearly manifested by the "Pro-Con Statement."  The Pro-Con Statement on Amendment E was widely published to voters by the South Dakota Secretary of State as required by SDCL 12-13-23.  In SDDS, Inc., 47 F.3d at 268, the Eighth Circuit held that such a Pro-Con Statement was

---

[4] Dr. Lobao's testimony will refer to "industrialized farming" rather than "corporate farming."  She uses the term to mean a nonhousehold-based farm production unit, with absentee ownership and control over production factors, as is, inter alia, a nonfamily farm corporation or syndicate.  Along with scale (size), legal status as a corporation or syndicate is an organizational variable measured and investigated by social scientists when they research "industrialized farming."

"legislative history" of an initiated measure.[5]  Here, the Pro

Statement states in part:

> [L]arge non-family farm corporations increasingly
> threaten our traditional rural way of life.
> Constitutional Amendment E gives South Dakota voters
> the opportunity to decide whether control of our
> state's agriculture should remain in the hands of
> family farmers and ranchers or fall into the grasp of a
> few, large corporations.
>
> Constitutional Amendment E is a logical extension of
> South Dakota's 1974 Family Farm Act and the 1988
> amendment prohibiting non-family farm corporation
> ownership of pork production facilities.  The amendment
> is almost identical to popular and successful
> constitutional provisions approved by voters in our
> neighboring state of Nebraska more than 15 years
> ago. . . .
>
> Constitutional Amendment E expands and strengthens our
> anticorporate farming statutes with an additional
> prohibition of non-family farm, corporate ownership of
> livestock. . . .
>
> Passage of Constitutional Amendment E will reaffirm
> South Dakota's commitment to family agriculture.  More
> importantly, it will prevent large, non-family farm
> corporations from using unfair, anticompetitive
> advantages to turn independent family farmers and
> ranchers into a new generation of sharecroppers.

Further, a South Dakota circuit court has determined the

purpose of Amendment E in construing the "business trust"

language of Section 21 of Amendment E.  The circuit court in

Knittel v. South Dakota, Sixth Judicial Circuit, Civ. 99-45,

determined:  "These statements [the "Pro-Con Statement" for

Amendment E] make it clear that §§ 21 and 22 were designed to

protect the environment, maintain the rural way of life, and help

---

[5] The Eighth Circuit recognized that the document, as in this
situation, was drafted by individual citizens and not developed
or edited by the State itself.

family farmers compete in the marketplace." <u>Knittel</u>, Memorandum Decision, at 12, (May 31, 2000) (attached as Appendix A). This state court determination of Amendment E's purpose is persuasive.

Plaintiffs allege, contrary to the above, that Amendment E was adopted for an illegitimate end or purpose. This argument is presumably based on some alleged subjective intent of the drafters of Amendment E, not the <u>objective purpose</u> of the voters who adopted Amendment E. If evidence is allowed on the subjective intent of the drafters, it is expected that they will testify that their intent and motives differed. However, as described above, subjective motives of the drafters are not necessarily the motives of the individual voters who adopted Amendment E. <u>Government Suppliers</u>, 753 F. Supp. at 769. <u>See also Palmer</u>, 403 U.S. at 224, 225; <u>O'Brien</u>, 391 U.S. at 383-84. Amendment E was passed by individual voters <u>not</u> involved in its drafting, and it is their objective intent that must be determined from the information generally available to the public such as governmental studies, academic research, and the Pro-Con Statement. The evidence at trial will demonstrate that Amendment E did indeed have a legitimate end, and bears a rational relationship to that end.

Plaintiffs also allege that "classifications" are established by the exemptions in Amendment E (Section 22 of Article XVII) which are not related to any legitimate end. For example, Section 22(7) exempts from Amendment E "land leases by

alfalfa processors for the production of alfalfa."  This classification, however, relates directly to the goal of Amendment E.  Leases to corporations or syndicates for alfalfa production do not threaten the continued existence of family farms.  Neither do the use of agricultural land for growing seed, nursery plants, or sod (Section 22(8)), or custom spraying, fertilizing, or harvesting (Section 22(14)), threaten the continued existence of the family farm.  The classifications established by the exemptions created by Section 22 of Amendment E are rationally related to the legitimate end of protecting family farms.

E.    Commerce Clause.

The commerce clause, on its face, is a grant to Congress of the power to regulate commerce among the states.  U.S. Const. art. I, § 8, cl. 3.  However, it is interpreted to also prohibit the states from taking certain actions regarding interstate commerce (absent congressional authorization).  Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 571 (1997); CTS Corporation v. Dynamics Corporation of America, 481 U.S. 69, 87 (1987).  In this "dormant" aspect, the commerce clause "prohibits economic protectionism--that is, 'regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'"  Fulton Corp. v. Faulkner, 516 U.S. 325, 330 (1996) (citing Associated Industries of Mo. v. Lohman, 511 U.S. 641, 647 (1994) (quoting New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273-74 (1988))).

1.   Commerce Clause Analysis.

The principal state regulation subject to dormant commerce clause analysis is that which discriminates against interstate commerce. CTS, 481 U.S. at 87. A state statute may do this either by discriminating against out-of-state economic interests or by benefiting in-state interests. Alliance for Clean Coal v. Bayh, 888 F. Supp. 924, 934 (S.D. Ind. 1995); Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 273 (1984).

This limitation on state regulatory power is not absolute. The states retain authority under their general police powers to regulate matters of legitimate local concern even though interstate commerce is affected. Alliance for Clean Coal, 888 F. Supp. at 935; Lewis v. BT Inv. Managers, Inc., 447 U.S. 27, 36 (1980); Maine v. Taylor, 477 U.S. 131, 138 (1986). "The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 126 (1978). See also Minnesota v. Clover Leaf Creamery Co, 449 U.S. 456, 471-72 (1981) (rejecting a claim of discrimination because the challenged statute "'regulates evenhandedly' . . . without regard to whether the [commerce came] from outside the State").

Discrimination may take one of three forms. The law may be discriminatory on its face, may have a discriminatory purpose, or may have a discriminatory effect. SDDS, 47 F.3d at 267; U&I Sanitation v. City of Columbus, 205 F.3d 1063, 1067 (8th Cir.

2000). "For purposes of the dormant Commerce Clause, 'discrimination' means 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Id. at 1067; Oregon Waste Systems, Inc. v. Dep't of Env. Quality of Ore., 511 U.S. 93, 99 (1994).

When a state regulation is challenged as a violation of the dormant commerce clause, it will be subjected to one of two tests, depending on the discriminatory nature of the statute.

