

FILED

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

NOV 0 6 2001

CLERK

o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o

CIV. 99-3018

SOUTH DAKOTA FARM BUREAU, INC.;          :
SOUTH DAKOTA SHEEP GROWERS
ASSOCIATION, INC.; HAVERHALS              :
FEEDLOT, INC.; SJOVALL FEEDYARD,
INC.; FRANK D. BROST; DONALD TESCH,       :         PLAINTIFFS' TRIAL BRIEF
WILLIAM A. AESCHLIMANN; SPEAR H
RANCH, INC.; MARSTON HOLBEN;              :
MONTANA-DAKOTA UTILITIES CO.;
NORTH-WESTERN PUBLIC SERVICE; and         :
OTTER TAIL POWER COMPANY,
                                          :
        Plaintiffs,
                                          :
vs.
                                          :
JOYCE HAZELTINE, in her official capacity as
Secretary of State of South Dakota and MARK   :
W. BARNETT, in his official capacity as
Attorney General of South Dakota,         :

        Defendants,                       :

and                                       :

DAKOTA RURAL ACTION and SOUTH             :
DAKOTA RESOURCES COALITION,
                                          :
        Defendant-Intervenors.
                                          :

                                          :

o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 2

## I.   Introduction.

### A.   Preface.

This case arises from certain laws of the State of South Dakota: the South Dakota ban on

corporate farming found at Art. XVII, §§21-24 of the South Dakota Constitution,

and the administrative regulations implementing it.. The corporate farming ban (the "CFB")

restricts the legitimate, traditional and nationally-common business activities of farmers like the

Plaintiffs and substantially discriminates against interstate commerce.   South Dakota's ban on

corporate farming is a invidious effort to regulate interstate commerce so as to favor certain

South Dakota agricultural interests.  The CFB also violates the equal protection and due process

rights of Plaintiffs.  For the reasons described below, Plaintiffs ask that this Court enjoin

enforcement of the CFB's restrictions and, thereby, free interstate commerce from

constitutionally impermissible burdens.

### B.   The Parties.

Since the Court is familiar with the parties from previous motions and hearings, Plaintiffs

will provide here only summary descriptions.  The individual Plaintiffs are all participants in

phases of the livestock production industry and, therefore, in interstate commerce.  The Court

will learn from their testimony that the Plaintiffs are either South Dakota farmers or South

Dakota businesses whose lives and legitimate businesses have been adversely impacted by the

CFB.

Plaintiffs Frank Brost and Marston Holben (and his corporate entities, Spear H. Ranch,

Inc. and the Holben Family Trust) are ranchers who own and operate "cow-calf' operations in

South Dakota. Because Plaintiff Holben is a resident of Arizona, he cannot qualify for a family farm corporation exemption under Section 22(l) of the CFB. Plaintiff Brost cannot qualify for the family farm exception because his health does not permit "substantial physical exertion". *See* CFB §22(l). The CFB has also disrupted the existing estate planning arrangements established for legitimate business and personal reasons by each Plaintiff.

Plaintiff Bill Aeschlimann, and his family, provide custom feeding and finishing of lambs near Sioux Falls. The CFB, however, bans "corporate" ownership of livestock. Since the lambs fed at his farm are sometimes owned by corporate entities, Plaintiff Aeschlimann can no longer pursue a substantial part of his business.

Plaintiffs John Haverhals and Ivan Sjovall are owners of feedlot operations where, with their respective families, they provide custom finishing of beef cattle. Since the CFB bars corporate ownership of the cattle for longer than two weeks, their business has been greatly disrupted. *See* CFB §22(5).

Plaintiff Don Tesch, and his spouse, raise hogs near Watertown. The CFB bars his corporate customers from contracting with him to raise hogs owned by the customer. The CFB has substantially disrupted this "family farm".

The organizational Plaintiffs, South Dakota Farm Bureau, Inc. and South Dakota Sheep Growers Association, Inc., are entities representing thousands of South Dakota farmers and ranchers on many issues, including opposition to the CFB. Many members of the organizational Plaintiffs have suffered the suppressive and distorting effects of the CFB.

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 4

The "Utility Plaintiffs" are partners in the Big Stone Power Plant. The Big Stone Power

Plant is located in Grant County and is owned by Plaintiffs Montana-Dakota Utilities Company

("MDU"), NorthWestern Public Service ("NWPS") and Otter Tail Power Company ("Otter Tail")

(collectively, "the Big Stone Plaintiffs"). Development of the Big Stone Plant was commenced

in 1969, and electrical power was first generated at the plant on May 1, 1975. As developed, the

Big Stone Plant has sufficient additional land to accommodate a second facility for future

expansion. The Plant owns approximately 2,100 acres, of which approximately '750 are

presently dedicated to power plant operation. The balance of the land is dedicated to future

development and is presently leased for farming purposes, generating approximately $15,000 per

year in revenues.

MDU is a division of MDU Resources Group, Inc., a Delaware corporation having its

principal place of business in Bismarck, North Dakota. It is an investor-owned public utility

authorized to do business in and serving approximately 114,000 electric customers in the state of

Montana, South Dakota, North Dakota and Wyoming. MDU is an interstate transmission utility,

a distribution utility, and an undivided owner of 22.7 percent of the Big Stone Power Plant.

Plaintiff NWPS is a division of NorthWestern Corporation, a Delaware Corporation

having its principal place of business in Sioux Falls, South Dakota. It is an investor-owned

public utility authorized to do business in and serving approximately 55,000 electric customers in

the state of South Dakota. NWPS is an interstate transmission utility, a distribution utility and an

undivided owner of 23.4 percent of the Big Stone Power Plant.

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 5

Plaintiff Otter Tail Power Company is a Minnesota corporation having its principal place
of business in Fergus Falls, Minnesota. It is an investor-owned public utility authorized to do
business in and serving approximately 124,000 retail and wholesale electric customers in the
state of Minnesota, North Dakota and South Dakota. Otter Tail is an interstate transmission
utility, a distribution utility, and an undivided owner of 53.9 percent of the Big Stone Power
Plant.

The Defendants ("Defendants") are the Attorney General of South Dakota (Mr. Mark
Barnett) and the South Dakota Secretary of State (Ms. Joyce Hazeltine). These are the officials
charged with enforcement of the CFB and, accordingly, the proper defendants in this Ex parte
Young action. The Defendants assert that the CFB is justified as a measure allegedly designed to
protect South Dakota's small farmers and the rural communities of South Dakota.

The Defendant Intervenors ("Intervenors") are Dakota Rural Action ("DRA") and South
Dakota Resource Coalition ("SDRC"). They were granted permissive intervention. DRA is a
non-profit organization whose claimed primary goal is to protect the economic viability of South
Dakota's family farmers. SDRC is a non-profit corporation with a claimed goal of protecting the
environment in South Dakota.[1] *See* South Dakota Farm Bureau, Inc. v. South Dakota, 2000
D.S.D. 43, 197 F.R.D. 623, 675 (T2) (2000). The Intervenors were the source of, and driving
force behind, the adoption of the CFB. As the Court will learn, individuals associated with the
Intervenors were the "drafters" of the CFB.

---

[1] Plaintiffs contend that the "goals" claimed by the Intervenors are, on their face, economic protectionism.
*See* Part II infra.

