FILED

FEB 11 2002

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| SOUTH DAKOTA FARM BUREAU, INC.; SOUTH DAKOTA SHEEP GROWERS ASSOCIATION, INC.; HAVERHALS FEEDLOT, INC.; SJOVALL FEEDYARD, INC.; FRANK D. BROST; DONALD TESCH; WILLIAM A. AESCHLIMANN; SPEAR H. RANCH, INC.; MARSTON HOLBEN; MARSTON AND MARIAN HOLBEN FAMILY TRUST; MONTANA-DAKOTA UTILITIES CO.; NORTHWESTERN PUBLIC SERVICE; and OTTER TAIL POWER COMPANY, <br><br>     Plaintiffs, <br><br> v. <br><br> JOYCE HAZELTINE, in her official capacity as Secretary of State of South Dakota, and MARK W. BARNETT, in his official capacity as Attorney General of South Dakota, <br><br>     Defendants, <br><br> and <br><br> DAKOTA RURAL ACTION and SOUTH DAKOTA RESOURCES COALITION, <br><br>     Defendant-Intervenors. | Civ. No. 99-3018 CBK <br><br><br><br><br><br><br><br><br><br><br><br><br><br> DEFENDANTS HAZELTINE AND BARNETT POST-TRIAL BRIEF |

Defendants Hazeltine and Barnett (hereinafter "the State")
submit that the evidence in this case does not demonstrate beyond
a reasonable doubt[1] that Sections 21 through 24 of Article XVII

---

[1] <u>Knowles v. United States</u>, 829 F. Supp. 1147 (D.S.D. 1993),
<u>aff'd in part</u>, 29 F.3d 1261 (8th Cir. 1994), <u>rev'd in part</u>, 91
F.3d 1147 (8th Cir. 1996); <u>American Meat Institute v. Barnett</u>, 64
F. Supp. 2d 906 (D.S.D. 1999).

of the South Dakota Constitution, commonly referred to as "Amendment E," are in violation of the United States Constitution (commerce clause, equal protection, and process claims).[2]

I.   Plaintiffs' Claims Do Not Meet Article III Requirements.

Before a federal court has jurisdiction under Article III, a case or controversy must be presented. Reno v. Catholic Social Services, Inc., 509 U.S. 43, 57 (1993); Abbott Laboratories v. Gardner, 387 U.S. 136, 148 (1967). "[A] real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract" is required. Babbitt v. United Farm Workers National Union, 442 U.S. 289, 298 (1979).

Plaintiffs have not met these requirements. First, Plaintiff Farm Bureau ("FB") presented no evidence of direct or tangible harm. FB does not farm or own farmland. Its claims concern alleged harm caused to its members. Mike Held, an executive with FB and its only witness, gave three examples of "concern" to FB. T 23-25. One involved joint ownership of machinery by a group of neighbors. T 23. Held did not explain the name or nature of the business organization and stated that he is "not qualified to interpret whether [t]his business

---

[2] During the course of trial, Plaintiffs submitted evidence regarding alleged damages. Plaintiffs stated at trial that this evidence was submitted only to substantiate alleged harm, and was not in support of a claim of taking without just compensation in violation of the Fifth Amendment of the U.S. Constitution. T 432. This is consistent with Plaintiffs' Amended Complaint, which makes no claim for a taking.

structure is in compliance" with Amendment E.   T 39.   This business entity is not a party to this proceeding.[3]

The second example was a livestock finishing scenario where neighbors would divide up the different facets of raising the same livestock (breeding, raising feeders, finishing).   T 24. Although testimony was offered that each of these neighbors would be family farmers, the organizational structure was not described, and these entities are not parties.   T 40.

In addition, FB asserted that Amendment E harms those who feed livestock on a contract basis.   T 24-25.   No specific contract was identified.   Held testified that the evidence of such harm would be provided by other parties.   T 27.   However, no other party testified as a FB member.

FB did not demonstrate that Amendment E directly or tangibly harmed it or its members.   Under Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), Plaintiffs must show "injury in fact," evidence that invasion of its own interests are (a) concrete and particularized and (b) result in actual or imminent harm.   Lujan, 504 U.S. at 560.   The law requires that "the party seeking review be himself among the injured."   Sierra Club v. Morton, 405 U.S. 727, 734-735 (1972).   FB must show that "it or its members would be affected" apart from their "special interest" in the subject. Id. at 735, 739.   FB has not done so.

