

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

FEB 1 3 2002



o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o

CIV. 99-3018

SOUTH DAKOTA FARM BUREAU, INC.;      :
SOUTH DAKOTA SHEEP GROWERS
ASSOCIATION, INC.; HAVERHALS           :
FEEDLOT, INC.; SJOVALL FEEDYARD,
INC.; FRANK D. BROST; DONALD TESCH,    :          PLAINTIFFS'
WILLIAM A. AESCHLIMANN; SPEAR H                   POST-TRIAL BRIEF
RANCH, INC.; MARSTON HOLBEN;           :
MARSTON AND MARIAN HOLBEN
FAMILY TRUST; MONTANA-DAKOTA           :
UTILITIES CO.; NORTH-WESTERN PUBLIC
SERVICE; and OTTER TAIL POWER          :
COMPANY,
                                       :
          Plaintiffs,
                                       :
vs.
                                       :
JOYCE HAZELTINE, in her official capacity as
Secretary of State of South Dakota and MARK  :
W. BARNETT, in his official capacity as
Attorney General of South Dakota,      :

          Defendants,                  :

and                                    :

DAKOTA RURAL ACTION and SOUTH          :
DAKOTA RESOURCES COALITION,
                                       :
          Defendant-Intervenors.
                                       :

o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o

Case Number: 99-3018
Name of Document: Plaintiffs' Post-Trial Brief
Page 2

I.     Introduction

       An Unusual Record

       . . . Could anti-corporate farming statutes be challenged under the commerce clause of the
       U.S. Constitution, Article I, §8?  Isn't the real purpose of such statutes to exclude large
       out-of-state agricultural businesses in order to protect small in-state operations? . . . .

       The question quoted above is a "leading" question, posed in a law school casebook. As a

leading question, it is designed to be answered: "Yes".  The casebook is <u>Agricultural Law</u> (West

Publishing Co., 1985), and it was co-authored by local counsel for Defendant-Intervenors,

Professor John H. Davidson.

       The casebook's question can be reformulated with reference to this case:

       Isn't the real purpose of  [Amendment E] to exclude large out-of-state        agricultural
       businesses in order to protect small in-state operations?

This question concisely summarizes the record in the present case.  This leading question should

also be answered: "Yes".

       The casebook's conclusion that laws like Amendment E violate the dormant commerce

clause doctrine is not the only irony found in the record.  Besides the Intervenors' lawyer, the

State's rural sociologist essentially "admitted" that Amendment E violated the dormant

commerce clause.  In November of 2001, on the eve of the trial, the State's testimonial expert

stated, in Exhibit 313A, that Amendment E was a "South Dakota law designed to restrict

operation of global agribusiness firms." (T 505)  If Amendment E were so "designed", then it

violates the dormant commerce clause.

       But, there is even more in the record.  In addition to Intervenors' local counsel and the

State's testimonial expert, the record also contains the testimony of one of Intervenors' other

Case Number: 99-3018
Name of Document: Plaintiffs' Post-Trial Brief
Page 3

lawyers (who was paid for her testimony at trial) that Amendment E was designed "to restrict the

operation of global argi-business firms." (T 224)

In essence, the record shows that Intervenors' local counsel, Intervenors' lawyer-drafter

of Amendment E and the State's testimonial expert all agree with Plaintiffs: Amendment E was

designed for the purpose of excluding "large out-of-state agricultural businesses in order to

protect small in-state operations." Plaintiffs, of course, appreciate the support provided for

Plaintiffs' theories by the State and, especially, by Intervenors. While these parts of the record

are sufficient to hold that the Amendment is unconstitutional, there is even more evidence in the

record regarding the Amendment's constitutional flaws. As discussed below, Plaintiffs will

review the record in light of the applicable law and the Court's prior rulings in this case.

     B.    The Structure of Plaintiffs' Brief.

Because of the space limitations, Plaintiffs' brief will focus on the dormant commerce

clause claim. Plaintiffs incorporate here, by this reference, their arguments from the Pretrial

Brief regarding the dormant commerce clause, equal protection and contract clause claims.

The threshold issue in a dormant commerce clause case is whether the challenger has

demonstrated a "burden on interstate commerce." *See* Lewis v. BT Investment Managers, Inc.,

447 U.S. 27 (1980). Assuming this burden is satisfied, the next issue concerns the nature of the

State's regulatory scheme: whether the State's regulation is "discriminatory" or

"nondiscriminatory". If the state regulation is discriminatory, the Court must apply the virtually

*per se* standard (*i.e.*, strict scrutiny), and the State must show that it has a compelling state

interest and that it has used the least drastic alternative means. If the state regulation is

Case Number: 99-3018
Name of Document: Plaintiffs' Post-Trial Brief
Page 4

"nondiscriminatory", then the Court must apply the three-part "undue burden" standard.  There,

the Court evaluates the State's actual reasons for creating the burden on interstate commerce and

the State's choice of means.  *See* Part IV.