One test applies if a law regulates evenhandedly and has only incidental effects on, and does not overtly discriminate against interstate commerce. Hampton Feedlot, Inc. v. Nixon, 249 F.3d 814, 818 (2001). Under this test, the law will be stricken only if the incidental effects it imposes upon interstate commerce are "clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, 397 U.S. 137, 142 (1970).

If the law overtly discriminates against interstate commerce, the second test applies: It will be struck down unless the state can demonstrate "under rigorous scrutiny, that it has no other means to advance a legitimate local interest." C&A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 392 (1994); Hampton Feedlot, 249 F.3d at 818; U&I Sanitation, 205 F.3d at 1067. Indeed, state laws that amount to simple economic protectionism are virtually per se invalid. Oregon Waste Systems, 511 U.S. at 99; Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978); United Waste Systems of Iowa v. Wilson, 189 F.3d 762, 767 (8th Cir. 1999).

In cases where overt discrimination exists which does not amount to economic protectionism, the State bears the burden of justifying the interstate discrimination or burden by showing, under strict scrutiny, that: (1) local benefits flow from the challenged law, and (2) nondiscriminatory alternatives, adequate to preserve the legitimate local purpose, are not available. Hughes v. Oklahoma, 441 U.S. 332, 336 (1979); Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 353 (1977); Dean Milk Co. v. City of Madison, 340 U.S. 349, 354 (1951).  It is considered a persuasive or overriding basis for validity when the state legitimately seeks to further a police power objective rather than when merely economic interests are at stake. Carbone, 511 U.S. at 405-6 (concurrence); U&I Sanitation, 205 F.3d at 1070.

  2. Amendment E Does Not Discriminate Against Interstate Commerce.

Amendment E must first then be analyzed to determine whether it discriminates against interstate commerce.

Section 21 of Article XVII (Amendment E) applies to all corporations and limited liability syndicates doing business in South Dakota; it prohibits all corporations and syndicates from owning real estate used for farming or from engaging in farming. It clearly applies both to in-state and out-of-state corporations and syndicates.  On its face, Amendment E thus regulates evenhandedly.

This analysis also applies to the effect of Amendment E. Amendment E's effect subjects both in-state and out-of-state

corporations and syndicates to its limitations.  The issue becomes whether this effect is only incidental or whether it disproportionately impacts out-of-state businesses.  Plaintiffs argue that Amendment E's effect is borne most heavily by out-of-state corporations and syndicates because of the "family farm exemption" contained in Section 22 of Article XVII.  The family farm exemption, by requiring that a family member either reside on the farm or be actively engaged in the day-to-day labor and management of the farm, is, however, equally restrictive to both in-state and out-of-state corporations and syndicates.

This will be borne out by the evidence submitted at trial. Plaintiffs Haverhals Feedlot, Inc., Sjovall Feedyard, Inc., Donald Tesch, and William Aeschlimann will testify that both their in-state and out-of-state customers have been affected by Amendment E.  Further, most of the Plaintiffs are in-state entities, complaining about the impact of Amendment E on their business.  In fact, the only out-of-state Plaintiff in this case, Spear H Ranch, complies with Amendment E as all the day-to-day labor during the months in which the ranching occurs[6] is provided by Marston Holben, a family member; therefore, this out-of-state corporation complies with the family farm exemption of Amendment E.  The evidence will demonstrate that out-of-state corporations do not bear an unequal portion of the effect of

---

[6] Nothing in Amendment E requires day-to-day involvement in ranching if the nature of the business does not require day-to-day work at all.

Amendment E; Amendment E's effects on interstate commerce are thus incidental.

The next issue is whether Amendment E is a measure designed to economically protect in-state businesses to the detriment of out-of-state businesses.  It clearly is not.  Amendment E's purpose, as most clearly expressed in the "Pro-Con Statement" and as determined by a South Dakota circuit court, see supra, is to protect family farms and the environment and to maintain the rural way of life.  It is thus not designed for economic protection of in-state businesses (as should be clear from the testimony of the Plaintiff businesses), neither helping in-state syndicates nor placing additional burdens on out-of-state syndicates.

It is anticipated that Plaintiffs will argue that the drafters of Amendment E were indeed motivated by economic protectionism or other discriminatory purpose, based upon Plaintiffs' characterization of the drafters' purpose and intent. As discussed supra, the subjective motive and intent of the drafters of Amendment E is not determinative of the objective motive and intent of Amendment E.  As a result, this evidence does not establish that Amendment E is an economic protectionist measure or was enacted for other discriminatory purposes.

Therefore, Amendment E regulates evenhandedly with only incidental effects on interstate commerce.  The test to be applied is whether the local benefits of Amendment E are outweighed by its burdens on interstate commerce.

3.   The Burden Imposed By Amendment E Upon Interstate
     Commerce Is Not Excessive in Relation to Its Local
     Benefits.

It is beyond dispute that legislation that promotes or

protects South Dakota agriculture is a valid local benefit and a

reasonable exercise of police power under South Dakota law.   In

In re Request for an Advisory Opinion, 387 N.W.2d 239, 243 (S.D.

1986), the South Dakota Supreme Court recognized that the plight

of agriculture seriously affects the State's economy:

> Measures to promote and protect a state's major
> industry are within a state's police powers.   "[I]t
> cannot be reasonably contended that the protection and
> promotion of [South Dakota's agriculture economy] is
> not a matter of public concern or that the Legislature
> may not determine within reasonable bounds what is
> necessary for the protection and expedient for
> promotion of that industry."

(Citations omitted.)   The issue is whether this local benefit is

outweighed by its burdens on interstate commerce.

The claimed burden of Amendment E upon interstate commerce

is the impact on out-of-state corporations and syndicates of

Amendment E's restriction on owning farmland and operating a

farm.

However, restrictions on corporate ownership of farmland

have long been in place in other states.   In Nebraska,

constitutional provisions very similar to Amendment E restrict

the same activities by corporations and syndicates conducting

business in Nebraska.   See MSM Farms.   Other states have also

prohibited corporate ownership of farmland and corporate farming

activities; see supra at 5.   Amendment E therefore does not

impose a new burden on the interstate activities of corporations

and syndicates.  They have long been prohibited from farming or owning farmland in many states.

Further, Amendment E was not the first South Dakota restrictions on corporate farming activities.  SDCL ch. 47-9A, the Family Farm Act, prohibited corporate farming and the corporate ownership of farmland.  SDCL 47-9A-3.  See supra at 8-9.