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 6

## C.   Factual Background.

### 1.   The Beginning:  The Family Farm Act of 1974.

As a matter of history, South Dakota's regulation of corporate involvement in agriculture

began, for present purposes, with the Legislative passage of the Family Farm Act of 1974 (the

"Act").  SDCL §47-9A-1 *et seq.*  At various times in this case, the Defendants and Intervenors

have argued that the "starting point" for analysis of the CFB is a law in Nebraska popularly

known as I300.  *Neb. Const. Art. XII, §8* (1982).  Except as discussed below, Plaintiffs

vigorously disagree with the Defendant/Intervenor position.  Although I300 was upheld when

challenged under equal protection and due process, *see* MSM Farms, Inc. v. Spire, 927 F.2d 330,

332 (8th Cir. 1991), *cert. denied*, 112 S.Ct. 65 (1992), it was not challenged under the dormant

commerce clause.  Here, of course, the dormant commerce clause challenge is Count I of

Plaintiffs' Complaint.

Even if the Court would find that the provisions of I300 are relevant, Plaintiffs contend

that I300 provides little help in understanding the issues raised by the CFB.  The provisions of

the CFB are much "stricter" than the provisions of I300.  For example, the family farm exception

of the CFB is narrower than the Nebraska law.  In this case, the proper "starting point" is the

state of the law in South Dakota at the time the CFB was adopted: the Act.

Under the Act, corporate ownership or leasing of "agricultural land" was generally

restricted.  The Act explicitly distinguished between domestic and foreign corporations.  *See*

SDCL §47-9A- 13 and 14; Allegheny Corp. v. Richardson, Inc., 463 N.W.2d 678, 679 (1990).

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 7

The Act provided, for domestic corporations,, two basic exemptions from the general prohibition on corporate format. The first was the "family farm corporation", SDCL §47-9A-14. The second exemption was the provision for an "authorized farm corporation". *See id.* at 15. For present purposes, the authorized farm corporation might be understood as an exemption for certain small, closely-held corporations, defined largely in terms of federal income tax law. The particulars are not significant in this case.

What is significant--in terms of burden on interstate commerce--is that the CFB does not have an exception for an authorized farm corporation. By eliminating the "authorized farm corporation', the CFB narrowed the range of available exemptions and, thereby, increased the burden on interstate commerce. Moreover, the family farm exception of the CFB is much narrower than the family farm exemption of the Act.

The Act was tightened in 1988 by the South Dakota voters, passing an amendment prohibiting all corporations except family farm corporations from owning or operating a "hog confinement facility". *See* SDCL §47-9A- 1 3. 1. Subsequent to 1988, it appeared that corporations could own the hogs that were raised or finished by South Dakota farmers. It was in response to this "contract farming" practice that the proponents of the CFB (lead by Intervenors) started the Initiative process that culminated in the CFB.

The constitutionally significant differences between the Family Farm Act and the CFB are: (1) although the Act only applied to land ownership, the CFB applied the corporate format restrictions to the ownership of livestock; (2) although both the Act and the CFB had exceptions for so-called "family farm" operations, the family farm exception under Section 22(l) of the CFB

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 8

was much narrower; (3) the Act had a second exception (for "authorized farm corporations") but

the CFB does not have this type of exception; (4) the CFB was enacted as an amendment to the

South Dakota Constitution thereby restricting any opportunities for opponents of the CFB,

including Plaintiffs, to use the normal legislative processes to correct any mistakes created by the

CFB; and (5) the CFB's enforcement procedures (*e.g.*, "citizen standing") were much broader and

potentially intrusive than the enforcement provisions of the Act, which relied on the Attorney

General's office and the Secretary of State"s office.

### 2.    The Effects of the Corporate Farming- Ban On Interstate Commerce

The adoption of the CFB has created many problems for South Dakota farmers and

ranchers such as the Plaintiffs, and the testimony presented by Plaintiffs will demonstrate the

constitutionally pernicious consequences of the CFB.  The CFB, for example, has severely

limited the "value-added" process of "custom feeding livestock".  Under the CFB, feedlots

cannot finish investor-owned livestock if the investor has a corporate format; the CFB, therefore,

interferes with the interstate flow of investment capital.  The CFB has restricted all forms of

"contract livestock production ".  The CFB has also restricted contract crop production.  From

the testimony of State officials, the Court will learn that investment in agri-business, especially

by non-residents, has been suppressed and distorted, with the loss to South Dakota and interstate

commerce running into the millions of dollars.

The Court will also learn about the deleterious consequences of the extremely narrow

family farm exception to the CFB, §22(l); the narrowness of the exception restricts ownership

and investment far more than did the Act.  The CFB's elimination of the "authorized farm

corporation" exception has also interfered with interstate commerce. This is demonstrated by

Plaintiffs Brost and Holben who could be exempt from the Act but not from the CFB.

Additionally, the Court will learn how the myriad of CFB exceptions creates obvious inequities

that violate the Plaintiffs' equal protection rights.

The Big Stone Plaintiffs, obviously participants in interstate commerce, will demonstrate

how the CFB has adversely impacted interstate commerce in several ways. First, the Big Stone

Plaintiffs are each interstate transmission utilities. Transmission corridors utilized by these

transmission companies are typically owned by utilities in the form of transmission easements.

The proscriptions of the CFB apply to ". . . an interest, whether legal, beneficial, or otherwise, in

any real estate used for farming in this state ... CFB, §21. Transmission easements created after

the effective date of the CFB in land used for farming clearly would be subject to the CFB:

> An easement is 'an interest in land in the possession of another which entitles the
> owner of such interest to a limited use or enjoyment of the land in which the
> interest exists.' [Citation omitted] Knight Madison, 2001 SD 120 ¶.

Inasmuch as transmission easements created after the effective date of the CFB would not

be permitted uses of land used for "farming", the Big Stone Plaintiffs, as transmission utilities,

would be required to convert the land within the easements to a nonfarm use within five years of

the acquisition of the easement. CFB §22(1 0). This would be a burden on the transmission

function and upon interstate commerce.

Second, the Big Stone Plaintiffs would face another burden regarding the future

acquisition of new transmission line easements. The Big Stone Plaintiffs estimate that the

acquisition cost of transmission line easement will increase by a factor of 200 or 300 percent

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 10

because of the CFB. Companies will likely be required to obtain fee title to the property through either negotiation or condemnation, because farmers will not want to contend with the inconvenience of corridors through their farmland which cannot be farmed or traversed. Additionally, the cost of maintenance of transmission line easements will increase. This is because the land must be removed from production and the utility will be required to maintain the land, where the farmer did so through farming practices in the past. The transmission corridor must be kept free of weeds and must be kept clear to permit access to and maintenance of transmission lines by the utility. These increased costs are not costs encountered by the Big Stone Plaintiffs in the other states in which they maintain transmission facilities. Thus, the cost of electric transmission in interstate commerce will be significantly impacted.

Third, the CFB will dramatically obstruct the development of new power plants. Siting of a new plant today requires approximately ten years to accommodate regulatory and environmental approvals and construction (the initial plant took six years). Yet, the CFB permits companies to hold an interest in land, whether by way of option, lease or fee title, for only five years. After five years, the land must either be converted to a non-farm use or divested. The inability of the Big Stone Plaintiffs to control land in and of itself will significantly impede the siting and construction process of power plants. In addition, the CFB's provisions will drive up the cost of the project by restricting revenues from farming the land pending construction.