---

[3] Indeed, even if the joint enterprise was a nonfamily corporation, it would not be barred by Amendment E if it was organized solely for the ownership of equipment (and not farming or ownership of livestock).

South Dakota Sheep Growers ("SG") also do not meet standing requirements.  Aeschlimann testified both as a member of SG and individually.  T 130, 142.  None of his testimony established that Amendment E has in fact injured SG.  T 130-31.

The "feedlot" Plaintiffs--Haverhals, Sjovall, Tesch, and Aeschlimann--have also not met the standing requirements.  Two of these businesses operate as corporations (Haverhals Feedlot, Inc., Sjovall Feedyard, Inc.), but are exempt from Amendment E under the family farm exemption: Section 22(1).  They live on the facility and a family member provides substantial day-to-day labor and management.  T 163, 173, 197, 198, 201.

These Plaintiffs testified that their suppliers or customers included business entities that might be in violation of Amendment E.  T 133-34, 167, 169, 202.  While these Plaintiffs may do business with those in who are in violation of Amendment E, they cannot assert the legal rights of those third parties.  Allen v. Wright, 468 U.S. 737, 751 (1984).

Plaintiff Tesch, an individual, operates currently under a production contract with Harvest States Cooperative.  T 180; Exh. 64.  That contract is "grandfathered" under Amendment E (Section 22(5)).  Tesch continues to receive new stock under this contract on a periodic basis.  T 190.  However, renewal of that contract is not grandfathered, and Harvest States Cooperative (not Tesch) would need to qualify (if it can) under Amendment E's cooperative exemption in Section 22(2) in order to renew the contract.  Tesch cannot bring claims of Harvest States.  Allen, 468 U.S. at 751.

Plaintiff Brost filed this suit individually.  He is involved in Brost Land and Cattle Co., Inc., which was incorporated in 1979.  T 64.  This corporation can continue to own the farm/ranch land it owned prior to Amendment E, but cannot purchase additional land or livestock.  Sections 21 and 22(4).  Brost Land and Cattle Co. is not a party.  Plaintiff Brost is an individual and does not have standing to raise these issues on behalf of Brost Land and Cattle Co., Inc.  Allen, 468 U.S. at 751.

Brost filed articles of incorporation for two entities after Amendment E was passed. Under SDCL 47-2-3, corporations may be organized for "any lawful purpose."  Since these entities were organized under a structure prohibited under the state constitution (Amendment E), they were not lawfully formed.  Again, Brost does not have standing to raise any issues with Amendment E that these corporations may have.  Allen, 468 U.S. at 751.

Plaintiff Spear H. Ranch, Inc. and Plaintiffs Holben and the Marston and Marion Holben Family Trust (through their operation of Plaintiff Spear H. Ranch) are in compliance with Amendment E under the family farm exception of Section 22(1).  Holben purchases steers for the corporation in the springtime, has them branded and vaccinated, and then pastures them on unimproved ranch property in western South Dakota.  T 250-53.  Once on the ranch, the cattle graze in the pasture for the summer.  Day-to-day labor is not required for this type of operation.  T 257.  Holben generally oversees matters every week or two, sometimes two or three times a week.  T 258.  He rides herd and checks to

make sure the steers are healthy.  T 259.  He and his wife
completely manage the operation.  T 258.  To the extent heavy
physical work is required, he hires the work done on behalf of
the corporation.  T 259.  Amendment E does not require that a
family member be present on a daily basis or be the sole
caretaker of the farm if the farming operation does not require
that level of activity.  Simply put, not every farming operation
requires daily chores.  The activities of Marston Holben qualify
Plaintiff Spear H. Ranch, Inc. under the family farm exception of
Section 22(1).  No testimony was offered by Holben demonstrating
how Amendment E "harms" his operation.