      C.    Background Facts.

      The Big Stone Partners, the "Utility Plaintiffs", own the Big Stone Power Plant located in

Grant County, South Dakota.  As developed, the Big Stone Plant has sufficient additional land to

accommodate a second facility for future expansion.  In fact, a second facility is in the

development stages, and an additional 300 acres has been purchased in anticipation of this

development.  (T 283)  Prior to this new development, the plant owned approximately 2,100

acres, of which 750 are dedicated to power plant operation.  The remaining acreage is dedicated

to future development and is presently leased for farming purposes, generating approximately

$15,000 per year in revenues.  If a change in ownership of the plant removed the Amendment E

grandfather, the new owners would not realize this income after a period of five years.  (T 325)[1]

The new plant, Big Stone II, will be physically located southwest of the existing plant.  Big Stone

II will not be owned by the same entities as the original plant, and once the land is conveyed, the

Amendment E grandfather will be lost.  (T 287, 288)

      MDU serves customers in the states of Montana, South Dakota, North Dakota and

Wyoming as an interstate transmission utility, a distribution utility, and an undivided owner of

22.7 percent of the Big Stone Plant.  NWPS serves customers in the state of South Dakota as an

---

[1] The ownership structure of the plant did change in 1985 when NWPS reduced
its percentage, which was purchased by the other two partners.  (T 285, 286)

interstate transmission utility, a distribution utility and an undivided owner of 23.4 percent of the Big Stone Plant. Otter Tail serves customers in Minnesota, North Dakota and South Dakota as an interstate transmission utility, a distribution utility and an undivided owner of 53.9 percent of the Big Stone Power Plant.

Because of the effect of Amendment E on Otter Tail's operations in South Dakota, Otter Tail's ratepayers are placed under an unwarranted financial burden, compared to the other states in which Otter Tail does business. (T 317) Otter Tail maintains interstate transmission facilities between South Dakota and other states. (T 320)

The Federal Energy Regulatory Commission ("FERC") has jurisdiction to regulate interstate transmission of electricity to Otter Tail, among others. Any transfer of Otter Tail's South Dakota transmission facilities to an independent system operator, which Otter Tail must join under FERC order, would drive up the cost of ownership and maintenance of the South Dakota portion of the system as compared to the other portions of the system. (T 308-312)

Amendment E has adversely affected, and will adversely affect, wind power development in South Dakota. Otter Tail, for example, has stayed away from South Dakota because of Amendment E. (T 313) The record also has testimony from FLP Energy which currently operates wind power facilities in Texas, Kansas, Iowa, Wisconsin and Minnesota. FLP Energy is poised to develop a 100 million-dollar wind power facility in central South Dakota, which is on hold because of Amendment E. (Ex. 131 9, 13 and 14)

Under Amendment E, the cost of transmission rights-of-way will increase approximately 200 to 300 percent in South Dakota, compared to other states. (T 326, 328) This is because

owners of agricultural land will be unwilling to sell less than a fee simple interest in the land

because they will be unable to use that land.  (T 330)  Additionally, the probable effect of

Amendment E, Section 22(4), will require the taking of fee title because it permits only

ownership or leasing of the land.  A lease, moreover, would not be commercially feasible.

The "Agricultural Plaintiffs" are "family farmers" who participate in interstate commerce

through the livestock production industry.  Unless the Amendment would be enjoined, the harm

to the businesses of the Agricultural Plaintiffs will continue, and most will be driven from their

chosen livelihoods.

### The Record Demonstrates That The Amendment Suppresses And Otherwise Burdens Interstate Commerce.

The record convincingly demonstrates that Amendment E burdens interstate commerce.[2]

Some of the most persuasive evidence is provided by witnesses who work for the Defendant-

State.  This is supplemented by the unrefuted testimony of Plaintiffs' expert economists and the

testimony of the Plaintiffs.

Part of the record of burden is established by witnesses who are, or were, state officials

responsible for economic development or supervision of the agricultural economy in South

Dakota.  The burden element is actually satisfied "out of the mouth" of the State itself.

---

[2]     The Amendment imposes a substantial and permanent burden on interstate commerce.  This burden, according to the record, is quantitative and qualitative. The Plaintiffs would note that this review of the burden on interstate commerce will also be applicable to any analysis performed in "the undue burden" standard. *See* Part IV below.

For example, South Dakota's Secretary of Agriculture, Mr. Darrell Cruea, testified that Amendment E restricted capital investment in agricultural and marketing opportunities for producers, including family farmers. (Ex. 130 10) Cruea testified that the Amendment restricted producers' cash flow and their ability to borrow. (Ex. 130 10). Cruea testified that Amendment E suppressed producer involvement in value-added processing. (Ex. 130 14)

Significantly, Cruea's testimony was not rebutted in any way by the State or the Intervenors.