Therefore, Amendment E imposes little more impact on interstate commerce than has already been established by law. This burden cannot be deemed excessive, especially in light of the local benefits of Amendment E.  These benefits, which will be described in testimony and are also established by the "Pro-Con Statement" of Amendment E, the circuit court decision discussed, supra, and even by the Eighth Circuit in MSM Farms, are the protection of the family farm, the environment, and the rural way of life.  Such local benefits are clearly extremely important to a rural state such as South Dakota.

Amendment E therefore, even with its incidental effects on interstate commerce, does not burden interstate commerce in excess in relation to its local benefits of protecting family farms.  As such, under Pike, 397 U.S. 137, Amendment E does not violate the commerce clause.

### 4.  In the Alternative, Amendment E Also Satisfies the Second Commerce Clause Test.

If the Court determines that Amendment E does discriminate against or burden interstate commerce, it still satisfies the "strict scrutiny" test.  The legitimate local purpose served by

Amendment E, described above, is the protection of the family farm and rural way of life.  The evidence at trial will also show that nondiscriminatory alternatives were attempted and failed to provide adequate protection for family farms.  SDCL ch. 47-9A, which restricts corporate farming activities, has been in effect since 1974 and has not stemmed the trend toward larger corporate farms and fewer family farms.  Other alternatives, such as restricting the size of farms, affect interstate commerce in the same manner as Amendment E; they would apply to both in-state and out-of-state corporations and syndicates just as does Amendment E.  Legislation or constitutional amendments which prohibit vertical integration by corporations and syndicates would in effect act almost entirely on out-of-state businesses, as in South Dakota it is out-of-state businesses that have the capital and power to vertically integrate.  Such legislation would burden interstate commerce far more than does Amendment E, and may indeed be viewed as per se economic protectionism.

Other alternatives include the promotion of farmer cooperatives for sharing capital, expenses, and marketing opportunities in order to compete with corporate farms is another alternative.  Historically, these organizations have been encouraged and have not halted the changes in land ownership and livestock management.

Another alternative would be an "excess land tax," whereby corporate farms would be required to pay more property tax than smaller farms.  This alternative may make the cost of doing

22

business higher for corporations, but would not address the problem of consolidation of farms, declining numbers of family farmers, and adverse changes in communities.

Thus, Defendants submit that no alternatives exist that would accomplish the goals involved here and that would have less of an impact on interstate commerce than does Amendment E.  As such, even under the strict scrutiny test, Amendment E does not violate the commerce clause.

F.   Due Process.

Plaintiffs allege that Amendment E violates the Fourteenth Amendment to the United States Constitution and Article VI, Section 2 of the South Dakota Constitution.  It appears that these allegations pertain to both substantive and procedural due process.

   1.   Substantive Due Process Claims Are Not Actionable When Explicit Textual Protections Are Otherwise Available.

The Plaintiffs' allegations (particularly those of the utilities) regarding substantive due process appear to make a takings claim.  For example, the Big Stone partners allege that: "The value of at least one existing generating plant, the Big Stone Plant, has been materially diminished . . . ."  Amended Complaint ¶ 5.  Further, the utilities intend to present testimony on actual damages incurred as a result of Amendment E. The proposed testimony of Ralph Brown relates exclusively to monetary damages.  Some of the other Plaintiffs may also offer similar testimony on monetary damages.  It appears they intend to pursue the substantive due process claims as either a substitute

for or precursor to a state takings case.  This is not permissible.

Substantive due process claims are not actionable when explicit textual arguments can be made under the Bill of Rights. Albright v. Oliver, 510 U.S. 266, 273 (1994) (Fourth Amendment analysis used instead of the more generalized substantive due process); Portuondo v. Agard, ___ U.S. ___, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000) (analysis under Fifth and Sixth Amendments rather than generalized notion of substantive due process); Smithson v. Aldrich, 235 F.3d 1058, 1064 (8th Cir. 2000) (Fourth Amendment).  When the allegations assert conduct that is a "taking" claim, such assertions are to be heard as Fifth Amendment claims rather than substantive due process issues. Macri v. King County, 126 F.3d 1125 (9th Cir. 1997); Armendariz v. Penman, 75 F.3d 1311, 1320 (9th Cir. 1996).  Moreover, substantive due process claims cannot operate as a loophole to avoid jurisdictional prerequisites for takings claims.  Macri, 126 F.3d at 1129.  Since Fifth Amendment "takings" claims must be first heard in state court, it is improper to consider the same claims in federal court under the guise of a substantive due process claim.  Id. at 1129; Madison v. Graham, 126 F. Supp. 2d 1320 (D. Mont. 2001).

> 2.  Amendment E Is Rationally Related to a Legitimate State Interest.

A violation of a substantive due process right occurs when "government officials use their power in such an arbitrary and oppressive way that it 'shocks the conscience.'"  Entergy,

Arkansas, Inc. v. Nebraska, 241 F.3d 979 (8th Cir. 2001). A statute that is rationally related to a legitimate state interest cannot be "truly irrational." Wellwood v. Johnson, 172 F.3d 1007, 1010 (8th Cir. 1999). An example of what constitutes "truly irrational" action is a regulation "applying only to persons whose names begin with a letter in the first half of the alphabet." Chesterfield Development Corp. v. City of Chesterfield, 963 F.2d 1102, 1104 (8th Cir. 1992).

As discussed above, Amendment E has a rational relationship to the State's interest in maintaining family farms and farm communities, and is not a violation of substantive due process rights.

Plaintiffs may claim a substantive due process violation arises from the initiated measure process itself. However, cases invalidating citizen voting processes under a substantive due process analysis do not apply here. Those cases are "delegation" cases where a governmental entity relegates its decision-making authority to a group of local voters without articulating standards for exercising that function. Here, the voters exercised power reserved to the people in the state constitution. There was no delegation. See Eastlake v. Forest City Enterprises, Inc., 426 U.S. 668, 676 (1976).

For these reasons, as well as those set forth in the foregoing analysis pertaining to the equal protection clause, Amendment E is not a substantive due process violation.

25

3.   The Adoption of Amendment E Did Not Violate Plaintiffs'
Procedural Due Process Rights.

As stated above, the Amended Complaint contains general
allegations regarding denial of due process and does not specify
whether such allegations are intended to focus on procedural or
substantive due process.  In opposing the Defendant-Intervenors'
Motion for Partial Summary Judgment, Plaintiffs listed some
purported procedural irregularities in the Amendment E drafting
process.