The Big Stone Plaintiffs also contend that the CFB will adversely affect utilities in a deregulated environment. While South Dakota has taken no steps toward deregulation of the electric utility industry, 24 states have taken final action toward retail competition. Additionally,

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 11

Congress has legislation before it seeking to deregulate the electric utility industry. If

deregulation occurs in South Dakota, it will significantly impact the ability of the Big Stone

Plaintiffs to do business in South Dakota, compared to their ability to do business in other

non-deregulated states.

In addition, many state deregulation regimes call for divestiture, or unbundling, of the

distribution, transmission and generation functions of electric utilities. Should this occur in

South Dakota, the same adverse impact of the CFB described above for new transmission

facilities will occur to all existing transmission facilities. This will have a substantial economic

impact upon the cost of transmission. Although the Big Stone Plaintiffs are currently immunized

by the CFB" grandfather provision, deregulation would destroy the grandfather provision which

permits the Plant to lease the farmland which it is holding for future expansion. In this event, the

Big Stone Plaintiffs would be required to remove that land from production or divest themselves

of the land. This would result in substantial lost revenues to the Big Stone Plant.

The grandfather immunity would also be vitiated if the partners sought to modify their

percentages of ownership (which they have previously done for business reasons), or if one or

more of them sought to sell their shares in the plant. Because a buyer would not receive the same

interest owned by the seller, the value of the share sought to be sold will be adversely affected.

The Big Stone Plaintiffs are unnecessarily "locked in" to their present regime, and their

flexibility to react to business trends carries a monetary penalty created solely by the CFB.

Another significant burden on interstate commerce created by the CFB relates to wind

power. South Dakota ranks in the top three to five states for potential output of electrical energy

generated by wind power. It has the added advantage of being close to markets in Minneapolis, Kansas City and Denver. FPL Energy has a 100 million dollar project slated for South Dakota, which will not go forward so long as the CFB is shown to affect the installation of both generation and transmission facilities, as described above. The CFB will completely suppress this 100 million dollar project. If the South Dakota does not carry its share of wind power now, it will place a bigger burden on other states to develop wind power now. Another burden on interstate commerce created by the CFB is that, once the grid is filled, it will cost South Dakota more in the future to join the grid because of the cost of the upgrades that will be necessary to accommodate that capacity. The CFB thus creates burdens on future wind power transmission and generation as have been described above.

Finally, the CFB's enforcement provision, §24, has greatly impacted interstate commerce and the Plaintiffs. By granting "citizen standing", the CFB has made all the Plaintiffs vulnerable to litigious "neighbors" and other special interest groups, and this has an obvious adverse impact on interstate commerce. *See* American Meat Institute v. Barnett, 64 F.Supp.2d. 906, 921 (¶53) (D.S.D. 1999) (the prospect that parties would face "the substantial danger of private lawsuits" is a "burden on interstate commerce").

All of these burdens created by the CFB will be demonstrated at trial, sometimes by the State's own officials.[2] Plaintiffs contend that the burdens created by the CFB are severe and constitutionally impermissible. Plaintiffs agree, moreover, with the assessment of these burdens

---

[2]As the challenger in a dormant commerce clause claim, Plaintiffs have the responsibility to demonstrate that the CFB burdens interstate commerce. For the reasons outlined above, Plaintiffs will satisfy that burden at trial.

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 13

offered by the State's chief executive, Governor William Janklow: by adopting the CFB, the

State "shot itself in the head".  Associated Press, "Janklow says, 'we shot ourselves in the head'

with corporate farm law ", Argus Leader, June 18, 2000, p. 6B.  *Cf.*, American Meat Institute, 64

F. Supp. 2d at 920 (¶ 46) (judicial notice taken of Governor's actions regarding interstate

commerce and the livestock industry).

In sum, the consequences of the CFB for interstate commerce have been substantial and

far-reaching.  The CFB has suppressed interstate investment in the livestock industry, especially

contract farming and custom-finishing of livestock.  The CFB has distorted the flow of interstate

investment, particularly in the livestock industry and in the electric power production industry.

The CFB has placed enormous added costs on Plaintiffs and others doing business in interstate

commerce.  The CFB, by the inevitable functioning of the narrow family farm exception,

distinguishes between farmers residing in South Dakota and out-of-state farmers; the CFB

thereby favors in-state farmers because they can satisfy the family farm exception while

nonresidents, like Plaintiff Holben, can not.  In an interlocking multitude of ways, the CFB has

suppressed and impermissibly distorted interstate commerce.

## II.    The Corporate Farming Ban Violates The Dormant Commerce Clause.

The dormant commerce clause doctrine judicially expresses one of the constitutional

"norms of national cohesion."  *See* Laurence Tribe, American Constitutional Law, 542 (2d ed.

1988).  Along with the Privileges and Immunities doctrine of Article IV and the equal protection

doctrine of the Fourteenth Amendment, the dormant commerce clause doctrine represents a

significant limit on state regulation of interstate commerce.  This constitutional concern

regarding state interference with interstate commerce is particularly acute when a State regulates

the actions of nonresidents and other political "outsiders" who are participating in interstate

commerce.  *See* South Carolina State Highway Dep't v. Barnwell Bros. Inc., 303 U.S. 177, 184

n. 2 (1938); Tribe, at 545 n. 94.

### A.    An Overview of the "Well-Settled" Dormant Commerce Clause Doctrine.

#### 1 .    The Two Tiers of Dormant Commerce Clause Doctrine

Over some 175 years, the judiciary has developed a "well-settled", two-tiered doctrine.

*See* Bendix Autolite Corp. v. Midwesco Enterprises, 486 U.S. 888, 889 (1988).  In recent years,

the Supreme Court has repeatedly announced its two-tier doctrine:

> We have ruled that that Clause prohibits discrimination against interstate
> commerce, see, e.g., Philadelphia v. New Jersey, 437 U.S. 617 (1978), and bars
> state regulations that unduly burden interstate commerce, see, e.g., Kassell v.
> Consolidated Freightways Corp. of Del., 450 U.S. 662 (1981).

Quill Corp. v. North Dakota, 504 U.S. 310, 312 (1992).  *See, e.g.*, C & A Carbone, Inc. v. Town

of Clarkstown, 511 U.S. 383, 390 (1994); Oregon Waste Systems v. Department of

Environmental Quality of the State of Oregon, 511 U.S. 93, 99 (1994); American Meat Institute,

64 F.Supp. 2d at 917 (¶36).

#### a.    The "Discrimination" Tier.

The first tier of the dormant commerce clause doctrine is the "discrimination" tier.[3]  The

standard of judicial review is known as the "virtually *per se* test.  Oregon Waste Systems, 511

U.S. at 99.  The virtually *per se* standard is a heavy burden for the State.  It is, in practical effect,

---

[3]For purposes of this Trial Brief, a state regulatory scheme is considered "discriminatory" when it is a form
of "economic protectionism" by the State. *See* C & A Carbone, 511 U.S. at 390.

a "strict scrutiny" standard. *See* <u>American Meat Institute</u>, 64 F.Supp.2d at 917 (¶37). The state

has the burden of persuasion; the state must have a compelling reason for its discriminatory

regulation and must utilize the least restrictive means of achieving that end.[4] *See, e.g.*, <u>SDDS,</u>

<u>Inc. v. State of South Dakota</u>, 47 F.3d 263, 268 (8th Cir. 1995), *cert. denied*, 523 U.S. 1118

(1998).