The Plaintiff Utilities make several claims.  First, they
make claims with respect to land at the Big Stone Power Plant.
The Complaint (and Dr. Brown's expert testimony) concern 552
acres of real estate adjacent to the Big Stone Power Plant that
the utilities owned previous to 1998.  This property is currently
exempt under the grandfather clause of Section 22(4) of
Amendment E.  This clause allows the current owners, the Big
Stone Partners (who own the land under a tenancy in common), to
continue to own this land and lease it to farmers so long as the
ownership interests of the Power Plant are not altered.  The
Utilities claim that if the percentages of ownership within the
tenancy in common change, then "it would destroy the grandfather
which Amendment E offers."  T 286.  However, even if the new
plant is operated by an entirely different enterprise or by some
different configuration of tenants in common, there is no

requirement that such new group would have to own the farmland or farm the nearby land.   T 304.

There is no evidence that the land would be for sale in the near future.  T 299.  Indeed, the plant manager believes that it is advisable to retain the property for future development, for ash disposal, and for a buffer zone for the plant.  T 299.  If the land was ever sold, it is marketable for purposes other than farming.  Due to its proximity to a rail line and good water supply, various industrial projects have been proposed in the past at this location.  These projects have included an ethanol plant and a processing plant called ProGold.  T 299.  Some land is currently leased to an ethanol plant.  T 300.

At trial, the Utilities raised a second issue regarding real estate at the Big Stone Power Plant.  The Big Stone Partners recently purchased farmland near the existing plant.  T 283.  The Utilities have initiated regulatory filings for approval of a new plant at this location.  T 283.  The Big Stone Partners intend to turn this land over to the new owners of Big Stone II, a group that has not yet been formed.  T 288, 289.  They have also purchased an option on additional land for the cooling pond for this project.  T 287, 306.  None of this additional property would be grandfathered under Amendment E.  For these lands, the Big Stone Partners must comply with Section 22(10), which permits a corporation purchasing agricultural land for development purposes to rent the land (to a family farmer) for no more than five years.  If the property is not developed within the five

years, the corporation can no longer use it for agricultural
production.

Construction of the existing plant took only five years.
T 301.  The current plant manager estimates construction of Big
Stone II may be complete as early as 2007.  Construction itself
would take as many as four construction seasons.  T 304.  Land
cannot be farmed when it is undergoing construction.
Construction on the new plant would necessarily begin within the
five-year period.  A constitutional requirement that the farmland
must be taken out of production after five years would not be
burdensome if the land is already taken out of production for
construction purposes.  This evidence does not demonstrate that
the Plaintiff Utilities are injured by Amendment E.

The Plaintiff Utilities also raised a claim concerning
easements for transmission lines.  This issue is dependant upon
whether an easement is "an interest whether legal, beneficial or
otherwise, in any real estate used for farming in this state."
Section 21.  An easement is a servitude on land.  SDCL 43-13-2.
It is "an interest in the land in the possession of another which
entitles the owner of such interest to a limited use or enjoyment
of the land in which the interest exists."  Knight v. Madison,
2001 S.D. 120, ¶ 4, 634 N.W.2d 540, 542 (emphasis added).  The
South Dakota Supreme Court construed SDCL 43-13-5 which provides,
"The extent of a servitude is determined by the terms of the
grant, or the nature of the enjoyment by which it was acquired."
Neither the physical size nor the purpose or use to which an

easement may be used can be expanded or enlarged beyond the terms
of the grant of the easement.  Id.

The South Dakota Supreme Court examined a utility easement
in Musch v. H-D Electric Cooperative, Inc., 460 N.W.2d 149 (S.D.
1990).  The court recognized that the easement is limited to the
use specified in the grant, and the remaining rights to use the
land lie with the grantor.  460 N.W.2d at 154.  Thus, utility
easements are a legal interest limited to the use specified by
their easement: the placement of utility poles and wires.  This
interest is not that contemplated by Amendment E, and the
Plaintiff Utilities are therefore not injured by Amendment E.

II.   Plaintiffs Further Have Not Established That Amendment E Is
      Unconstitutional.

      A.   Commerce Clause Claims.

Plaintiffs contend that Amendment E deprives South Dakota of
"commonplace and established methods of doing business."
Exh. 47.  The United States Supreme Court has refused to accept
this argument for commerce clause purposes.  In Exxon Corporation
v. Governor of Maryland, 437 U.S. 117, 127 (1978), the Court held
that the commerce clause does not protect "the particular
structure of methods of operation" for businesses.  Instead, it
protects interstate firms from prohibitive or burdensome
regulations.  437 U.S. at 127, 128.  Moreover, the commerce
clause does not immunize corporations from regulation.  Id.