Another state official, cabinet member Mr. Ron Wheeler, testified at the trial based on his many years as head of the Governor's Office of Economic Development. As head of GOED, Wheeler was uniquely qualified to observe the effects of Amendment E. He testified that the Amendment had a suppressive and inhibiting effect on the flow of interstate investment. (T 737, 739, 745) He testified that the GOED had learned of over 20 investment projects suppressed by the Amendment. (T 741) Wheeler testified that the Amendment burdened a "full range" of projects. (T 742) He testified that the Amendment had delayed the "Hematech" project and had adversely affected the Lake Norden "cheese factory" project. (T 742-743)

Significantly, Wheeler's testimony was not refuted or rebutted by the State or the Intervenors.

The record regarding the burden on interstate commerce was also bolstered by the testimony of the Plaintiffs. The Agricultural Plaintiffs testified that the Amendment restricted livestock production contracting and other value-added strategies.

Case Number: 99-3018
Name of Document: Plaintiffs' Post-Trial Brief
Page 8

Plaintiff John Haverhals testified that his feedlot had lost over half of his business because of the Amendment and that he will go out of business if the Amendment continues in effect.  (T 164, 173)  Plaintiff Don Tesch testified that his production contract for hogs was cancelled because of the Amendment.  (T 184)  Plaintiff Marsden Holben testified that the Amendment burdened his efforts to plan the distribution of his estate. (T 250)  Plaintiff Bill Aeschlimann testified that his lamb growing farm, which does custom feeding, would be closed by enforcement of the Amendment.  (T 134)

Plaintiff Frank Brost testified to several of the ways the Amendment burdens interstate commerce.  Brost testified, for example, that his corporation could not satisfy the "family farm" exception because of his health-based disability and that this restricted his ability to pursue a value-added venture with his cattle (T 71, 76)

Significantly, none of the testimony by the Agricultural Plaintiffs was refuted or rebutted in any substantive way.

The Utility Plaintiffs are involved in interstate commerce in the generation and transmission of electric power. The representatives of the Utility Plaintiffs testified that the Amendment adversely impacted their business in a number of significant ways. First, given the fact that transmission easements created after the effective date of Amendment E will not be permitted certain uses of land used for "farming", transmission utilities will be required to convert the land within the easements to a nonfarm use within five years of acquisition of the property.  Amendment E, Section 22(10).  Second, because Section 22(10) permits only fee ownership or leasing, and because leasing is not commercially practicable (and

Case Number: 99-3018
Name of Document: Plaintiffs' Post-Trial Brief
Page 9

may run afoul of the South Dakota statutory prohibition against rural leases extending longer

than 20 years), Amendment E burdens the Utility Plaintiffs by not permitting ownership of less

than fee title.

The acquisition cost of fee title for transmission line corridors will increase, therefore, by

a factor of 200 to 300 percent because of Amendment E. This is, of course, a burden that these

three interstate plaintiffs do not face in other states. Therefore, the cost of doing business in

South Dakota will be more than in the other states in which the Big Stone Partners do business,

and such business will be diverted to more favorable settings than South Dakota.

Third, any change in ownership regime of the Big Stone Plant will cause the Big Stone

Partners to lose $15,000 to $20,000 per year in income from leasing the property held for future

expansion at the Big Stone Plant, after five years because of the operation of Section 22(10). The

property is owned in tenancy in common by the three utilities. A change in ownership by the

tenants will terminate the tenancy, and the new tenancy will be subject to Amendment E.  20

Am.Jur.2d, Co-tenancy and Joint Ownership, §40. As calculated by Dr. Brown, in present value

terms, as much as $53,000 could be lost. (T 597)

Another burden on interstate commerce demonstrated by the record is that the

development of wind power in South Dakota has been stymied by Amendment E. While Otter

Tail is involved in wind power in other locations, it has avoided South Dakota because of the

economic impact of Amendment E. (T 313)

The adverse impact of the Amendment on the interstate wind power industry was

dramatically confirmed by the testimony of a nonparty witness, Mr. Robert Bergstrom.

Case Number: 99-3018
Name of Document: Plaintiffs' Post-Trial Brief
Page 10

Bergstrom, national project director for FPL Energy, testified by deposition—Exhibit 131.

Bergstrom testified that FPL Energy, the world's largest developer of wind power, wants to

develop wind power in Hyde and Deuel Counties since South Dakota is one of the best wind

resources in the nation. (Ex. 131 6) Bergstrom testified that the FPL Energy project involved an

initial investment of 100 million dollars. Bergstrom testified that this investment would be

suppressed by the breadth of the Amendment. (Ex. 131 20) Bergstrom also testified that, even if

the Amendment only delays the development of wind power generation, the costs would be

significantly greater later because of the scarcity of transmission capability. (Ex. 131 18) Thus,

Bergstrom identified yet another way in which the Amendment burdened and impaired interstate

commerce in the electric power industry.