The first issue raised appears to be the notion that the
constitutional initiative process itself is not adequate or
"normal" in terms of political "give-and-take."  In South Dakota,
the initiative process includes several safeguards for ensuring
that initiated measures are fully subject to debate.  Proponents
of such constitutional measures are required to file the full
text of the proposal with the South Dakota Secretary of State
prior to circulation of petitions.  SDCL 2-1-6.2.  The notice is
public and typically engenders publicity both pro and con.
Petitions, containing the substance of the proposal, are then
circulated.  SDCL 2-1-7.  The petitions are filed a full year in
advance of the vote.  SDCL 2-1-2.1.  This period prior to
election day gives the citizens the opportunity to consider the
arguments pro and con.  It provides for opportunity to read the
various editorials and listen to the debates of all sides.  The
Secretary of State is required to prepare and distribute public
information ("Pro-Con Statements") on any constitutional
amendment.  SDCL 12-13-23.  The Attorney General is required to

develop a ballot explanation.  SDCL 12-13-9.  Financial backers on all sides of the issue are required to disclose their interests before the election.  SDCL 12-25-19.1.  All of these steps provide a very public educational process.  The State submits that this process provides for ample "political give-and-take" and also educates the public (the decision makers) about the effect of the proposal.

Although the Plaintiffs assert that this process forecloses them from "any normal political recourse," they were entitled to participate in the public debate in 1997 and 1998.  In fact, evidence at trial will show that Plaintiffs Farm Bureau and Frank Brost were active participants in this process.  See Breck v. Janklow, 2001 S.D. 28, ¶ 26, 623 N.W.2d 449 (contentions over lack of public input were "meritless" when challenger presented testimony to the decision makers).  Further, Plaintiffs are not foreclosed from initiating another constitutional measure to amend or otherwise change the Constitution.

As a second issue, Plaintiffs appear to be asserting that the drafting process was too hasty and the drafters too inexperienced.  They assert that experts should have been consulted.  It is apparent, however, the drafting process is different from the decision-making process.  It is the voters who enacted Amendment E, not the drafters.  What the drafters did is overridden by this legislative process, for the same reasons that individual legislator's intent is not relevant; see supra at 4-5.

As seen, the process for initiated measures provides for the decision makers to analyze the facts, listen to debate, and engage in the decision making in a "legislative" proceeding. Legislative proceedings do not demand formal trial type proceedings. <u>Association of Nat'l Advertisers v. F.T.C.</u>, 627 F.2d 1151 (1979). Decision makers in legislative matters are not required to analyze factual matters according to any specific method. <u>Townsend v. Yeomans</u>, 301 U.S. 441, 451 (1937). Further, in such due process challenges, "The haste with which an act is passed cannot be considered in determining its constitutionality and the court will not look into the motives, wisdom or haste connected with the passage of statutes; those matters are left to the legislature." <u>Independent Community Bankers Ass'n v. South Dakota</u>, 346 N.W.2d 737, 745 (S.D. 1984).

Plaintiffs also allege that they have been denied due process because Amendment E interferes with "legitimate business expectations by effectively nullifying existing contracts and business relationships" for future livestock purchases (Amended Complaint ¶ 138), and by eliminating the use of forward contracts (Amended Complaint ¶ 139). Plaintiffs' livestock purchases that were under contract are exempt from Amendment E under Section 22(5) for the length of the contract. Thus, only future contract purchases of livestock that had not been anticipated by contract prior to the adoption of Amendment E could be affected. Such future contracts, however, are speculative. Even if they were not, entities that are regulated by government such as

corporations and limited liability entities (see supra at 2)
cannot claim that contracts have been impaired by new
governmental regulations.   See, e.g., Home Building & Loan Ass'n
v. Blaisdell, 290 U.S. 398, 435-39 (1934) (states retain power to
enact laws which affect contractual rights); Allied Structural
Steel Co. v. Spannaus, 438 U.S. 234, 241 & n.13 (1978).

Further, Amendment E does not impact the use of forward
contracting.   Forward contracts are a marketing tool, generally
between the farmer or rancher and a processing facility.   The
processing facilities are corporations prohibited from the
ownership, keeping or feeding of livestock more than two weeks
prior to slaughter.   Sections 21 and 22(15) of Amendment E.   As
will be shown in testimony, the ownership, control, and risk for
the livestock subject to a forward contract remains with the
farmer/rancher and does not transfer to the processing facility
until the livestock is delivered for slaughter, or, if the sale
is based on grade and yield, until slaughter and grading occurs.
As a result, processing facilities do not violate Amendment E if
they make a forward contract with a farmer/rancher.   Amendment E
does not restrict Plaintiffs from continuing to use this
marketing tool.

Amendment E therefore does not violate Plaintiffs'
Fourteenth Amendment due process rights.

G.   Utilities.

Northwestern Public Service, Montana-Dakota Utilities, and
Ottertail Power Company (hereinafter referred to collectively as

"utilities") claim that Amendment E is unconstitutional as applied to their operations, particularly under the commerce (by "stifling the generation and delivery of electricity," Amended Complaint ¶ 5), equal protection, and due process clauses. These claims appear to be based on the allegation that the utilities are no longer able to purchase easements on farmland for transmission lines. Second, the utilities claim that land purchased jointly (Big Stone property) has decreased in value due to Amendment E. Third, they claim that they will lose the ability to compete in the event of possible deregulation. Each of these three claims should be rejected.

1. Deregulation Issue.

State Defendants previously filed a Partial Motion for Summary Judgment asserting that the electric deregulation component of Plaintiffs' argument was not ripe for consideration. Doc. No. 104. In finding that a justifiable controversy exists as to the transmission line and Big Stone property issues, this Court held that "questions as to possible deregulation are not ripe and will not be considered by the Court." Doc. No. 135. For this reason, additional briefing on the deregulation issue is not included here, and the State is not expecting that the issue will be considered by the Court at trial.

2. Transmission Lines.

Neither the express language nor purpose of Amendment E suggest that Amendment E is intended to involve utility operations such as transmission lines.

Amendment E prohibits corporations from doing two things: (a) engaging in farming and (b) obtaining interests in real estate used for farming.  The utilities are not engaging in farming; that issue is undisputed.  The utilities' claim is that they own an interest in real estate used for farming through their easement interest for transmission lines.

While the first section of Amendment E (S.D. Const. art. XVII, § 21) prohibits corporations from obtaining an interest whether "legal, beneficial or otherwise," that section must be read together with the second section of Amendment E (S.D. Const. art XVII, § 22).  Section 22(4) provides that interests in land as of the date that Amendment E was approved are exempt from the provision.  This "grandfather provision" applies only if "such land or other interest is held in continuous ownership or under continuous lease by the same such corporation or syndicate," as is arguably the case with the utilities' current ownership of transmission line easements.