### b.     The "Undue Burden" Tier.

The applicable standard in the second tier is an "undue burden" standard. *See* <u>Quill</u>

<u>Corp.</u>, 504 U.S. at 312; <u>Bendix Autolite Corp.</u>, 486 U.S. at 895 (the test is whether the state

regulation "is an unreasonable burden on commerce"). The second tier standard applies even

when the State's regulation of interstate commerce is conducted in a nondiscriminatory manner.

*See* <u>Pike v. Bruce Church, Inc.</u>, 397 U.S. 137, 142 (1970).

Under the second tier standard, the Court will consider three factors: (1) the burden on

interstate commerce created by the state restriction; (2) the substantiality of the State's

non-protectionist interest; and (3) the availability to the State of less burdensome regulatory

means to achieve its goals. *See, e.g.*, <u>Bendix Autolite Corp.</u>, 486 U.S. at 894; <u>Pike</u>, 397 U.S. at

142 (part of the standard is whether the state's interest "could be promoted as well with a lesser

impact on interstate activities."); <u>C & A Carbone</u>, 511 U.S. at 405 (O'Connor, J., concurring in

the judgment). Thus, even if the State has regulated in a facially neutral manner, the State may

---

[4]Plaintiffs have found only one Supreme Court decision where a state has successfully met the standard of the first tier. *See* <u>Maine v. Taylor</u>, 477 U.S. 131, 151 (1986). This decision is markedly distinguishable from the present case because, here, the State has many alternatives available to achieve its purported goals and cannot otherwise satisfy strict scrutiny.

violate the dormant commerce clause doctrine by unduly burdening interstate commerce.  *See*
Bendix Autolite Corp., 486 U.S. at 891.  The undue burden test is, in essence, similar to the
"substantial relationship" standard from equal protection doctrine.  *See* Craig v. Boren, 429 U.S.
190, 197 (1976) (the "intermediate scrutiny" standard used in gender discrimination).

The Supreme Court initially examines a case on the first tier.  If the Court would
determine that a State has "discriminated" against interstate commerce (*i.e.*, engaged in
"economic protectionism"), the Court applies the virtually per se test and does not consider the
second tier.  *See, e.g.*, C & A Carbone, 511 U.S. at 390.

### 2.   The Multiple Rationales of The Modern Dormant Commerce Clause Doctrine.

In all likelihood, the challenge to the Corporate Farming Ban will plow new ground for
the dormant commerce clause doctrine.  Under these circumstances, Plaintiffs will identify the
multiple policy rationales underlying the dormant commerce clause doctrine.

Both the case law and the commentators generally recognize that the modern dormant
commerce clause doctrine is supported by three, sometimes overlapping, rationales.  One
commonly-recognized rationale for the doctrine is the enforcement of national economic
solidarity or avoiding "economic Balkinization".  *See* Oregon Waste Systems, 511 U.S. at 98; C
& A Carbone, 511 U.S. at 406 (O'Connor, J., concurring in the judgment); Tribe, supra, at 542.
Under a second rationale, the dormant commerce clause doctrine is justified by the need to
provide judicial protection to the nonresidents involved in interstate commerce because, as
non-voters, they would not have the ability to participate in the political process (and thereby

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 17

engage in "self-help").  *See* West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 200 (1994); Mark

Tushnet, Rethinking the Dormant Commerce Clause, 1979 Wis.L.Rev. 125, 113.  A third

rationale justifies the rigorous levels of judicial review of the dormant commerce clause doctrine

on the grounds that the persons involved in interstate commerce are asserting a form of

"economic liberty".  *See e.g.*, C & A Carbone, 511 U.S. at 389 ("access to a local market"); Pike,

397 U.S. at 142; Daniel Farber, State Regulation and the Dormant Commerce Clause, 3 Const.

Comm. 395, 396 (1986).

It is important to recognize that these three rationales coexist.  Although some dormant

commerce clause decisions may reflect all three rationales, any one of the rationales can justify

the non-deferential judicial review found in the two tiers of the doctrine.  As long as the Court

finds that Plaintiffs' claims here are justified under one of the rationales, a Court should employ

the appropriate level of scrutiny.

### B.    The CFB Is A "Discriminatory " Regulation.

#### 1.    Controlling Precedent Recognizes Three Modes of Proving Prohibited Discrimination.

Plaintiffs contend that South Dakota's Corporate Farming Ban is a classic example of

"discriminatory" regulation.  Under Supreme Court and Eighth Circuit precedent, there are

generally three ways a court would find that a State regulation would be discriminatory regarding

interstate commerce.  Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County, 115 F.3d

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 18

1372, 1383 (8th Cir. 1997) *cert. denied.*, 118 S.Ct. 629 (1998); <u>SDDS, Inc.,</u> 47 F.3d at 267.[5]

First, a regulatory scheme may "facially discriminate". *See, e.g.,* <u>C & A Carbone</u>, 511 U.S. at

391; <u>Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.,</u> 520 U.S. 564, 581 (1197).

Second, a regulatory scheme, even though it is facially neutral, may have a "discriminatory

purpose". *See, e.g.*, <u>Hunt v. Washington State Apple Advertising Commission</u> 432 U.S. 333,

352-353 (1977); <u>SDDS, Inc.,</u> 47 F.3d at 270.   Third, even if the text were facially neutral and had

not been enacted for the purpose of discriminating against interstate commerce, a regulatory

scheme may have "discriminatory effect" that constitutes a facial discrimination. *See, e.g.*,

<u>Camps Newfound</u>, 520 U.S. at 578; <u>Maine v. Taylor</u>, 477 U.S. at 148 n. 19; <u>SDDS, Inc.,</u> 47 F.3d

at 271.

### 2.    The CFB Is Facially "Protectionist".

Plaintiffs contend that the CFB is facially protectionist.  Especially in recent decades, the

United States Supreme Court has developed a generally broad concept of "facial" discrimination.

While many decisions would support this generalization, Plaintiffs will rely on several with close

similarity to the present facts.

### a.    The CFB Is Facially Discriminatory Because of its Structure.

The protectionist, or discriminatory, nature of the CFB is initially observable simply from

reading its text.  The drafters of the CFB chose to create many "exceptions" in Sections

22(l)-22(15) to the general prohibition of Section 21.  These exceptions have significant

---

[5]Although the terminology varies from decision to decision, the Supreme Court has utilized all three of
these theories for determining the existence of State "discrimination".  *See* authorities cited <u>infra</u>.

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 19

substantive import.  Plaintiffs contend that the mere presence of such substantive exceptions is

the basis for finding the CFB is facially discriminatory.  *See* Kassel v. Consolidated Freightways

Corp., 450 U.S. 662, 676 (1981) ("Iowa's scheme, although generally banning large doubles from

the State, nevertheless has several exemptions that secure to Iowans many of the benefits of large

trucks . . . .).  *Cf.*  Police Department of Chicago v. Mosley, 408 U.S. 92, 94 (1970) ("exceptions"

in a regulatory scheme are the basis for judicial determination that government was

"discriminating" against free speech).  Just like the "exemptions" in Kassel, the exceptions in

Section 22 of the CFB have the consequence of securing to South Dakota farmers many of the

benefits of a limited liability format while denying farmers or farm investors in neighboring

States such benefits.  This approach constitutes facial discrimination against interstate commerce.