Plaintiffs did not demonstrate that Amendment E establishes
deferential treatment, in favor of in-state regulated entities
and discriminating against out-of-state entities, between in-
state and out-of-state entities regulated by Amendment E.  In

fact, Plaintiffs contend that in-state regulated entities are burdened by Amendment E more than out-of-state corporations and syndicates.  For example, FB stated that Amendment E "actually hurts South Dakota Farmers rather than protects them against out-of-state competition."  T 38.  Although Plaintiff Brost asserted that Amendment E treats residents differently from nonresidents, he also stated that Amendment E "is a limiting factor on commerce in South Dakota" and that it "significantly hurts South Dakota farmers in many instances."  T 101, 102.  Plaintiff Brost is "not claiming that Amendment E benefits South Dakota farmers to the detriment of out-of-state farmers" from a "profit-making perspective."  T 100.

In-state economic hardship does not violate the commerce clause.  In <u>Hampton Feedlot v. Nixon</u>, 249 F.3d 814, 820-21 (8th Cir. 2001), the court stated:

> The Missouri Legislature has the authority to determine the course of its farming economy, and this measure is a constitutional means of doing so.  We have no doubt that the state considered the potential harm and benefits to all stakeholders in creating its price discrimination law.  In the event that the implemented statute adversely affects Missouri farmers or consumers, appellees are free to petition the legislature to amend or repeal the statute.  Appellees have asked us to strike Missouri's statute because it burdens interstate commerce, but they have failed to show how the measure has this unconstitutional effect.  Economic hardship experienced by Missouri feedlots does not rise to the level of a dormant commerce clause violation.

Plaintiffs attempted to prove that Amendment E was premised on a purpose of economic protectionism in violation of the commerce clause, by submitting testimony of the subjective intent of the drafters and minutes of the meetings of the drafters.

This "subjective intent" evidence cannot be considered.  Barket, Levy & Fine v. St. Louis Thermal Energy, 21 F.3d 237, 241 (8th Cir. 1994).  Instead, the issue to be examined is whether the voters had constitutionally permissible reasons for passing Amendment E.  Evidence of constitutionally permissible rationale is contained in the Pro-Con Statement (Exh. 19), the governmental documents (Exhs. 501, 502), and academic research (Exh. 314; T 232-42, 802-63).  This type of "legislative history" also includes publications that were placed before the voters, including brochures produced against Amendment E (Exh. 305) and press releases (Exhs. 107, 108, 109, 110).  The voters had before them numerous discussions of the local interests involved in Amendment E, and discussions of how Amendment E would affect family farms.

The commerce clause balancing test set forth in Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970) applies if a law regulates evenhandedly and has only incidental effects on, and does not overtly discriminate against, interstate commerce.  The evidence submitted at trial indicates that (at worst) Amendment E evenhandedly applies to in-state and out-of-state entities, see supra.  Under the Pike test, the law will be stricken only if the incidental effects it imposes upon interstate commerce are "clearly excessive in relation to the putative local benefits." 397 U.S. at 142.

The evidence demonstrates that the local benefit being conferred by Amendment E is the prohibition of corporate ownership of farms and farmland.  See, e.g., Pro-con Statement,

Exh. 19.   Expert sociologists testified using different
approaches, and each approach demonstrated that industrialized
farming such as corporate farming (including production
contracting) caused detrimental effects in farm communities over
the long term.

Dr. Lobao reviewed thirty-eight studies that are
representative of the major sociological work regarding
industrialized farming[4] and its effect on communities.   T 455,
474.   Dr. Lobao looked at studies that used four generally
accepted sociological methodologies:  case study designs, macro-
social accounting designs, regional economic impact models, and
surveys.   T 457-59.   The studies included those funded by the
United States government (T 463), as well as various private
studies.   Over seventy-five percent of the studies showed that
industrialized farming caused some detrimental effects in the
communities involved.   T 496; Exh. 314, Table 1.   These
detrimental socioeconomic effects include income inequality and
corresponding social disruption, crime rates, lack of education
attainment, lower total community employment, and higher
unemployment rates.   T 475.   Detrimental effects on the social
fabric of the community include the decline in quality of local
governance, reduced enjoyment of property, lack of civic
participation, and social disruption.   Exh. 314, at 16-17.