Significantly, none of Bergstrom's testimony about the suppressive obstacles created by

Amendment E for the wind power industry were refuted or rebutted.[3]  The State or the

Intervenors could have produced their own wind power witness if Mr. Bergstrom was mistaken

in any regard, but they did not call any rebuttal wind power witness.

D.    Plaintiffs' Economic Experts

The Plaintiffs presented even more evidence about the Amendment's adverse effect on

interstate commerce from the two distinguished economists. First, Dr. Ralph Brown, an

economist from the University of South Dakota, testified that the Amendment adversely effects

the siting process of power generation plants by raising the costs in South Dakota; this makes

---

[3] Because of Amendment E, FPL Energy would not pursue its 100 million-dollar
investment in South Dakota.

Case Number: 99-3018
Name of Document: Plaintiffs' Post-Trial Brief
Page 11

South Dakota locations less competitive. (T 600-601) Dr. Brown confirmed the testimony of
Mr. Bergstrom about the adverse impact on interstate commerce in the wind power aspect of the
power generation industry. (T 601) Additionally, Dr. Brown testified that the Amendment
created a loss of value for the Utility Plaintiffs at the Big Stone plant. (T 597) Finally, Dr.
Brown testified as to the adverse effects of the Amendment in the event "deregulation" might
occur.

In the case of Dr. Brown, the State attempted to limit, by motion, his testimony, but the
Court overruled the motion. Dr. Brown's testimony stands unrebutted.

Plaintiffs also presented the testimony of Dr. Luther Tweeten, an Iowa farm boy turned
internationally prominent agricultural economist. Dr. Tweeten testified that Amendment E
created many pernicious burdens on interstate commerce.

Dr. Tweeten testified, for example, that Amendment E obstructs and virtually eliminates
the practice of "production contracts" from the South Dakota livestock industry. (T 536) The
restriction of production contracts interferes with the flow of investment capital into agriculture
and, thereby, burdens interstate commerce. (T 537) Dr. Tweeten also testified that Amendment
E will negatively affect the national practice of vertical coordination and, thereby, burden
interstate commerce.[4] More generally, Dr. Tweeten's study lead him to conclude that the
Amendment will be counterproductive to the asserted goal of the Amendment: instead of

---

[4] Dr. Tweeten also opined that Amendment E denied farmers the types of nationally
common "tools" which give producers the flexibility to respond to a consumer-driven
marketplace. As such, Dr. Tweeten warned that Amendment E placed South Dakota
producers in the inflexible place of "a dinosaur" (T 616)

Case Number: 99-3018
Name of Document: Plaintiffs' Post-Trial Brief
Page 12

helping family farmers, the Amendment will actually be detrimental to the small family farm.  (T

553)  Dr. Tweeten summarized the "dual" effect of the Amendment on interstate commerce:

> "So, it's not just a matter of putting walls around to keep inputs out, nonqualifying
> corporations out of the state, we also inhibit ourselves from exporting to other states." (T
> 613)

None of Dr. Tweeten's conclusions were seriously challenged on cross-examination.[5]

The State did not even have a testimonial expert economist. Meanwhile, the Intervenors listed an

economist regarding the "dairy industry" as a trial witness, *but Intervenors never called the*

*witness.* Without expert testimony to rebut Dr. Tweeten and Dr. Brown, the Defendants cannot

seriously contest this issue.

In summary, the Plaintiffs presented compelling direct evidence and extensive expert

testimony that the Amendment's regulatory scheme adversely burdens interstate commerce.

Although Defendants had the opportunity, there was no record of refutation or rebuttal. Plaintiffs

contend that, under these circumstances, the Court should find that the Amendment burdens

interstate commerce and rule for the Plaintiffs on this issue.

III.     The Record Establishes That The State's Regulatory Scheme Is Discriminatory.

The first issue is whether the State's regulatory scheme is "discriminatory".  As detailed

in Plaintiffs' Pretrial Brief, Plaintiffs are entitled to pursue three theories of discrimination: (1)

facial discrimination; (2) discriminatory purpose; and (3) discriminatory effect.

---

[5] The Intervenors' cross-examination was able to bring out the unpleasant fact (from
Intervenors' perspective) that "small farms" are the worst managers of environmental
problems.

    A.    <u>Facial Discrimination</u>.

Plaintiffs will not repeat here their complete contention that Amendment E is facially discriminatory. For present purposes, it is sufficient to note that the determination of facial discrimination is a matter of law.

The livestock production industry is inherently interstate commerce. To the extent that Amendment E regulates the livestock production industry, the Amendment is inherently impacting interstate commerce. Based on the recent Supreme Court authorities such as <u>West Lynn Creamery, Inc. v. Healy</u>, 512 U.S. 186, 192 (1994), Plaintiffs contend that the Court should review the regulatory scheme as a whole (and not just the text of §21). Viewed as such, Amendment E is facially discriminatory.