However, the scope of utility easements for transmission towers does not purport to include the right to exclude others or control whether or not farming occurs or does not occur on the right-of-way area.  This is consistent with easements in general. While easements include the legal descriptions of the area involved, the scope of the easement is "measured and defined by the purpose and character of that easement; and the right to use the land remains in the owner of the fee so far as such right is consistent with the purpose and character of the easement."

Musch v. H-D Electric, 460 N.W.2d 149, 152 (S.D. 1990) (citing 17
Am. Jur. 993 and Langazo v. San Joaquin Light & Power, 32 Cal.
App. 2d 678, 90 P.2d 825 (1939)).  In other words, the fee owner
of the land maintains "dominion and control" over the strip of
land used for a utility easement.  Musch, 460 N.W.2d at 152.  In
Musch, a tort case, the South Dakota Supreme Court recognized
that the trespass defense was available only to the actual
"possessory space" within the easement area.  The utility could
not claim a trespass defense for the whole area described in the
right-of-way document; it could claim the defense only for the
area actually used by the utility within the scope of the
easement, i.e. the space occupied by the pole or tower and
associated guy wires.  In the same way, the prohibitions of
Amendment E relate only to the actual possessory space used by
the towers and guy wires themselves.  The area used by the towers
and guy wires is not used for farming.  Cows may be pastured near
the towers within the right-of-way, but they do not occupy the
same "possessory space" as towers.

Additional language in Amendment E also supports the
conclusion that the "interest in land" restriction relates only
to situations where the interest includes control over the
agricultural use.  For example, Amendment E allows corporations
to hold mineral rights on agricultural land.  S.D. Const.
art. XVII, § 22(9).  Corporations may hold a security interest in
land.  S.D. Const. art. XVII, § 22(13).  Custom harvesting

operations may exercise their statutory "thresher's lien"[7]
authority to obtain title to crops without running afoul of
Amendment E.  S.D. Const. art. XVII, § 22(14).  In situations
where the transmission lines are located on agricultural land and
the utilities exercise no control over use of the land for
agricultural purpose, Amendment E does not apply.

Even if the meaning of Amendment E was unclear in this
regard, the result would be the same.  If the constitutional
amendment is not clear by its terms, courts are to "look to the
history of the times and examine the state of things existing
when the constitution was framed and adopted, in order to
ascertain the prior law, the mischief, and the remedy." City of
Sioux Falls v. Sioux Falls Firefighters, 234 N.W.2d 35, 37 (S.D.
1975) (citing 16 Am. Jur. 2d Constitutional Law § 87).  Accord
South Dakota Auto Club, Inc. v. Volk, 305 N.W.2d 693, 697 (S.D.
1981).  In one of the most recent challenges to a South Dakota
constitutional amendment, the Supreme Court considered the
history of lottery regulation, policy statements in previous
legislation, and the fact that a previous constitutional proposal
had been introduced and rejected.  Poppen v. Walker, 520 N.W.2d
238, 243-46 (S.D. 1994).  The court also considered "the
circumstances under which a constitutional provision was formed,
the general spirit of the times, and the prevailing sentiment of
the people." Id. at 246, 247.

---

[7] SDCL 38-17-14.

Amendment E was enacted in response to a rural crisis in agriculture.  See supra at 5-10, 12-13.  The threat to the family farm is the issue here; keeping electric utilities from building transmission lines would be contrary to that purpose.

The legislative history also supports this view.  As discussed above, the only legislative history accepted by the courts for South Dakota ballot measures is the "Pro-Con Statement" issued by the Secretary of State.  The Pro-Con Statement did not include any mention of utilities whatsoever.

Based on the language of Amendment E, the circumstances surrounding its passage, and the accepted legislative history on this constitutional amendment, it is clear that Amendment E was never intended to prohibit utilities from obtaining easements for transmission lines.

   3.  The Big Stone Property.

The three utilities formed the Big Stone Partners to build and operate the Big Stone Power Plant in Grant County.  They jointly own approximately 1,350 acres used for the power plant, associated railway, and infrastructure to support the plant. This land is used for industrial purposes and has nothing to do with Amendment E.  They also own adjacent property (552.8 acres) that they lease to three individual farmers and a partnership for agricultural use.  This part of the property has been held for future development, including additional electric plant construction.  Due to nearby water and rail facilities, this land could also be used in the future for commercial or industrial

development.  Evidence will show, for example, that greenhouses,
fish farms, ethanol plants, and a high fructose corn syrup plant
have shown interest in the land in the past.

At present, it is undisputed that these 552.8 acres are
exempt from Amendment E.  Amendment E (S.D. Const. art. XVII,
§ 22(4) provides that agricultural land owned by a corporation or
syndicate as of the approval date of the amendment and held in
continuous ownership by the corporation or syndicate is exempt.
The Big Stone Partners owned the 552.8 acres of land in question
on the approval date of the Amendment and have continuously held
the land since that time.

Although they are not harmed for this reason, they are
apparently concerned about the eventual resale value of the land
for development.  See supra, discussion of substantive due
process issue.  The State submits that such event is speculative
for several reasons.  First, the Big Stone Partners have not
eliminated the possibility of developing the property themselves.
Industrial development is not prohibited in any manner by
Amendment E.  Second, even assuming that the Big Stone Partners
sell the land, the purchaser may not be a corporation or
syndicate barred from owning agricultural land under Amendment E.
Third, even if such a buyer did purchase the land, that buyer
could lease the land to a qualified family farm corporation, sole
proprietorship, or general partnership for farming for five years
pending development.  S.D. Const. art. XVII, § 22(10).  Even if
the purchaser took longer than five years to develop the

property, construction could be started on the property and farming would not occur anyway.

Thus, while it is possible that Amendment E could have some effect on the Big Stone Partner's land in Grant County, there is no effect at present. It is unknown if there will be an effect in the future, and whether such effect would be more than incidental.

H.   42 U.S.C. § 1983 Challenge.

The Plaintiffs have further pled that Amendment E violates 42 U.S.C. 1983. This statute does not provide a separate cause of action (Baker v. McCollan, 443 U.S. 137, 144 n.3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); Johnson v. University of Wisconsin-Eau Claire, 70 F.3d 469, 481 (C.A.7 1995)), but rather requires a showing of the constitutional deprivations discussed above. For the reasons set forth supra, this claim must be rejected.