### b.    The CFB, Read As A Whole, Is Facially Discriminating.

The Supreme Court has held that facial discrimination is determined by examining the

whole statute – not just one provision.  *See* South Central Bell Telephone Co. v. Alabama, 526

U.S. 160, 169 (1999).  Alabama required each corporation doing business in Alabama to pay a

franchise tax based on the firm's capital.  *Id.* at 162.  The rub – *i.e.*, the protectionism – emerged

when the Court examined another provision of Alabama's franchise tax code.  Alabama permitted

domestic corporations to control their tax base and tax liability.  *Id.*  A domestic corporation

could set its stock's par value well below its book or market value.  *Id.* at 169.  A domestic

corporation, therefore, could lower its franchise tax liability simply by lowering its par value.  In

contrast, foreign corporations could not lower their franchise tax liability because the Alabama

franchise tax code tightly regulated how foreign corporations had to define their stock's par

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 20

value. *Id.* at 162. Taken as a whole, the franchise tax code created an advantage for domestic

corporations, *see id.* at 169, and was facially unconstitutional. *Id.*

In determining facial discrimination, the Supreme Court not only requires that a

regulatory statute should be read as whole, it has also held that the regulatory scheme must be

considered as a whole. *See* West Lynn Creamery, 512 U.S. at 194. In West Lynn Creamery, the

state of Massachusetts sought to protect its in-state dairy farmers from competition from

out-of-state dairy farmers. *Id.* Massachusetts imposed a tax on all milk "dealers" selling in

Massachusetts, whether domestic or foreign. The State took the proceeds of this tax on dealers

and placed them in a separate fund. Pursuant to a separate statutory provision, the State then

used the separate fund to pay a subsidy exclusively to domestic "dairy farmers". *Id.* at 194. The

West Lynn Creamery Court held that "[b]y so funding the subsidy, [Massachusetts] not only

assists local farmers but burdens interstate commerce." *Id.* at 199.

Since the tax was arguably evenhanded, the State argued that the tax was

nondiscriminatory. The Supreme Court, however, looked at the State's regulatory scheme as a

whole and held that Massachusetts was engaged in facial discrimination against interstate

commerce. *Id.,* at 194.

The rationale for the Court's wholistic approach to determining facial protectionism is

easy to understand. The Constitution is "not so rigid as to be controlled by the form by which a

State erects barriers to commerce." West Lynn Creamery, 512 U.S. at 201. Unless a Court

examines the regulatory scheme as a whole, the States will think that their regulatory efforts can

be camouflaged by cleaver drafting. State officials, however, cannot be rewarded for engaging in

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 21

cute or deceptive drafting practices. The Supreme Court has made this point clear: "The
commerce clause forbids discrimination, whether forthright or ingenious." Best & Co. v.
Maxwell, 311 U.S. 454, 455-456 (1940).[6]

The Supreme Court's facial discrimination doctrine applies to the CFB. The Court should
consider the CFB as a whole – and not just the text of Section 21. When the restrictions of
Section 21 are considered together with the exceptions created in Section 22, the focus of the
CFB clearly emerges: the CFB facially discriminates against interstate commerce because it
favors certain in-state farmers against out-of-state farmers. Paraphrasing the Supreme Court's
recent facial discrimination decision:

> [The CFB] law grants domestic [farmers] considerable leeway in controlling [decisions
> about corporate format] .... [South Dakota] law does not grant a foreign [farmer] similar
> leeway. . . .

South Central Bell Telephone, 526 U.S. at 162. Moreover, South Dakota's attempt to preserve
local farmers' interests by protecting them from the rigors of interstate competition is exactly the
type of economic protectionism that the dormant commerce clause doctrine prohibits. *See* West
Lynn Creamery, 512 U.S. at 205.

### c.    The CFB Is Inherently Protectionist.

In addition to a textual and structural analysis, the Court can find that the CFB is facially
discriminatory because of the subject matters of the CFB. First, the CFB is inherently

---

[6]Here, even if the Intervenors' drafting of the CFB might be considered "ingenious", the text of the CFB
constitutes a facially protectionist regulation of interstate commerce.

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 22

protectionist because, in this case, the CFB is directed at the *livestock industry*.[7] The livestock

raising and livestock feeding industries are, however, part of an "integrated interstate market".

*See* West Lynn Creamery, 512 U.S. at 203. Like certain other industries, the livestock markets

"are by their nature interstate in nature." *See* Allstate Insurance Co. v. State of South Dakota, 871

F.Supp. 355, 358 (D.S.D. 1994) (automobile glass replacement industry). Since the CFB was

targeted at the livestock industry, it was inherently an attempt to regulate interstate commerce.

Second, the CFB is inherently targeted at interstate commerce because the means chosen

for the CFB's regulatory scheme involves the "corporate" business format. In the modern

national economy, the corporate format is essentially the norm. Harry Hern and John Alexander,

Laws of Corporations 5 (3d ed. 1983) (". . . the modern business corporation is a key institution

in the world and in the American free enterprise profit system. . . ."). Thus, when a state

explicitly targets corporations, the state is necessarily regulating interstate commerce, and the

state must consider the dormant commerce clause doctrine.

In this case, South Dakota's CFB has been targeted at the corporate nature of interstate

commerce and, as represented by all the individual Plaintiffs, at the livestock industry which, by

its nature, is interstate commerce. For both these reasons, this Court should determine that the

CFB is facially discriminatory.

---

[7]It is obvious that not all the livestock produced in South Dakota is consumed in the state. Hence, it is an undisputed fact that the products of the livestock industry flow across state lines to consumers around the nation (and the world). The livestock industry is, by its nature, interstate commerce.

### C.    The CFB Was Motivated By Protectionist Purposes.

In addition to their contention that the CFB is facially protectionist, Plaintiffs contend

that the CFB is discriminatory because it was motivated by protectionist purposes.  Under

applicable Supreme Court and Eighth Circuit authorities, as well as precedent within the District,

Plaintiffs may present both direct and circumstantial evidence of the economic protectionist

purpose underlying the CFB.  *See* SDDS, Inc., 47 F.3d at 267-269.

The types of evidence of protectionist purpose include: (1) impact or effect of CFB; (2)

the historical context and background of the development of the CFB; (3) the sequence of events

leading up to the development of the text of the CFB; (4) any departures from normal procedures

involved in the Development of the CFB's text; (5) the legislative history of the text; and (6)

testimony from the decision-making or drafters of the CFB.  *Cf.*, Village of Arlington Heights v.

Metropolitan Housing Development Corp., 429 U.S. 252, 265-66 (1977) (purposeful

discrimination in equal protection); Church of the Lukumi Babala Aye v. City of Hialeah, 508

U.S. 520, 540 (1993) (purposeful discrimination in free exercise).  Regarding the determination

of purposeful discrimination, a Court "is not bound by the name, description or characterization

given by the legislature or the courts of the State but will determine for itself the practical impact

of the law." Hughes v. Oklahoma, 441 U.S. 322, 336 (1979) (internal quotation omitted).

In determining whether a state regulation is discriminatory, the Supreme Court has

considered the impact, or effect, of the regulation on interstate commerce.  Wyoming v.

Oklahoma, 502 U.S. 437,455 (1992); Kassel, 450 U.S. at 668-669; American Meat Institute, 64

F.Supp.2d at 919-920 (¶44).  "Apart from the text, the effect of a law in its real operation is

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 24

strong evidence of its object." City of Hialeah, 508 U.S. at 535. From an effect or impact on

interstate commerce, an inference may be drawn that the State had the purpose of restricting

interstate commerce.