---

[4] Industrialized farming refers to farming where different groups
of people are engaged in management of the operation beyond just
a household situation.   T 451.

Sociologists have also found that industrialized farming causes detrimental health effects.  Exh. 314, at 16-17.

Secondly, Dr. Lobao testified regarding her own research on socioeconomic wellbeing in various communities.  T 464.  She compared small family, larger family, and industrialized farming. T 454.  Dr. Lobao found that the middle-sized family owned and operated, locally controlled farms tended to be related to higher quality of life in terms of socioeconomic well being.  T 464. Although there was not a clear-cut detrimental impact on an immediate basis, she found a detrimental impact occurring over time, such as a ten-year period.  T 465.

Dr. Heffernan testified regarding production contracting, a type of industrialized farming that is largely prohibited by Amendment E.  Production contracting is becoming more commonly used in the hog business, but has been in use in the broiler industry for decades.  T 802.  Although South Dakota is not a large poultry producer, the experience in the broiler industry is useful to analyze the possibilities in the hog industry (or other livestock industries using production contracts in the future).

Dr. Heffernan testified regarding sociological effects of production contracting in one Louisiana parish over thirty years. T 803.  This case study surveyed and conducted personal interviews of broiler growers in 1969, 1981, and 1998.  T 803. In 1969 the parish was an impoverished area, and contract production had been in place for about ten years.  T 806, 810. Contracts were issued by four different companies (integrators) for terms long enough for the grower to pay off his capital

investment (building, waste management system, water supply).
T 810.

In 1981 the number of integrators had dropped to two.
T 813.  Contracts were offered only for seven or eight weeks (the
time to feed a batch of broilers) rather than a period of years.
T 814.  Growers had done well economically during the period from
1969 to 1981, but were still in debt for the broiler buildings.
T 815-16.

By 1999 there was one integrator.  T 818.  The number of
independent family farmers had decreased dramatically over the
thirty years, and the number of contract growers had doubled.
T 818.  The contracts remained at a term of seven weeks, but
there was an inconsistent supply of broilers for the growers to
feed.  T 820.  Integrators were able to vary the supply of
broilers to meet market needs; growers sat with buildings empty
and a continuing debt load.  T 820.

By 1999 this parish had the highest farm sales of any parish
in the state, yet was still a persistent poverty county.  T 824.
Growers had made capital expenditures for the buildings, but were
unable to build collateral.  T 826.  The integrators often
required the growers to make additional improvements.  T 826.
Also, the growers never built up equity in the stock, although
the risk of death loss was theirs.  T 827.

Further, poultry growers have no opportunity to become
independent producers.  Due to the rise in production
contracting, the large corporations own ninety-five to ninety-
eight percent of the broilers at all stages of production and

manufacturing.  T 827.  They do not buy broilers on the market, and there is no independent market for broilers.  As Dr. Heffernan stated, "bird never sells."  T 827.[5]

Poultry production in Louisiana is not an isolated example of the asymmetrical position between the growers and integrators in production contract situations.  See, e.g., Crowell v. Campbell Soup Company, 264 F.3d 756 (8th Cir. 2001) (broilers in Minnesota) and Seegers v. Pioneer Hi-Bred International, Inc., 997 F. Supp. 1124 ( N.D. Ind. 1998) (seed corn in Indiana).

Dr. Heffernan also testified regarding concentration among processors in the food system.  T 831.  Because of increasing concentration, farmers have fewer options to sell their product. T 832.

Against this background, the Plaintiffs' claim that there is no legitimate local benefit to Amendment E.  From their perspective, the best that can be said is that the corporate farming issue is an area of intense debate.  See USDA Reports "A Time to Act" And "A Time to Choose."  Exhs. 501, 502.  Indeed, Dr. Heffernan and Dr. Tweeten have been on point-counterpoint panels regarding agricultural policy issues before a major USDA conference and before FB leaders.  T 797.  The State itself has engaged in this debate through the years.  T 799.