<u>The Record Persuasively Demonstrates That The Amendment Was A Purposeful Discrimination</u>.

The Supreme Court decisions recognize that, even if a state regulation might be considered facially neutral, it still will be considered "discriminatory" if it were based on protectionist or other constitutionally impermissible purposes. The discriminatory purpose theory prevents a state from using clever or "ingenious" drafting to escape proper judicial scrutiny. Plaintiffs presented a variety of evidence regarding the protectionist purpose of Amendment E.

    1.    <u>The Official Ballot Statement: Amendment E's "Federalist Papers"</u>

Plaintiffs placed the state-sponsored explanatory pamphlet, Exhibit 19, in the record. (T 634) Commonly known as the "Pro Statement", Exhibit 19 is compelling evidence of discriminatory purpose. Under the governing Eighth Circuit precedent, <i>see</i> <u>SDDS, Inc. v. South</u>

Case Number: 99-3018
Name of Document: Plaintiffs' Post-Trial Brief
Page 14

<u>Dakota</u>, 47 F.3d at 263, 268 (8th Cir., 1995), *cert. den.* 523 U.S. 1118 (1998),  the Pro Statement

is sufficient for this Court to find that the proponents had a purpose to discriminate against

interstate commerce.

      The Pro Statement was drafted by the staff of Mr. Dennis Wiese, president of the South

Dakota Farmers Union.  (T 633)  The Pro Statement is candid about its protectionist goal:

protecting certain South Dakota livestock producers from the competitive forces of the interstate

marketplace.  The Pro Statement asserted that "Amendment E is needed to prevent corporations

from using interlocking boards and other anti-competitive ties <u>with the meatpacking industry

from limiting and then ending market access</u> for independent livestock producers".  (Ex. 19  1)

(emphasis supplied).  Even more flagrantly, the proponents stated that, unless the Amendment

would pass, "Desperately needed profits will be skimmed out of local economies and into the

pockets of distant corporations."  *Id.*  At trial, Mr. Wiese was asked about the "distant

corporations" phrase in Exhibit 19.

> "Q.    But, again, what I'm trying to emphasize to you is that so much of Amendment E
> dealt with out-of-state corporations, didn't it?  That was your whole intent here.
>
> Smithfield owned John Morrell, we were concerned what they might do in the
> state as well."

      In his trial testimony, Mr. Wiese elaborated—again, candidly—on the "evils" he was

addressing with the proposed amendment.  He stated that the proponents: "felt that when these

companies came in with large volumes of hogs it diminished the marketplace for those

independent producers thus displacing them." (T 634)  Moreover, Mr. Wiese made this

"admission" of impermissible purpose during his direct examination.

Case Number: 99-3018
Name of Document: Plaintiffs' Post-Trial Brief
Page 15

In sum, the Pro Statement, and the trial testimony explaining the climate regarding the

Pro Statement, are a candid presentation of the Amendment's purpose. Mr. Wiese deserves

credit for his candor—but he essentially conceded that the purpose of the Amendment was

economic protection of South Dakota producers. Such protectionism, of course, is

unconstitutional unless justified by the state's satisfaction of the strict scrutiny standard.

Plaintiffs contend that other "admissions" about discriminatory purpose are found in the

testimony of the Intervenors' lawyer, Ms. Thompson, and in the testimony of the State's expert,

Dr. Lobao. *See supra*, Part IA. Both Mr. Wiese and Ms. Thompson agree: from its start at the

Hog Meeting, the purpose of Amendment E was to exclude certain out-of-state entities from

South Dakota. Plaintiffs contend that, under the SDDS decision, the concessions of the Pro

Statement, bolstered by the trial testimony, are sufficient to establish the Plaintiffs discriminatory

purpose theory. The record is replete with protectionism. The Amendment's purpose was to

protect certain South Dakota producers against out-of-state competitors.

    2.    Evidence of the "Climate" Concerning the Development of Amendment E
            Demonstrates Impermissible Purpose.

In pursuing the theory that Amendment E was motivated by discriminatory purposes,

Plaintiffs were permitted, under applicable authorities, to submit evidence regarding the

"climate" surrounding the adoption of the Amendment (to use the Court's term). The Plaintiffs

developed the record of discriminatory purpose with six types of evidence: (1) effect or impact

on interstate commerce; (2) the historical background of the Amendment; (3) the sequence of

events forming the development of the Amendment; (4) departures from normal procedures in its

development; (5) the "legislative history" of the Amendment; and (6) testimony from the drafters

or other decision-makers.[6]  From this record, the following story emerges; as in <u>SDDS</u>, it is "brimming" with protectionism.  <u>SDDS</u>, 47 F.3d at 268.