I.   Conclusion.

Defendants therefore submit that the evidence at trial will substantiate their position that Amendment E is constitutional.

Dated this 2nd day of November, 2001.

Respectfully submitted,

MARK BARNETT
ATTORNEY GENERAL

R. Giedd

Roxanne Giedd
Diane Best
Assistant Attorneys General
500 E. Capitol Ave.
Pierre, South Dakota 57501-5070
Telephone:  (605) 773-3215

usdc.rg(dh)

APPENDIX A

| STATE OF SOUTH DAKOTA | ) | IN CIRCUIT COURT |
|---|---|---|
| | ss. | |
| COUNTY OF GREGORY | ) | SIXTH JUDICIAL CIRCUIT |

| | | |
|---|---|---|
| MARVIN KNITTEL, ARLA KNITTEL WURTZ, and JUDITH KNITTEL MEIERHENRY | | CIVIL 99-45 |
| Plaintiffs, | | MEMORANDUM DECISION |
| vs. | | |
| STATE OF SOUTH DAKOTA, Defendant. | | |

The above matter came before this court on February 10, 2000. The Plaintiffs, Marvin Knittel, Arla Knittel Wurtz and Judith Knittel Meierhenry appeared in person and with their attorney, Mark Meierhenry of Sioux Falls, South Dakota. The State of South Dakota appeared by the through Assistant Attorney General Diane Best of Pierre, South Dakota.

On March 23, 2000 the State of South Dakota submitted its Motion For Court To Take Judicial Notice. Pursuant to SDCL 19-10-4, and the Court having received no objection from the Plaintiffs, the court herein grants the motion. The court takes judicial notice of the following: (1) Pro-Con Statement for 1998 Constitutional Amendment E; (2) Ownership and Control of Farmland in the United States; and (3) A Time to Act. The Court received the final submission by counsel on April 13, 2000.

The court has considered the evidence and testimony herein, together with the briefs submitted by counsel, and being fully advised in the premises enters this written memorandum decision.

## Statement of the Facts

On October 5, 1904, Fried Knittel (Fried) filed application #1169 for homestead of the Southeast Quarter (SE¼) of Section 7, Township 96 North, Range 73 West of the 5th Principal Meridian, Gregory County, South Dakota. Fried and his wife Mary took actual residence in April 1905 and built a house and buildings and harvested crops. Adoph John Knittel (Adolph) was born in 1906 on the homestead. Fried published his proof of homestead in the United States Land Office in Gregory on February 18, 1911.

Fried and Mary set one acre of land in the homestead quarter aside for the Zion Evangelical Lutheran Church. Additionally, Fried and Mary purchased the SW¼ of Section 7, adjoining the Knittel homestead, from a relative, Konstantin Stirm.

Later, Adolph and his wife Anna purchased the SE¼ and the SW¼ quarters of Section 7 from Adolph's parents, Fried and Mary. Additionally, Adolph and Anna purchased an adjoining quarter in Tripp County.

Adolph and Anna had three surviving children: Marvin Knittel, Arla Knittel Wurtz, and Judith Knittel Meierhenry (Plaintiffs). Plaintiffs purchased their parents' three quarters of land and currently hold the land as tenants in common. The Zion Lutheran acre set aside by Plaintiffs' grandparents, Fried and Mary, is currently a cemetery in which a few family members are buried. Judith Knittel Meierhenry maintains the cemetery for approximately $500 per year.

The Plaintiffs presently cash rent the property through a general partnership. The person renting the land cultivates some of it and operates the rest as pastureland. None of the Plaintiffs have lived on the land or farmed the land since childhood. Additionally, none of the Plaintiffs' six children intend to become farmers.

Plaintiffs wish to "create a trust in order to preserve the homestead, avoid fractional interests, avoid generational estate taxes and other personal reasons." (Complaint ¶ 22). Apparently, Plaintiffs intend to "transfer by warranty deed their undivided one-third ownership each in the real estate to themselves as trustees for present and future descendants of the Plaintiffs as a class of beneficiaries." (Plaintiff's Brief at 8). More specifically, they intend to name "themselves as original trustees and provid[e] for replacement trustees upon the death of any Plaintiff." (Plaintiff's Brief at 10). Plaintiffs ask this Court to render a declaratory judgment on whether the South Dakota Constitution, Art. XVII, §§ 21-24,[1] prohibits such a trust.

## **Legal Standard**

This Court's general power to issue declaratory relief stems from SDCL 21-24-1.[2] The general powers conferred in SDCL 21-24-1 apply to

---

[1] The Court will refer to Article XVII by section number throughout the opinion.

[2] "Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed ... The declaration may be either affirmative or negative in form and effect; and such declaration shall have the force and effect of a final judgment or decree." SDCL 21-24-1.

any proceeding "in which a judgment or decree will terminate the controversy or remove an uncertainty." SDCL 21-24-6. Therefore, SDCL 21-24-1 authorizes this Court to remove the parties' uncertainly about the language of §§ 21 and 22.

Moreover, SDCL 21-24-3 provides that any person whose rights are affected by a statute or ordinance "may have determined any question of construction ...arising under the ...statute [or] ordinance ... and obtain a declaration of rights ...thereunder." SDCL 21-24-3. SDCL 21-24-3 does not specifically list "constitution." However, the Court can see no reason why SDCL 21-24-3 should not apply to questions of constitutional interpretation.

Beyond this statutory authority, the Supreme Court has established four jurisdictional prerequisites for declaratory judgment:

> (1) There must exist a justiciable controversy; that is to say, a controversy in which a claim of right is asserted against one who has an interest in contesting it; (2) the controversy must be between persons whose interests are adverse; (3) the party seeking declaratory relief must have a legal interest in the controversy, that is to say, a legally protectible interest; and (4) the issue involved in the controversy must be ripe for judicial determination.

Boever v. SD Bd. of Accountancy, 526 NW2d 747, 746 (SD 1995) (quoting Danforth v. City of Yankton, 25 NW2d 50, 53 (SD 1946)). These prerequisites insulate a court from "render[ing] advisory opinions or determin[ing] moot or theoretical questions." State of North Dakota v. Perkins County, 9 NW2d 500 (SD 1943).

In this case, Plaintiffs have presented only general ideas for a possible trust. Plaintiffs have not drafted an actual trust document for the State to challenge. Given this shaky procedural foundation, the Court will examine the above-mentioned jurisdictional requirements in regard to all issues.[3]

The first question is whether this action is a justiciable conflict between adverse parties. In other words, "a controversy in which a claim of right is asserted against one who has an interest in contesting it." Boever, 526 NW2d at 750. The Court concludes that Plaintiffs have presented a justiciable conflict on the application of § 21 and 22, but not the merger issue.