A second evidentiary factor in determining discriminatory purpose is the historical

context of the State regulation. *See* Kassel, 450 U.S. at 677. Part of the historical context

includes the state of the relevant law at the time that challenged regulation becomes effective.

*See* American Meat Institute, 64 F.Supp.2d at 916 (¶29).

Another evidentiary factor in determining discriminatory purpose is the sequence of

events leading up to the adoption of the challenged State regulation. *See* Kassel, 450 U.S. at 677

(prior legislation had been vetoed by the state's governor, forcing the Legislature to adopt the

challenged regulation); American Meat Institute, 64 F.Supp.2d at 916 (¶29).

A fourth evidentiary factor in determining discriminatory purpose would be any

departures from normal procedures. *Cf.*, City of Hialeah, 508 U.S. at 526 (city council held "an

emergency public session"). In this case, Plaintiffs will present evidence of the rapidity of the

CFB's drafting and the lack of careful study involved in the drafting of the CFB. The Drafters

chose expediency over accuracy.

A fifth evidentiary factor, under Supreme Court authority, in determining discriminatory

purpose is the "legislative history" of the challenged regulation. *See* Kassel, 450 U.S. at 677.

Here, Plaintiffs will present evidence about the drafts of the CFB's language considered prior to

its finalization (by the Intervenors and the other proponents) and the other "inputs" into the

drafting process. Plaintiffs will also present the official Ballot Question Pamphlets for the CFB.

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 25

The Court will conclude that the legislative history of the CFB "is brimming with protectionist rhetoric". <u>SDDS, Inc.</u>, 47 F.3d at 268.

A sixth evidentiary factor recognized by Supreme Court authority for determining discriminatory purpose is testimony (including admissions) from the regulatory decision makers or "drafters". *See* <u>Kassel</u>, 450 U.S. at 677; <u>Hunt</u>, 432 U.S at 352. *Cf.*, <u>City of Hialeah</u>, 508 U.S. at 541. Here, Plaintiffs will present testimony from witnesses to, and participants in, the CFB's drafting process. This evidence will confirm that the CFB was adopted for impermissible protectionist purposes.

### D.    The CFB Is Protectionist "In Effect".

The Plaintiffs contend that the CFB can be found to be protectionist both on its face and in purpose. Alternatively and additionally, Plaintiffs contend that, after the evidence would be received into the record, this Court will find that the CFB is also discriminatory because its provisions are protectionist in impact or in effect.

Numerous Supreme Court decisions have found that state laws are "discriminatory" because the regulations had an adverse impact on interstate commerce. For example, in the <u>South Central Bell</u> decision, <u>supra.</u>, the Supreme Court considered the effect of the state's franchise tax scheme on out-of-state corporations. Since the out-of-state corporations could not avail themselves of the tax-lowering technique available to Alabama corporations, the Supreme Court found that the franchise tax scheme was discriminatory in effect. *See id.*, 526 U.S. at 169.

In <u>West Lynn Creamery</u>, also discussed above, the Supreme Court considered the impact of the "dealer tax-producer subsidy" regulatory scheme and concluded that it had the effect of

discriminating against non-Massachusetts dairy farmers. *See id.*, 512 U.S. at 195-196. *See also*
Fulton Corp. v. Faulkner, 516 U.S. 325, 333 (1994) (a state "intangibles" tax had the effect of
favoring domestic corporations over foreign competitors and the effect of discouraging domestic
corporations from participating in interstate commerce).

Additional authority for Plaintiffs' contention about discrimination by effect is found in
the American Meat Institute decision, supra. In American Meat Institute, the Court found that
the "uniform" pricing statute "results in South Dakota projecting its legislation into other states
and regulating the prices which must be paid by South Dakota packers [who are part of interstate
commerce]." 64 F.Supp.2d at 919 (¶44). The Court also recognized that the uniform pricing
statute would, by reducing the supply of livestock entering South Dakota from other markets,,
"obviously be of great economic benefit to South Dakota livestock producers". *Id.*, 64. F.Supp.
at 920 (¶46). The reasoning in American Meat Institute is applicable here: a state regulation may
be found to be discriminatory against interstate commerce because of the "results" it may have.
*See generally,* SDDS, Inc., 47 F.3d. at 271.

In this case, the effects of the CFB on the livestock industry are "obviously" pernicious.
The CFB has the effect of excluding corporate investors from raising or finishing livestock in
South Dakota since such investors cannot satisfy the narrow family farm exception of Section
22(l). The CFB also has the effect of excluding new investment in electric power generation and
transmission, including wind power generation. Perhaps Plaintiffs' best evidence of the effects
of the CFB will come from state officials who will testify that millions of dollars of commercial

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 27

development have been suppressed by the CFB, to the permanent detriment of the national economy (as well as the economy in South Dakota).

### E.    The State's Interests Fail The Strict Scrutiny Standard.

Plaintiffs contend that, for the reasons described above, the CFB's constitutionality should be tested against the strict scrutiny standard where the burden is on the Defendants to show: (1) that the State's claimed are "compelling"; and (2) that the State has chosen the least restrictive means to achieve the compelling interest. *See* Part IIAI supra.

Plaintiffs contend, first, that none of the State's claimed interests (or the Intervenors' claimed interest in protecting the environment) are, on the facts of this case, actually compelling. The facts will show that the State's interests cannot, on the record, be considered compelling.[8]

Alternatively, Plaintiffs contend that, even if the claimed interests might be shown to be compelling, the CFB transparently fails the least restrictive means prong of strict scrutiny. The Defendants have a less restrictive means to assist family farmers and rural communities: the State can provide economic development programs, including cash subsidies or tax rebates. The State also has less restrictive means to protect against claimed environmental problems: the existing set of environmental protection legislation, including the general permit legislation for livestock operations. *See* SDCL §34A- B-1 *et. seq.*

---

[8]Plaintiffs suggest that the actual purpose of the CFB was an effort by some "independent" livestock producers to eliminate competition from the meatpackers by banning the packers' "captive supply" practices. This purpose could have been served in a less burdensome manner. Like the State of Iowa, South Dakota could have forthrightly prohibited packer ownership of feedlots or livestock at feedlots. *See* Iowa Code § 9H.2 (2001).

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 28

In sum, the State cannot satisfy strict scrutiny.  After the evidence is in the record, the

Court should rule for Plaintiffs.

**F.    The CFB Also Fails The Standard of The Nonprotectionist Tier.**

The Plaintiffs contend that the CFB is a protectionist regulation and should be evaluated

under the strict scrutiny standard of the discrimination tier.  In this section Plaintiffs address the

argument that the CFB would not be subject to strict scrutiny because it regulates

"nondiscriminatorily" between intrastate commerce and interstate commerce.  In such

circumstances, a state regulation is evaluated on the "nondiscrimination" tier of the dormant

commerce clause doctrine. As noted above, Part Al supra, the standard on the nondiscrimination

tier is the undue burden test.  *See* Bendix Autolite, 486 U.S. at 894.[9]

**1.    The Nondiscrimination Standard.**

In this undue burden standard, the Court considers: (1) the extent of the burden on

interstate commerce; (2) the weight of the nondiscriminatory state interest allegedly promoted by

the state regulation; and (3) the State's availability of alternative means to achieve this legitimate

interest. *See* Bendix Autolite, 486 U.S. at 894; Hunt, 432 U.S. at 354; U & I Sanitation v. City of

Columbus, 205 F.3rd 1063, 1070 (8th Cir. 2000).  In this case, the burden on interstate

commerce will be amply demonstrated, by testimony from the Plaintiffs, Plaintiffs' experts and

by witnesses from the State.