---

[5] While there is an opportunity for direct neighborhood sales (such as the sales by Hutterite Colonies in South Dakota) or niche markets, those enterprises represent as little as 2 percent of the broiler market nationwide.  There are generally no plants to process these broilers for independent firms.  The Hutterite Colonies, for example, process the broilers themselves and sell the broilers themselves in local communities.

This evidence clearly shows that the local benefits of Amendment E outweigh its incidental effects on interstate commerce.  Plaintiffs did not sustain their burden of proving that Amendment E violates the commerce clause.

   B.   <u>Due Process</u>.

Plaintiffs appear to be arguing that their due process rights were violated due to the "hasty" procedure involved in enacting Amendment E through the initiative process.  Yet, legislative discussions to change the corporate farming laws occurred during the winter of 1997 in the South Dakota legislative session.  T 47.  Drafting of Amendment E itself occurred from March to May of 1997.  T 245.  Amendment E was based on a similar law in Nebraska and was not created whole cloth.  T 222.  This procedure is not any shorter than that followed in the South Dakota Legislature.  The whole South Dakota legislative session is only thirty-five to forty days.  S.D. Const. art. III, §§ 6.  Further, the initiated measure was filed one year in advance of the election as required by the South Dakota Constitution, Article XXIII, Section 1.

Further, Plaintiffs participated in the public debate (editorials, television debates, brochures) on Amendment E. T 47, 48, 118-121, Exhs. 342, 305, 309.  The "Vote No on E" committee hired a political consultant experienced in statewide election issues similar to this one.  T 119.  They also hired a campaign coordinator, Deb Mortenson.  Exh. 342.

All of this procedure comports with due process requirements.  See Defendants Hazeltine and Barnett's Trial Brief (hereinafter "State Trial Brief") at 26-28.

Plaintiffs also may be making a substantive due process claim, although such was not pled.  See State Trial Brief, at 23. This claim is not actionable when explicit textual arguments can be made under the Bill of Rights.  See State Trial Brief, at 24; Nicholas v. Pennsylvania State University, 227 F.3d 133, 143 n.3 (3d Cir. 2000).

Further, a legislative act will withstand a substantive due process challenge if the State "identifies a legitimate state interest that the legislature could rationally conclude was served by the statute."  Nicholas, 227 F.3d at 139 (quoting Alexander v. Whitman, 114 F.3d 1392, 1403 (3d Cir. 1997) and Sammon v. New Jersey Bd. Of Medical Examiners, 66 F.3d 639, 645 (3d Cir. 1995)).  A stricter scrutiny is applied to legislative acts that burden certain fundamental rights.  Id.  Such fundamental rights and liberties are "fundamental," "implicit in the concept of ordered liberty," and such that "neither liberty nor justice would exist if they were sacrificed."  Palko v. Connecticut, 302 U.S. 319, 325-26 (1937).

Plaintiffs here, however, have not made any claim that they have fundamental rights burdened by Amendment E.  Amendment E does not prohibit the activity of farming by all business entities, but only restricts farming activities from being performed by corporations or limited liability syndicates.  There is no fundamental right to farm in the structure of a corporation

or limited liability syndicate, particularly in light of the rights of states to regulate corporations (see, e.g., Asbury Hospital v. Cass County, 326 U.S. 207, 211-12 (1945); Exxon Corporation, 437 U.S. at 127; Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 242 (1984).

It is clear that Amendment E is supported by and rationally related to a legitimate state interest; see supra. Therefore, Amendment E does not violate Plaintiffs' substantive due process rights.

Plaintiffs argue that Amendment E has limited their ability to do estate planning. However, there is no fundamental constitutional right to estate planning vehicles like corporations or limited liability structures. See supra. This is not a due process violation.

Plaintiffs also appear to be making an "interference with contracts" due process claim; the only due process claim that can be made with contracts is an "impairment of the obligations of contracts" claim. The clause is implicated only when states impose "substantial modifications of private contracts." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241 & n.13, 244 (1978). In this situation, the grandfather provisions protect existing contracts.

Indeed, no evidence was submitted at the trial indicating that any existing contract of Plaintiffs' was affected at all. Even Plaintiff Tesch's production contract[6] was not affected: it

---

[6] There was some discussion at trial about whether Tesch could continue to accept new livestock under his existing production
(continued...)