The Intervenors, along with the South Dakota Farmers Union, were the primary proponents of the Amendment.  As the Court observed, they were "frustrated" by their lack of success in the South Dakota Legislature.  The proponents called a meeting for March 24, 1997 in Pierre.  The invitation read:

### "HOG MEETING

You are invited to a meeting to finalize plans for the

**Corporate, contract, concentrated hog factory initiative."**

*See* Ex. 25 at 5.  The proponents could not have been more explicit: they planned to stop "corporate" entities involved in the hog production industry, and this necessarily attacked interstate commerce.

From this March 24 meeting, the sequence of events was strikingly rapid.  The proponents completed drafting Amendment E in less than six weeks.[7]  (T 245)  The proponents' haste was caused by the need to have the proposed amendment certified by the Secretary of State and the requisite initiative petitions submitted by November 1997 (one year in advance of the November 1998 election).

---

[6] As at the trial, Plaintiffs disclaim any reliance on the "subjective intentions" of the drafters.

[7] Plaintiffs contend that, in light of the complex issues at stake, this "speed" was reckless.

The next significant event occurred when the proponents appointed a Drafting Committee that held its first meeting on March 25, 1997. *See* Ex. 36. The Drafting Committee was composed of five members, only one of which was a lawyer (Mr. Jay Davis). Ms. Luann Napton was the recording secretary.[8] At the March 25 meeting, Mr. Davis, the lawyer, warned the Committee that the proposed initiative raised "Commerce Clause" problems. Mr. Davis said, "The problem with [the eventual Amendment] is that it might be struck down for violating the Commerce Clause." (Ex. 36) Ms. Napton dutifully recorded the "Davis warning" and distributed it. Although the Committee was, therefore, put on notice about potential dormant commerce clause concerns, the Committee did nothing about this "problem".

The next event is the Committee's hiring of a Nebraska lawyer, Ms. Nancy Thompson, on April 1, 1997. The Committee continued to ignore the Davis warning and apparently relied on the legal advice of Ms. Thompson. Ms. Thompson, however, did nothing about dormant commerce clause "problems".[9]

Under time pressure, only three drafts of Amendment E were prepared by Ms. Thompson. (T 227). Meanwhile, one Committee member, Ms. Rene Morog, engaged in some additional research. Ms. Morog, the only Committee member who actually "farmed", contacted a rural sociologist at the University of Iowa, Dr. Kendall Thu, and she had him review a draft amendment. (T 416) Dr. Thu responded and warned Ms. Morog that the draft amendment had

---

[8] Ms. Napton was essentially the "James Madison" of this drafting process. Napton's Minutes, like Madison's famous "Notes", are compelling evidence of discriminatory purpose.

[9] If Ms. Thompson, or others on the Committee, had some explanation for why they ignored the various warnings, they failed to make any record at trial.

Case Number: 99-3018
Name of Document: Plaintiffs' Post-Trial Brief
Page 18

many problems. *See* Ex. 4. Ms. Morog communicated the "Thu warning" to the rest of the

Committee. (T 47). The Committee, however, ignored the Thu warning, just as it had ignored

the Davis warning.

The next event also related to Ms. Morog's research efforts. She contacted Dr. Neil Harl,

a prominent agricultural economist at Iowa State University. Ms. Morog had

Dr. Harl review a draft. Dr. Harl sent Ms. Morog a fax with his comments and concerns. (Ex.

54) Dr. Harl, like Dr. Thu and Mr. Davis, warned about various problems. Dr. Harl specifically

identified that the proposed amendment would constitute a "complete" ban on the flow of

investment capital to South Dakota agriculture. *See* Ex. 54 at 2; Ex. 5.

As the Court may recall, the State's sociologist, Dr. Heffernan, testified that he

considered that Dr. Harl would be "authoritative" and that Heffernan would rely on Harl's

advice. (T 847) But, the Amendment's proponents ignored the Harl warning about the effect of

the Amendment on the flow of investment capital.

In April, 1997, driven by their frustration and their hostility to out-of-state corporate

agribusiness entities, the Hog Meeting Group again assembled and voted to approve a draft. (Ex.

3 3) The Amendment was submitted to the Secretary of State and, with only minor changes,

appeared on the initiative petitions.

This sequence of events and this legislative history are certainly relevant and admissible

to the issue of purpose. The proponents of the Amendment acted with great haste. The

proponents received at least three warnings from lawyers, sociologists and economists about the

unconstitutional effect of the Amendment. It is submitted this Court should find that the

Case Number: 99-3018
Name of Document: Plaintiffs' Post-Trial Brief
Page 19

proponents had knowledge of the dormant commerce clause "problems" with their proposed

Amendment, but that the proponents ignored the advice.