In regard to the merger issue, Plaintiffs claim the doctrine of merger does not prevent them from naming themselves as original trustees and providing for replacement trustees upon the death of any Plaintiff. (Plaintiffs' Brief at 10). However, the Court will address this claim only if the State has an interest in contesting it.

The only role of the State in this case is in upholding the Constitution. As long as the proposed trust does not violate § 21, the State has no interest in contesting it. Other possible problems with the trust, like merger, are not the State's concern. Therefore, this Court cannot decide the merger issue in a declaratory judgment action *against the State.*

---

[3] The State has challenged jurisdiction on only the merger issue.

In regard to the application of §§ 21 and 22 to the proposed trust, the existence of a justiciable conflict between adverse parties is a tougher case. There is no trust, as yet, for the State to challenge. In addition, the State agrees that the *proposed* trust would not violate the constitution. Certainly, these facts indicate a lack of the adverse interest required for declaratory judgment.

However, the Supreme Court has recognized "*a liberalization of what constitutes adversely affected parties* with interests ...entwined in a justiciable controversy ... when a determination of present rights is achievable only by an interpretation which may, to some extent, involve future contingencies." Kneip v. Herseth, 214 NW2d 93, 98 (SD 1974) (emphasis added). Under this analysis, the apparent indifference of the State is not controlling. Id. at 99. When the State is obligated to enforce a law which will put it in controversy with another party, even if that controversy depends on contingencies outside the control of the State, declaratory judgment should be allowed. Id.

Given these principles, this Court holds that there is a justiciable conflict between adverse parties regarding §§ 21 and 22. If the trust, whenever it is drafted, violates § 21, the State will be obligated to mount a challenge. This potential conflict, although based on future contingencies, is enough for a justiciable conflict between adverse parties.

Having determined that applicability of §§ 21 and 22 is a justiciable conflict between adverse parties, the second question is whether the matter

is ripe for judicial review. "Courts often require adverse claims, based upon *present rather than speculative facts*, which have ripened to a state of being capable of judicial adjustment." Kneip, 214 NW2d at 96 (emphasis added). However, a matter is ripe, even though based on future contingencies, if "a realistic approach, based upon plaintiff's good faith, reflects that conflict is imminent." Id. at 99.

After careful review, this Court concludes that the case is ripe for declaratory judgment. No doubt the dispute in question depends on a future contingency (the establishment of a trust). However, as pointed out in the discussion above, there is a possibility of an imminent conflict with the State if the issues at hand are not resolved.

Moreover, this Court must keep in mind the remedial nature of the Declaratory Judgment Act. The legislature has directed that the Act's "purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and is to be *liberally construed and administered.*" SDCL 21-24-14 (emphasis added). This liberal construction helps "establish guidelines for parties' actions so they may keep within lawful bounds, avoid expense, bitterness of feeling, the disturbance of orderly pursuits and ... foster judicial economy." Id. at 96. Rendering a declaratory judgment at this point will assure that the Plaintiffs do not violate our State constitution and is totally consistent with the purposes of the Act.

### Constitutional Provisions[4]

**Art. XVII § 21**: *No corporation[5] or syndicate* may acquire, or otherwise obtain an interest, whether legal, beneficial, or otherwise, in any real estate used for farming in this state, or engage in farming ...

[S]yndicate: [I]ncludes any limited partnership, limited liability partnership, *business trust,* or limited liability company organized under the laws of any state of the United States or any country. A syndicated *does not include general partnerships,* except general partnerships in which nonfamily farm syndicates or nonfamily farm corporations are partners.

[F]arming: Means the cultivation of land for the production of agricultural crops, fruit, or other horticultural products, or the ownership, keeping, or feeding of animals for the production of livestock or livestock products.

**Art. XVII § 22**: The restrictions in § 21 ... do not apply to:

(1)     [F]amily farm corporation or syndicate: ...[A] corporation or syndicate engaged in farming or the ownership of agricultural land, in which a majority of the partnership interests, shares, stock, or other ownership interests are held by members of a family *or a trust created for the benefit of a member of that family.* The term, family, means natural persons related to one another within the fourth degree of kinship ...or their spouses. *At least one of the family members ...shall reside on or be actively engaged in the day-to-day labor and management of the farm.* Day-to-day labor and management shall require *both daily or routine substantial physical exertion and administration.* None of the corporation's or syndicate's partners, members, or stockholders may be ...other corporations or syndicates, unless all of the stockholders, members, or partners of such entities are persons related within the fourth degree of kinship to the majority of partners, members, or stockholders ...

---

[4] Style changes for readability.

[5] Clearly, Plaintiffs do not propose a "corporation" organized under the laws of any state or country. § 21. Therefore, this opinion addresses only the term "syndicate."

(12)  <u>Bank as Trustee</u>:  Agricultural lands held by a state or nationally chartered bank as trustee for a person, corporation or syndicate that is otherwise exempt from the provisions of §§ 21 to 24, inclusive ...

SD Const. Art. XVII, §§ 21-22 (emphasis added).

I.  **Whether Plaintiffs may transfer the legal title of their farm real estate to themselves as trustees for present and future descendents as a class of beneficiaries under § 21, so long as the trust is not a business trust.**

The main issue in this case is whether the proposed trust is a syndicate under § 21. A syndicate is a "limited partnership (LP), limited liability partnership (LLP), business trust, or limited liability company (LLC) organized under the laws of any state of the United States or any country." § 21. Clearly, the proposed trust is not a LP, LLP, or LLC. The questions, therefore, are (1) whether the definition of syndicate includes all trusts, and if not (2) whether the proposed trust is a "business trust" as defined by South Dakota law.

In order to answer these questions, the Court must utilize the rules of constitutional construction:

First and foremost, the object of construing a constitution is to give *effect to the intent* of the framers of the organic law and of the people adopting it. The Supreme Court has the right to construe a constitutional provision in accordance with what it perceives to be its *plain meaning*. When words in a constitutional provision are *clear and unambiguous*, they are to be given their *natural, usual meaning* and are to be understood in the *sense in which they are popularly employed*. If the meaning of a term is unclear, the Court may look to the intent of the drafting body.

<u>Poppen v. Walker</u>, 520 NW2d 238, 242 (SD 1994) (citations omitted) (emphasis added).