In the undue burden standard, the State (here, Defendants) must demonstrate that some

"public benefit" derives from the CFB.  The Defendants must prove that their interests are clear

---

[9]The Supreme Court has not decided any cases on the nondiscrimination tier for over a decade.

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 29

of "any tinge of local parochialism". <u>Lewis v. BT Investment Managers, Inc.</u>, 447 U.S. 27, 43

(1980). Defendants must prove that their interests are not illusory. *See* <u>Kassel</u>, 450 U.S. at 671 (.

. ."State's safety interest has been found to be illusory" ... ). The state cannot be permitted to

interfere with the national economy or unduly burden economic liberty just because the state can

develop some *post hoc* explanation for the regulation.

In the undue burden test, the third factor considered is the availability of alternatives for

the state that are less burdensome regarding the interstate commerce interest.[10] The alternative

means factor is the "Bermuda Triangle" for many state regulations. *See, e.g.*, <u>Great Atlantic and</u>

<u>Pacific Tea Co., Inc. v. Cottrell</u>, 424 U.S. 366, 373 (1976); <u>Bendix Autolite</u>, 486 U.S. at 894.

That would be the case here.

One of the Supreme Court's most recent nondiscrimination tier decisions, <u>Bendix</u>

<u>Autolite</u>, <u>supra</u>, is illustrative of the state alternative means factor of the undue burden test. The

state of Ohio required all foreign corporations doing business in Ohio to submit to the general

jurisdiction of the Ohio court system by appointing a resident agent for service of process.

Failure to appoint an agent lead to the forfeiture of any defense based on statutes of limitations,

with the effect that the foreign corporation would be subject to suit in perpetuity. 486 U.S. at

892-893. A foreign corporation challenged the Ohio statutory scheme under, *inter alia*, a

dormant commerce clause theory. The Supreme Court decided the case using the

nondiscrimination tier" standard. *Id.*, at 891. The Supreme Court acknowledged that the state

_____

[10]Not all cases will reach this factor. The alternative state means factor is considered only "when
necessary". For example, when the state fails its burden to demonstrate a nondiscriminatory local benefit, the Court
does not have to consider the state's alternatives. *See, e.g.* American Meat Institute, 64 F.Supp.2d at 921 (¶51)

had a legitimate interest in protecting its citizens' access to foreign corporations that would do

acts in Ohio but later withdraw from the state. *Id.*, at 894. The Supreme Court, however, found

that Ohio had a less burdensome alternative than its tolling statute: the Ohio long-arm statute

would have permitted jurisdiction at all times. *Id.* Because the State had a less burdensome

alternative means to achieve its goals, the State lost. *Id.*, at 895.

      The burden of persuasion in the undue burden standard is on the State. *See, e.g.*, <u>Hunt</u>,

432 U.S. at 353; <u>Pike</u>, 397 U.S. at 142; Michael E. Smith, State Discrimination Against Interstate

Commerce, 74 Cal.L.Rev. 1203, 1256 (1986). The unanimous <u>Hunt</u> Court succinctly

summarized the placement of the burden of persuasion in a nondiscrimination tier case:

> . . . the burden falls on the state to justify [the nondiscriminatory regulation] <u>both</u> in terms
> of the local benefits flowing from the statute <u>and</u> the unavailability of nondiscriminatory
> alternatives adequate to preserve the local interests at stake."

432 U.S. at 353 (citing *inter alia* <u>Pike</u>) (emphasis added). This placement of the  burden of

persuasion is consistent with the undue burden standard's doctrinal function of identifying state

pretextual conduct that, although written in the "guise" of neutrality, actually burdens interstate

commerce unnecessarily and thereby threatens national economic interests. *See* <u>Bendix Autolite</u>

<u>Corp.</u>, 486 U.S. at 894; <u>Pike</u>, 397 U.S. at 142; <u>American Meat Institute</u>, 64 F. Supp.2d at 921

(¶51) (state failed its burden to demonstrate that the purported state interest was sufficient when

compared to the burden on interstate commerce).

## 2.    <u>The State And Intervenor Interests Fail The Undue Burden Standard.</u>

      All of the claimed state interests identified by the Defendants, or the Intervenors, fail to

satisfy the undue burden analysis. The alleged "local interests" are, in some cases, illusory, or

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 31

the Court will find that the record is insufficient. In all cases, however, the CFB will fail the

means prong of the undue burden standard. For example, the claimed Intervenor interest in

"protecting the South Dakota environment", to the extent it is not completely illusory, fails the

means test. South Dakota law, as of 1998, already provided extensive protection for the

environment. Less burdensome alternatives to the CFB included expansion of the State's general

permit scheme. *See* SDCL §34A-2B-1 *et. seq.* Moreover, South Dakota's tort law ("nuisance

law") already protected other persons from any problems of noise or odor. County and local

zoning regulations also provided less burdensome alternatives. Education for farmers could have

been increased. Since South Dakota had less burdensome alternatives available, the state fails

the undue burden standard.

The same is the case for the claimed interests in protecting the small family farm or small

rural communities. The State has many alternatives for assisting small farmers that are less

burdensome on interstate commerce than the CFB. The State, for example, could establish

property tax relief for small farmers. The State could provide various loans or subsidies for

small farmers. *See* West Lynn Creamery, 512 U.S. at 199 n. 15. The State can establish

educational programs. The State can establish "mentoring" programs that will help young people

get started in farming. All of these alternatives, or combinations of these alternatives, would be

less burdensome on interstate commerce than the CFB. Accordingly, the Defendants fail the

undue burden standard.

As for the purported interest in protecting rural communities (against, apparently, the

large South Dakota cities), the State has many alternatives. The State might establish "economic

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 32

development zones" or other programs.  The State might provide special personnel or assistance

to small communities to facilitate economic development.  Of course, the State could provide

subsidies or loans.  All these alternatives would be less burdensome regarding interstate

commerce than the CFB.

The ready availability of alternative means to the overbroad CFB demonstrates that, even

under the undue burden standard, the State has failed to satisfy the standard.

### G.    Conclusion.

With respect to its claimed interests, what the State cannot do, as a matter of federal

constitutional law, is build a regulatory "wall" around South Dakota.  Yet, the CFB has the effect

of isolating South Dakota from the national economy and burdening interstate commerce.  Since

Plaintiffs, and the national economy, are protected against the economic protectionism of the

CFB by the dormant commerce clause doctrine, Plaintiffs request that this Court enjoin

enforcement of the CFB.

### III.    The Corporate Farming Ban Violates The Equal Protection Doctrine.

The text of the Equal Protection Clause of the Fourteenth Amendment ("the equal

protection clause") provides that a State may not "deny to any person within its jurisdiction the

equal protection of the laws."

Plaintiffs do not contend any "suspect class" or "quasi-suspect" class is burdened by the

CFB.  *See* MSM Farms, Inc., 927 F2d at 332.  The MSM Farms decision, however, did not

address the rational basis-with-bite standard ("the RBB standard").