18

is valid for the term of the contract under Section 22(5) of Amendment E. Tesch cannot renew his contract (supra). The existing contract does not automatically renew. Section 3 provides that "parties will attempt a renewal." Therefore, Tesch's alleged harm for building a sewage lagoon that anticipated renewal of his contract does not warrant relief under an impairment of that contract claim.

Plaintiff Aeschlimann also submitted a production contract (Exh. 72). This contract was not terminated by Amendment E, as it clearly was protected by the grandfather provision of Section 22(5). Harvest States Cooperative rescinded the contract, and Aeschlimann did not pursue any claim he may have had for that recision. T 141, 142

Plaintiffs also advanced argument regarding forward contracts; however, no Plaintiff with standing has presented a forward contracting claim. But even so, forward contracts are not covered by Amendment E. Section 21 applies only to situations where corporations acquire interests in real estate used for farming or engage in farming. Farming is defined as the ownership, keeping, or feeding of animals. Forward contracts,

---

(...continued)
contract. The terms of the production contract itself clearly contemplate that livestock will continually be delivered to Tesch throughout the term of the contract: see Exh. 64, Section 2.4A, which states "all pens shall be cleaned between groups of pigs," and Section 2.2, which states "owner agrees to refill facilities within one week of the time the facility is emptied." Thus the delivery of additional livestock during the term of Tesch's production contract is grandfathered activity under Section 22(5) of Amendment E.

however, do not involve these activities; they do not transfer ownership of animals or harvested crops while they are growing on the farm.  The risk of loss is taken by the farmer or rancher, not the packer.  Therefore, the packer is not engaging in farming when he enters into a forward contract, which is the argument that the Plaintiffs have asserted.

It is noted that Plaintiffs attempt to support their argument with their interpretation of Article XVII, Section 22(15) which exempts "Livestock futures contracts, livestock purchased for slaughter within two weeks of the purchase date, or livestock purchased and resold within two weeks."  (Emphasis added.)  They claim the two-week period exempts only livestock contracted for purchase less than two weeks before slaughter.  However, under the rule of last antecedent, the phrase "within two weeks" clearly modifies the words "for slaughter."  American Meat Institute v. Barnett 64 F. Supp. 2d 906, 916 (D.S.D. 1999); Kaberna v. Lead Deadwood School District, 438 N.W.2d 542, 543 (1989).  This exemption pertains to situations where livestock is owned and fed by the packer itself for up to two weeks.  It does not address forward contracts; forward contracts are not exempted here because they are not barred by Amendment E in the first place.

Further, the Plaintiffs are not packers.  They cannot make a claim based on the legal rights of the packers in forward contracts.  Allen, 468 U.S. at 751.

C.   Equal Protection.

As Plaintiffs have admitted, there is no suspect class for equal protection purposes involved herein.  Plaintiffs have argued that Amendment E establishes an irrational class distinction between farmers and ranchers by the grandfather clauses (Sections 22(4) and (5)), and by the alfalfa exemption in Section 22(7).  However, the evidence itself shows that farmers and ranchers are not similarly situated.  Class distinctions can be made between them.  E&T Realty v. Strickland, 830 F.2d 1107 (11th Cir. 1987).  Further, the equal protection clause "does not guarantee economic equality."  Barket, Levy & Fine, Inc., 21 F.3d at 241.

Plaintiffs submitted evidence that Brost and Holben, because of age and illness, cannot comply with the family farm exemption of Amendment E.  Section 22(1).  Heightened review under the equal protection clause is not warranted for age claims.  Kimel v. Florida Board of Regents, ___ U.S. ___, 120 S.Ct. 631, 145 L.Ed.2d 522, 542 (2000); Weber v. Strippit, 186 F.3d 907, 911 (8th Cir. 1999).

The standard equal protection analysis applies: whether the state law bears a rational relationship to some legitimate end.  Central State University v. American Association of University Professors, 526 U.S. 124, 127-28 (1999); United States v. Mound, 149 F.3d 799, 801 (8th Cir. 1998), cert. denied, 525 U.S. 1089 (1999); Von Kerssenbrock-Praschma v. Saunders, 121 F.3d 373, 378 (8th Cir. 1997).  See also MSM Farms, Inc. v. Spire, 927 F.2d

330, 332, <u>cert. denied</u>, 502 U.S. 814 (1991) regarding Nebraska's anticorporate farming constitutional provision.