Plaintiffs do not presently contend that the proponents were required to seek "expert"

advice (although a prudent person would). While the proponents may not have had an obligation

to seek expert advice, it was reckless of them to ignore the advice they received. Plaintiffs

contend that, when the proponents received expert advice (for free) and then ignored it, this is

evidence of their purpose to raise a wall around South Dakota agriculture. Taken together with

the Pro Statement, the haste and recklessness of the proponents, as recorded in the Drafting

Committee's own notes, demonstrates that the Amendment was designed for a discriminatory

purpose. *See* SDDS, 47 F.3d. at 270.

    C.    Discriminatory Effect

Plaintiffs have presented evidence that, even if Amendment E was not motivated by

discriminatory purposes, it has a discriminatory effect on interstate commerce. The case law

recognizes the "discrimination by effect" theory. *See* Plaintiffs' Pretrial Brief. The

discriminatory effect theory is premised upon the commonly understood principle that an actor

(including a State) is presumed to intend the consequences that flow from the actor's conduct.

When a state regulation has a discriminatory effect, the Court may permissibly infer that the actor

(State) intended the consequences of its actions.

Much of the evidence regarding burden on interstate commerce, *see* Part II, above, also

demonstrates that the burden was "discriminatory". For that reason, it will not be reiterated here.

In light of the page limits, a few examples must suffice.

Amendment E increases, for example, the costs of transmission easements in South Dakota for the Utility Plaintiffs when compared to the costs in adjoining states served by Otter Tail. Thus, Otter Tail will understandably (and reasonably) look to these other states for expansion of its business. As such, interstate commerce is consequently affected adversely.

Another part of the Amendment E scheme also creates an effect discriminatory on interstate commerce. Section 22(1)—the so-called family farm corporation exception—operates as a de facto discrimination against out-of-state persons. Section 22(1) requires a person to either live on the farm or to do "both daily and routine substantial physical exertion and administration". An out-of-state resident, like Plaintiff Holben, cannot satisfy either criterion. (T 254) For this reason, the operation of the Section 22(1) exception discriminates against out-of-state residents involved in interstate commerce.

Other examples abound. For present purposes, the failure of the State or Intervenors to have expert testimony to rebut this issue should be considered as a significant default. In sum, the Amendment's regulatory scheme has a discriminatory effect on interstate commerce.

Under each of the three theories, and cumulatively, this Court should find that the Amendment's regulatory scheme was discriminatory. Hence, this Court should test the regulatory scheme against the strict scrutiny standard.

IV.     The Amendment Fails All Applicable Standards

Although space limitations require that the Plaintiffs abbreviate their argument, the following discussion, set in the context of the undue burden standard, should not obscure

Case Number: 99-3018
Name of Document: Plaintiffs' Post-Trial Brief
Page 21

Plaintiffs' primary argument. Plaintiffs contend that the Amendment "discriminates" against

interstate commerce. Under the existing doctrine, therefore, the State must satisfy strict scrutiny.

      A.      The Strict Scrutiny Standard Is Failed.

      The State cannot meet the strict scrutiny test. First, none of the governmental interests is

"compelling" even though they may be arguably "legitimate". Additionally, the State has not

shown that the means (*i.e.*, the Amendment) is the least drastic alternative for achieving any

compelling interest. There are many alternatives available, and the State's failure to utilize them

means that the State fails the strict scrutiny test.

      B.      The State Fails the "Undue Burden" Standard

      If the Amendment would be deemed "nondiscriminatory, then the applicable standard is

the "undue burden" test. *E.g.*, Bendix Autolite Corp. v. Midwesco Enterprises, 486 U.S. 888,

889 (1988). There are three elements: (1) the extent of the burden on interstate commerce; (2)

the weight of the purported nondiscriminatory state interest; and (3) the State's alternative

means. Plaintiffs will discuss each element in light of the record here.

      1.      The Plaintiffs Satisfy the "Burden" Element

      The Plaintiffs have the burden of proof to show the extent of the burden on interstate

commerce. As described in Part II, above, Plaintiffs have satisfied that element. The

Amendment has a suppressive and profoundly negative impact on interstate commerce.

      2.      The State Failed the Burden of Proof on the Local Benefit Element.

      The State and the Intervenors have tried to defend the Amendment based on two asserted

"local benefits" of the Amendment. Plaintiffs will address each alleged state interest.

Case Number: 99-3018
Name of Document: Plaintiffs' Post-Trial Brief
Page 22

### The Family Farm Interest

The State sought to defend the Amendment as a means to protect small family farms. The State's record was based on two sociologists, testifying as experts. (The State did not offer any other evidence; the State did not present, for example, an economist.) The sociologists were designed as a "two step" argument. Dr. Heffernan talked about the "evils" of concentration in the food processing industry. Under the State's theory, the evils of concentration are carried over as "harm" to rural communities by Dr. Lobao's testimony about the harm caused by "industrialized farming".