The first question is whether the definition of syndicate includes any trust besides a business trust. This Court holds that § 21 clearly and unambiguously prohibits *only* a business trust. If § 21 prohibited all trusts, the term "business trust" would be repetitive and meaningless. See <u>South Dakota Auto Club, Inc. v. Volk</u>, 305 NW2d 693, 696 (SD 1981) (Court construing constitutional section must give effect to *all* provisions).

Because the definition of syndicate includes only a business trust, the second question is whether the proposed trust is, in fact, a business trust.

> The term "business trust" ... shall mean an unincorporated business association of the type which at common law was known as a "common-law trust," "business trust," or "Massachusetts trust," created by a trust instrument commonly known as a declaration of trust under which *property is held, invested, and reinvested by trustees for the benefit and profit of such persons as are or may become the holders of transferable certificates evidencing beneficial interests in the trust estate.*

SDCL 47-14-1 (emphasis added).

The main difference between business trusts and ordinary trusts is the purpose. "Business trusts differ from ordinary trusts in that the primary purpose of a ...business trust is to conduct a business for profit, while the object of the traditional trust is to hold and conserve particular property, and its powers are incidental to this purpose." 13 AmJur2d <u>Business Trusts</u> § 8 (1964).

Another difference between an ordinary trust and a business trust is transferability of interest.  According to the definition of a business trust, all beneficiaries hold *transferable* certificates.[6]  SDCL 47-14-1.  On the other hand, an ordinary trust may prohibit the beneficiaries from transferring their interests.  SDCL 55-1-16.

After examining these characteristics, the Court holds that the proposed trust would not be a business trust.  First, the trust would not be set up to conduct business for a profit, as is the purpose of a business trust.  The main purpose of the proposed trust, according to Plaintiffs, is to maintain the property for posterity and prevent it from being divided up among descendants.[7]  (T. 26-27).  Plaintiffs plan to rent out the property through the trust and use the rental income to maintain the buildings and the cemetery on the property.  (T. 24-26, 28-29). Although the leftover rental income will be distributed to the beneficiaries, this consequential profit is not the main purpose of the trust.

Second, in addition to having a non-business purpose, the trust will apparently not grant free transferability of interest to the beneficiaries.  According to Plaintiffs, they intend to "transfer the real estate to the Knittel Homestead Trust with themselves as trustees and original beneficiaries followed by their heirs as a class." (Plaintiff's Brief at 10).  According to this

---

[6] These certificates have been likened to shares of a corporation.  13 AmJur2d <u>Business Trusts</u> § 22.

[7] Of course, Plaintiffs are additionally looking to avoid estate taxes.  (Complaint ¶ 22).

plan, the beneficial shares are limited to Plaintiffs and their heirs.  The beneficiaries cannot freely transfer their interests as in a business trust. Indeed, one of the stated purposes of the trust is to avoid breakup of the land among the descendants.  (Complaint ¶ 10).

Additionally, § 21 was not intended to foreclose the type of family trust proposed by Plaintiffs.  Both parties agree that the amendments which created §§ 21 and 22 were designed to prohibit large corporations and non-family farm entities from owning farmland.  Supporters of §§ 21 and 22 warned voters that independent producers will have market access problems if pitted against the unfair commercial advantage of big business. (1998 Ballot Question Pamphlet "Pro" Statement).  In addition, supporters cautioned that large corporations will readily sacrifice the environment to profit.  Id.  Moreover, §§ 21 and 22 were an attempt to stop the decline in the family farmer way of life.  Id.  Overall, §§ 21 and 22 were meant to "reaffirm South Dakota's commitment to family agriculture ... [and] prevent large, non-family farm corporations from using unfair, anti-competitive advantages to turn independent family farmers and ranchers into a new generation of sharecroppers."  Id.

These statements make it clear that §§ 21 and 22 were designed to protect the environment, maintain the rural way of life, and help family farmers compete in the marketplace.  The Court has been directed to no authority that these sections were designed to foreclose a family from

putting the family homestead in trust to avoid estate taxes and breakup of the estate by descendants.

In fact, the proposed trust would *serve* the original purposes of §§ 21 and 22. By renting out the land and using the profits to maintain the homestead, the trust would assure that the land will be productive for many years to come. In addition, given the sentimental value Plaintiffs feel for the homestead, it is unlikely they will allow their leassee to environmentally abuse the land. Finally, by making land available to rent by small farmers, the trust maintains the rural way of life.

In summary, § 21 does not prohibit an ordinary trust, only a business trust. The trust proposed by Plaintiffs, therefore, will not violate § 21 if it is not a business trust. The trust will not be a business trust if it is not organized to conduct business for a profit and disallows free transferability of interest by the beneficiaries.[8]

II.   **Whether Plaintiffs as tenants in common may own the farm real estate and organize as a general partnership to rent the land to a farmer.**

Section 21 clearly allows general partnerships unless nonfamily farm syndicates are partners. Therefore, Plaintiffs may own the farm real estate as tenants in common and organize as a general partnership to rent land to

---

[8] Although it is not clear from their brief, Plaintiffs' seem to be asking the Court to also decide whether the proposed trust would fit the definition of a family farm syndicate in § 22(1). However, the enumerated items in § 22 are *exemptions* from § 21. Because the proposed trust does not fit the definition of a corporation or syndicate in § 21, it is automatically exempted from § 21. Therefore, the Court need not address the exemption in § 22(1).

a farmer, provided that no nonfamily farm syndicates or nonfamily farm corporations are partners.

III.  **Whether Plaintiffs may transfer the legal title of their farm real estate to a state or nationally chartered bank to administer the trust.**

Article XVII, § 22(12) expressly allows a state or nationally chartered bank to act as trustee of farmland for a beneficiary, so long as the beneficiary does not fall within the definition of a corporation or syndicate in § 21. Therefore, Plaintiffs may transfer the legal title of the land to a state or nationally chartered bank in trust so long as no beneficiaries fit within the definition of a corporation or syndicate under § 21.

**Conclusion**

The merger issue presented by Plaintiffs does not meet the jurisdictional prerequisites for declaratory judgment and will not be addressed.

Article XVII § 21 does not prohibit an ordinary trust, only a business trust. The trust proposed by Plaintiffs, therefore, will not violate § 21 if it is not a business trust. The trust will not be a business trust if it is not organized to conduct business for a profit and disallows free transferability of interest by the beneficiaries.

Plaintiffs may own the farm real estate as tenants in common and organize as a general partnership to rent land to a farmer under § 21, provided that no nonfamily farm syndicates or nonfamily farm corporations are partners.  Plaintiffs may transfer the legal title of the land to a state or