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 33

Plaintiffs contend, for present purposes, that this Court should apply the RBB standard

because the facts of this case bear a significantly close relationship to the determinative facts of

Romer v. Evans, 517 U.S. 620, 635 (1996). In Romer the voters in the state of Colorado had

adopted a state constitutioral amendment which had various adverse impacts on gays and

lesbians. The Supreme Court determined that the Colorado state amendment was flawed because

it "identifies persons by a single trait and then denies them protection across the board." 517

U.S.at 633. Romer's analysis is closely parallel to the plight of the Plaintiffs here. First, the

State adopted a constitutional amendment that cuts Plaintiffs off from the normal political

processes. Second, the CFB identifies persons "by a single trait " – namely, a limited liability

business format. Thus, this Court should apply the Romer standard.

Under the rational basis with bite standard, the State may not use overly broad means. In

Romer, the Court determined that "the breadth of the Amendment is so far removed from these

particular justifications that we find it impossible to credit them." 517 U.S. at 635. The

excessive breadth of the Colorado Amendment lead the Court to reject as insincere the state's

asserted legitimate interests. *Id. See also* City of Cleburne v. Cleburne Living Center, 473 U.S.

432, 450 (1985). Here the breadth of the CFB undercuts the legitimacy of South Dakota's

purported interest in protecting "family farms".

Ultimately, the flaw in CFB is that the means of regulation – a ban on the corporate

format – is both over-broad and, simultaneously, under-inclusive. Banning corporate formats

will not rid the farm environment of large entities, but it will prohibit real family farmers, such as

the individual Plaintiffs, for continuing in their businesses. The simultaneous over-breath and

under-inclusiveness of the CFB suggests, under <u>Romer</u>, that the real purposes of the CFB are illegitimate economic protectionism. Thus, this Court should find that the CFB denies the Plaintiffs their equal protection rights.

## IV.   The CFB Violates Plaintiffs' Due Process Rights Under The Contracts Cause.

The Contracts Clause, Art. I., § 10 of the Constitution, provides: "No State shall . . . pass any ... Law impairing the Obligation of Contracts . . . ." By the adoption of the CFB, the State of South Dakota, through the Defendants, have severely and permanently impaired various contracts belonging to certain Plaintiffs and, therefore, have violated the Contracts Clause doctrine and the Due Process rights of certain of the Plaintiffs (*e.g.*, Plaintiffs Tesch, Haverhals, Sjovall and Holben).

Although at one time the Contracts Clause had "receded into comparative desuetude". . . [it] remains part of the Constitution. It is not a dead letter." <u>Allied Structural Steel Co. v. Spannaus</u>, 438 U.S. 234, 241 (1978). The history of the Contracts Clause demonstrates how it was adopted to protect the national economy against state efforts to protect their own residents. "It was the strongest single constitutional check on state legislation during our early years as a Nation. . . . " *Id.*

The Contracts Clause standard is a two-part inquiry. The first inquiry is whether the state law "has, in fact, operated as a substantial impairment of a contractual relationship." *See* <u>Spannaus</u>, 438 U.S. at 244. If a severe impairment would exist, then the Court inquires whether the law creating the burden was "necessary and reasonable." *See* <u>United States Trust Co. v. New Jersey</u>, 431 U.S. 1, 29 (1977).

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 35

In this case, the CFB has, in fact, operated as a severe impairment of the Plaintiffs

contractual relationships.  Plaintiff Tesch, for example, had his contractual relationship with the

corporate owner of the pigs cancelled solely because of the CFB.  Plaintiffs Haverhals and

Sjovall, who operate cattle feeding yards, have lost a number of their cattle feeding contracts

because of the CFB.  Plaintiff Holben's contractual relationships between himself, his family

trust and his corporation have been negated, creating large expenses.  Because there has been

severe impairment of these Plaintiffs' contractual rights, this Court must examine whether the

severe disruption was "necessary".  Spannaus, 438 U.S. at 247. Once "severe disruption of

contractual expectations" has been established, the State's selection of means must be evaluated

for "reasonableness".  *See id.*

For many of the reasons advanced in Parts II and III of this Trial Brief, Plaintiffs contend

that the State's use of the drastic CFB measure fails the "necessary" prong.  First, some of the

asserted interests are, "in fact", illusory or even frivolous.  The only interest arguably realistic is

protection of small farmers.

Even assuming the interest in protecting small farmers was  "necessary", the means

chosen – the CFB – is unreasonable. *See* Spannaus, 438 U.S. at 248-250.  As explained above,

the State has many, less drastic alternative means to achieve its goal, and the existence of these

alternatives makes the CFB an unreasonable choice.  *See* Part IID supra; *see also* Energy

Reserves Group v. Kansas Power & Light Co., 459 U.S. 400, 418 (1983) (Kansas did not

completely terminate private contracts but imposed instead more limited increases in existing

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 36

escalation clauses). The CFB created a much broader impact than necessary to achieve any

legitimate end.

     For many of the same reasons outlined above, the CFB violates constitutional norms.

Here, it violates the principles of the Contracts Clause and the Due Process Clause. This Court

should grant Plaintiffs declaratory relief and enjoin enforcement of the CFB.

## V.   **Conclusion.**

     The CFB is, on its face, in purpose and in effect, a state exercise in economic divisiveness

and isolationism. As such, the CFB violates the dormant commerce clause rights of Plaintiffs.

In effect, the CFB also violates the equal protection and due process (Contracts Clause) rights of

Plaintiffs. Even if South Dakota's purpose were to "protect" certain domestic farmers against

interstate competition, Plaintiffs would note that, as Justice Cardozo once said,

> The Constitution was framed under the dominion of a political philosophy less parochial
> in range. It was framed upon the theory that the peoples of the several states must sink or
> swim together, and that in the long run prosperity and salvation are in union and not
> division.

Baldwin, 294 U.S. at 523.

     The Framers were right in their initial policy conclusions to protect interstate commerce

against state protectionism. Justice Cardozo was right in interpreting the Framers' intentions. In

contrast, the Intervenors and the Defendants here are constitutionally wrong. After the evidence

is in the record, Plaintiffs respectfully request that this Court declare the CFB to be

unconstitutional, enjoin Defendants from enforcing it and provide such other relief as may be

appropriate.

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 37

Dated this 2<sup>1d</sup> day of November 2001.

WOODS, FULLER, SHULTZ & SMITH P.C.

By_____

Richard O. Gregerson
Susan M. Sabers
Post Office Box 5027
300 South Phillips Avenue, Suite 300
Sioux Falls, South Dakota 57117-5027
(605) 336-3890
Attorneys for Plaintiffs South Dakota Farm
Bureau, Inc.; South Dakota Sheep Growers
Association; Haverhals Feedlot, Inc.; Sjovall
Feedyard, Inc.; Frank D. Brost; Donald Tesch
and William A. Aeschlimann

And

Professor David S. Day
315 Forest Avenue
Vermillion, SD 57069

SPEAR H RANCH & MARSTON HOLBEN

Represented by:

Thomas P. Tonner
Post Office Box 1456
Aberdeen, South Dakota 57401
(605) 225-1000

And

Case Number: Civ. 99-3018
Name of Document: Plaintiffs' Trial Brief
Page 38

MONTANA-DAKOTA UTILITIES CO.,
NORTHWESTERN PUBLIC SERVICE &
OTTER TAIL POWER COMPANY

Represented by:

David A. Gerdes
May, Adam, Gerdes & Thompson, LLP
503 South Pierre Street
Post Office Box 160
Pierre, South Dakota 57501
(605) 224-8803