The evidence at trial demonstrates that Amendment E bears a reasonable relationship to a legitimate end.  It therefore does not violate the equal protection clause of the Constitution.

      D.   <u>Americans With Disabilities Act</u>.

The Court previously dismissed the Americans with Disabilities Act claim filed by Plaintiffs.  However, in a December 12, 2001, Memorandum, the Court indicated that it may reconsider its previous decision due to the recent decision in <u>Grey v. Wilburn</u>, 270 F.3d 607 (8th Cir. 2001).  However, *only Plaintiff Farm Bureau* brought the ADA claim.  (Original) Complaint, para. 121.  Plaintiff FB listed some concerns regarding Amendment E, but submitted no evidence regarding any disabled member.  T 23-25.

The ADA has four titles, of which only Title II applies to state government.  Title II states:

> No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such public entity.

42 U.S.C. 12132.[7]  Thus, in order to raise a claim under 42 U.S.C. 12132, the Plaintiffs must meet the definition of a

---

[7] There is a question as to whether the State's role is even a "service, program, or activity" provided by the State within the meaning of the ADA.  Some courts would lean that way.  <u>Heather K. v. City of Mallard, Iowa</u>, 946 F. Supp. 1373, 1383 (N.D. Iowa 1996); <u>Crowder v. Kitagawa</u>, 81 F.3d 1480, 1483 (9th Cir. 1996).  However, that question need not be answered here due to the lack of standing and lack of a disabled individual.

"qualified individual with a disability."  This definition
appears at 42 U.S.C. 12102(2) as:

   (A)   A physical or mental impairment that substantially
         limits one or more of the major life activities of
         such individual;

   (B)   A record of such an impairment; or

   (C)   Being regarded as having such an impairment.

Heart disease even constitutes a physical impairment under
the ADA.  Hilburn v. Murata Electronics North America, Inc., 181
F.3d 1220, 1227 (11th Cir. 1999).  However, in order to be a
disability under the ADA, the physical impairment must
substantially limit one or more of the individual's major life
activities.  Id.; 42 U.S.C. 12102(2); 29 C.F.R. 1630.2(j);
Strippit, 186 F.3d at 913.

A limit on one type of job (such as farming) is not a
"substantially limiting impairment" contemplated under the ADA.
Taylor v. Nimock's Oil Co., 214 F.3d 957, 960 (8th Cir. 2000).
Instead, the claimant must demonstrate the inability to work in a
broad range of jobs.  Toyota Motor Manufacturing, Kentucky, Inc.
v. Williams, 2002 WL 15402 (Jan. 8, 2002); Sutton v. United
Airlines, 527 U.S. 471 (1999).

Physical limitations due to heart conditions are not a per
se disability covered by the ADA.  Strippit, 186 F.3d at 914.
Moderate limitations on major life activities caused by some
restrictions on physical labor do not constitute a "disability."
Strippit, 186 F.3d at 914.

Plaintiffs here have shown no disability protected by the
ADA.  Three Plaintiffs (Brost, Sjovall, and Holben) presented

some evidence of heart disease.  However, the ADA claim filed in the Complaint was not made by these parties.  They all testified generally that they had heart disease that limits the types of physical labor they can perform.  T 58, 198, 255.  However, they did not establish that the nature, duration, and long-term medical problems of their heart disease caused them to be substantially limited in a major life activity, and, therefore, they have not demonstrated that they are within the class of disabled persons protected by the ADA.

E.    42 U.S.C. § 1983.

Plaintiffs' 42 U.S.C. § 1983 claim is premised upon the constitutional claims raised in this suit.  There is no independent action taken by Defendants on which the 42 U.S.C. 1983 claim is based.  As Plaintiffs' constitutional claims fail, so must their 42 U.S.C. 1983 claim.

Dated this 8th day of February, 2002.

Respectfully submitted,

MARK BARNETT
ATTORNEY GENERAL


Roxanne Giedd
Diane Best
Assistant Attorneys General
500 E. Capitol Ave.
Pierre, South Dakota 57501-5070
Telephone:  (605) 773-3215

usdc.rg(dh)

24