The State's problem here is that the State's experts did not establish in any way that a ban on *corporate business structure* actually was related to preserving family farms.   Dr. Heffernan testified that concentration in the food processing industry harmed some poultry farmers in Louisiana, *but he never established that any such harm arose from the business use of corporate business structures.* Dr. Lobao attempted to connect the nature of the farming unit ("industrialized farms") with some harm to rural communities. But, Dr. Lobao had no basis to opine that the corporate business structure of farms was connected to any harm to South Dakota rural communities because she had never studied "corporate farming".

Ironically, Dr. Lobao's research actually established that, in the region of the country including South Dakota, the presence of "industrialized farms" was associated with "better economic conditions" for family farms. (T 503) She also testified that, in areas such as South Dakota, "Small farming units impoverish localities . . . ." (T 503) The State's expert, therefore, did not support the State's theory. Dr. Lobao, in essence, supported Plaintiffs' position.

On the record at trial, Dr. Lobao did not establish any link between corporate business structures and harm to rural communities. And, without Dr. Lobao, the State cannot link whatever Dr. Heffernan's "food processing concentration" theory may be with any harm to South Dakota's farmers.

In sum, Plaintiffs contend that, on the record, the State's asserted family farm interest does not satisfy its burden. As in the AMI decision, this failure of proof must be held against the State. *See* American Meat Institute v. Barnett, 64 F.Supp.2d 906, 921 ¶51 (D.S.D. 1999).

    b.  The "Manure Lagoon" Interest

The State also failed to establish that its asserted interest in preventing water pollution from manure lagoon spills was more than theoretical. Neither the State nor the Intervenors presented any evidence about any manure lagoon problems in South Dakota. This was a critical omission. Without some proof, the Court should conclude that the manure lagoon interest was essentially illusory. *See* AMI, 64 F.Supp.2d at 921.

    3.  The State Failed To Demonstrate That It Lacked Alternative Means.

Under the Hunt decision, the State had the burden to show "the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake". *Id.,* Hunt v. Wash. State Apple Advertising Comm., 432 U.S. 333, 353 (1977). Neither the State nor the Intervenors made any showing that alternatives were not available. (Of course, alternatives such as regulating based on farm "size" or even the "industrialized nature" of a farm were available.) Since the State failed its burden here, the Court should follow controlling Supreme Court precedent and rule for Plaintiffs. *See* Bendix Autolite, 486 U.S. at 895.

Case Number: 99-3018
Name of Document: Plaintiffs' Post-Trial Brief
Page 24

    4.    <u>Conclusion</u>.

In sum, while the Plaintiffs satisfied the element where it had the burden, the Stated failed its burden regarding the purported "local interests" and its burden on "alternative means". Therefore, even if the Court would use the undue burden standard, the Court should rule for Plaintiffs.

V.    <u>Conclusion</u>.

The record conclusively establishes that, on the issues of "burden" and "discrimination", Plaintiffs satisfied their burden of proof. In contrast, the State and the Intervenors have not established that their alleged interests are more than illusory. They also failed to show that the means selected were appropriately tailored to the alleged ends. The Defendants, therefore, failed their burden under both the undue burden and strict scrutiny standards.

The Court should conclude that, in purpose and effect, Amendment E was designed to exclude certain parts of interstate commerce from South Dakota *and* to protect small in-state agricultural interests from the competition of interstate commerce. For both reasons, Amendment E is unconstitutional under the dormant commerce clause and the other doctrines.

Under the controlling Supreme Court doctrine and the record established at trial, the Court should grant Plaintiffs' the requested declaratory relief, enjoin the Amendment's enforcement and grant such other relief as may be appropriate.

Dated this 12th day of February, 2002.

Case Number: 99-3018
Name of Document: Plaintiffs' Post-Trial Brief
Page 25

WOODS, FULLER, SHULTZ & SMITH P.C.

By _____

Richard O. Gregerson
Susan M. Sabers
Post Office Box 5027
300 South Phillips Avenue, Suite 300
Sioux Falls, South Dakota 57117-5027
(605) 336-3890
Attorneys for Plaintiffs South Dakota Farm
Bureau, Inc.; South Dakota Sheep Growers
Association; Haverhals Feedlot, Inc.; Sjovall
Feedyard, Inc.; Frank D. Brost; Donald Tesch
and William A. Aeschlimann

And

Professor David S. Day
315 Forest Avenue
Vermillion, SD 57069

SPEAR H RANCH & MARSTON HOLBEN
Represented by:
Thomas P. Tonner
Post Office Box 1456
Aberdeen, South Dakota 57401
(605) 225-1000

And

MONTANA-DAKOTA UTILITIES CO.,
NORTHWESTERN PUBLIC SERVICE &
OTTER TAIL POWER COMPANY
Represented by:
David A. Gerdes
May, Adam, Gerdes & Thompson, LLP
503 South Pierre Street
Post Office Box 160
Pierre, South Dakota 57501
(605) 224-8803